UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ANDREW LEISE,

              Plaintiff,

    v.

VERMONT HUMAN RIGHTS
COMMISSION, KEVIN CHRISTIE, BOR
YANG, DA CAPO PUBLISHING, INC.,
JOHN AND JANE DOE I-X,
              Defendants.

Docket No. 2:22-cv-00009

## VERMONT HUMAN RIGHTS COMMISSION, KEVIN CHRISTIE, AND BOR YANG'S MOTION TO DISMISS

NOW COME Defendants Vermont Human Rights Commission ("HRC"), Kevin

Christie ("Christie"), and Bor Yang ("Yang") (collectively the "HRC Defendants"), by and

through their undersigned attorneys and hereby move this Court to dismiss Plaintiff's

Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## MEMORANDUM OF LAW

### I.    FACTS

Plaintiff has been a Vermont State Police officer for nearly 22 years. (Complaint, ¶

1).[1] He asserts six claims in this action against the HRC, as well as Christie and Yang in their

individual and official capacities. The first three claims are constitutional due process claims

brought under 42 U.S.C. § 1983 ("Section 1983") (¶¶ 107-152). The remaining three are

---

[1] For purposes of this motion, the HRC Defendants assume the truth of the facts alleged. "¶" refers to paragraphs in the Complaint (Doc. 1).

claims based in state law for invasion of privacy (¶¶ 153-56), defamation (¶¶ 157-60), and tortious interference with contract. (¶¶ 161-63).

These claims all arise from Plaintiff's and other VSP troopers' responses to a dispute between Dr. Lydia Clemmons and a tenant between September 2017 and December 2017. The Complaint alleges that a tenant moved onto the Clemmons Family Farm in Charlotte, Vermont, which is owned and operated by Dr. Clemmons, a black woman. (¶¶ 20-21). On September 18, 2017, the tenant paid his security deposit in silver coins. (¶ 21). Dr. Clemmons thought this was unusual, suspected they were stolen, and reported them to the police. (¶ 21) Based on Dr. Clemmons' report, several days later the police arrested the tenant for stealing the coins, a criminal complaint was filed in Windsor County Criminal Court, and he was released with conditions of release. (¶¶ 21, 22). Therefore, Dr. Clemmons was a key witness in a criminal case for the tenant living on her property.

The relationship between Dr. Clemmons, her family, and the tenant deteriorated quickly. Between September 2017 and December 2017, Dr. Clemmons, members of her family, and the tenant all contacted the VSP. (¶ 20; *see generally* Final Determination, Exhibit 1)[2] Dr. Clemmons called the VSP to report the tenant's near-continuous violations of his conditions of release, damage he caused to property, theft, and more erratic behavior that made Dr. Clemmons feel unsafe, such as leaving axes, guns, and other weapons throughout the property. Plaintiff was one of the state troopers who responded to these calls. (¶ 20).

Dr. Clemmons filed a complaint January 26, 2018 with the HRC alleging that the VSP, a predominantly white force (¶ 2), discriminated against her on the basis of her race and

---

[2] The Court may consider the Final Determination (Ex. 1), which includes the Investigative Report, because it is an integral part of the Complaint. *See infra*, Section II.A.

gender when responding to these disputes. (¶¶ 1, 20). When it received Dr. Clemmons's complaint, an HRC employee investigated the claim. The investigation took nearly three years, during which time the investigator reviewed (i) court documents in related criminal and civil proceedings involving Dr. Clemmons and the tenant; (ii) nearly 25 incident reports involving calls from the Clemmons' and the tenant and nearly 65 calls for assistance; (iii) emails from various VSP employees, including Plaintiff; and (iv) interviews of 14 people involved, including Plaintiff. (¶ 3; Exhibit 1). Plaintiff claims the HRC "reached a conclusion by July 2020"—before the investigation and the investigative report were finalized—that there were not reasonable grounds to find discrimination. (¶¶ 3, 93). But at this time the investigation was not finished. What Plaintiff erroneously refers to as the "First Report" was merely a preliminary memorandum, written prior to a review of the entire record and months in advance of submitting a first draft of the investigative report. *See* Exhibit 2, available at https://vsp.vermont.gov/sites/vsp/files/documents/Memo%20071620_Redacted.pdf (last accessed Mar. 31, 2022). When the investigation really did conclude, the 109-page Final Determination—including the Investigative Report dated November 10, 2020, the one and only official report that was prepared in this case—that recommended there were reasonable grounds to find that the DPS/VSP discriminated against Dr. Clemmons based on her race and gender. (¶¶ 4, 10). The HRC Commissioners agreed, and voted on March 25, 2021 that there were grounds to believe discrimination occurred. (¶ 3; Exhibit 1).

Plaintiff, a witness in the aforementioned HRC matter, disagrees with the Commissioners' conclusion. He asserts throughout the Complaint that the Investigative Report falsely labeled him "as a racist." (¶¶ 2, 6, 11, 12, 112, 127, 132-34, 141, 147, 148, 155, 159). The assertion is false. The HRC, Yang, and Christie make no such claim. No such label

was employed nor that term used. In fact, the term does not appear anywhere in any document, communication or statement by the HRC Defendants.[3] Absent specific factual allegations, Plaintiff alleges that the "HRC's leadership manipulated and falsified" the evidence to "reverse the conclusions and generate an investigative report that recommended a finding of discrimination." (¶ 3). Plaintiff speculates that the HRC's leadership did this to "politically promote itself as aligned with national movements such as Black Lives Matter." (¶ 2).

The Complaint alleges that Seven Days requested that Yang provide it with the Investigative Report (¶ 115). On June 10, 2021, Yang provided the Investigative Report to Seven Days. (¶ 4). Without any factual basis that Yang had any relationship or even knew of any staff member of Seven Days, Plaintiff imagines that Yang provided Seven Days the Investigative Report "in exchange for favorable media coverage" that would "promote HRC's leadership, shape public opinion against VSP and its troopers, and eliminate scrutiny of the Investigative Report[.]" (¶¶ 4-5). Plaintiff alleges Yang "intended to humiliate and harm the individual troopers" named in the report because she did not redact their names. (¶ 4).

On June 23, 2021, Seven Days published an article about the investigation entitled "Vermont State Police Discriminated Against Black Woman Who Runs Clemmons Family Farm, Commission Says." (¶5). Seven Days posted the Investigative Report in its entirety online with the article. (¶ 6). The Complaint also alleges that the HRC "knew that the average reader would not closely review the lengthy Investigative Report to find its flaws and inconsistencies." (¶ 10).

---

[3] The HRC Defendants also did not call him a "sexist," though the Investigative Report did find reasonable grounds to believe the VSP discriminated on the basis of gender. Plaintiff does not seem terribly concerned about that finding.

That same day the Department of Public Safety released a statement that the VSP posted on their website expressing support for the troopers involved in the Clemmons matter. *Statement of the Department of Public Safety on the Findings of the Human Rights Commission in March 2021*, available at https://vsp.vermont.gov/public/June2021statement (last accessed Mar. 31, 2022). The Department of Public Safety indicated it was aware of the HRC report and findings, but that it was "confident that the services provided by our staff [the VSP] in these cases were professional and appropriate." The statement also noted that the Department of Public Safety "strongly believes that the involved troopers did not discriminate on any basis in the provisions of law enforcement services." Commissioner Michael Schirling "expressed concern that the case remained unpublished, despite the fact that the decision was critical of VSP." Although it did not publish the Investigative Report, the posting provided links to VSP incident reports, emails relevant to the dispute, the preliminary status mem from the HRC, and a DPS memoranda to the HRC.

Plaintiff claims that the (fictitious) public label of a "racist" (a label the HRC Defendants did not apply) damaged his good name, deprived him of his ability to work as a trooper, and has effectively ended his career. (¶¶ 112, 113, 133).  However, he does not allege the VSP has taken any adverse employment action against him or that he has quit because of the Investigative Report or the Seven Days article. He is coy about his actual employment status, but claims he has been unable to return to work as a VSP trooper and has lost income. (¶¶ 134, 141).

II.     LEGAL ARGUMENT

A.      Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss claims when a plaintiff fails to state a claim on which relief can be granted. To survive a motion to dismiss in

a civil case, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "To be plausible, the complaint need not show a probability of plaintiff's success, but it must evidence more than a mere possibility of a right to relief." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192 (2d Cir. 2013). Although a court accepts as true a plaintiff's factual allegations and draws all reasonable inferences in the plaintiff's favor, this benefit does not apply to legal conclusions, and "threadbare recitals of the elements of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663; *Gadreault v. Grearson*, 2011 WL 4915746, *4 (D. Vt. 2011). In determining whether a plaintiff has stated a plausible claim for relief, the court may "draw on its experience and common sense." *Iqbal*, 556 U.S. 664. Allegations that are "mere conclusions are not entitled to the assumption of truth." *Id.*

Without converting a motion to dismiss to one for summary judgment, the court may consider matters outside of the four corners of the complaint, such as matters incorporated by reference or integral to the claim, and items subject to judicial notice. "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Tessler v. Paterson,* 451 F. App'x 30, 32 (2d Cir. 2011) (citation and quotation marks omitted). "When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the Complaint, documents that [plaintiff] relied on in bringing suit and that are either in his possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken." *Jamil v. Vermont Attorney General's Office*, 2015 WL 475452, *2 (D. Vt. Feb. 4, 2015), *citing*

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  Under this standard, the following documents may therefore be considered by the court in this Motion to Dismiss (1) Exhibit 1, the Final Determination, which includes the Investigative Report; (2) Exhibit 2, the preliminary status memorandum sent by the HRC investigator to Lydia Clemmons (what Plaintiff refers to as the "First Report"); (3) the Seven Days article; and (4) government documents posted on official government websites.[4]

> B.   The Human Rights Commission, and Defendants Christie and Yang in their Official Capacities Are Immune From Suit Under the 11th Amendment, and All Claims Against Them Must Be Dismissed

The HRC Defendants are state actors immune from suit in federal court under the 11th Amendment of the U.S. Constitution, and all claims asserted against them must be dismissed. The 11th Amendment states that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Unless a state unequivocally waives its immunity, the 11th Amendment bars suits for damages in federal court against state governments, its agencies, and officials. *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122-23 (2d Cir. 2020) (affirming dismissal of suit against judges because "a state official sued in his official capacity is entitled to invoke Eleventh Amendment immunity from a claim for damages"); *Farricielli v. Holbrook*, 215 F.3d 241, 244-45 (2d Cir. 2000) (11th Amendment "immunity also protects a state from suits brought by its own citizens, such as this one, and extends to state officers who act on behalf of the state") Vermont has expressly retained its Eleventh Amendment immunity. 12 V.S.A. § 5601(g)

---

[4] The Court may take judicial notice of government documents that are published in their entirety on the State of Vermont's official website. *Cangemi v. United States*, 13 F.4th 115, 124 n.4 (taking judicial notice of government website, draft feasibility report published on website, and final report available on website).

("Nothing in this chapter waives the rights of the state under the 11th Amendment of the United States Constitution.").

The HRC is entitled to this immunity because it is a state actor. The HRC is an agency established by statute. *See generally* 9 V.S.A. ch. 141; 9 V.S.A. § 4551(a); *see also* ¶¶ 14, 109. The 2021 Fiscal Year State of Vermont Executive Budget Recommendation ("Budget Recommendation"), identifies the HRC as "Other Boards and Commissions" of the Executive Branch, and refers to the HRC as a "state agency having jurisdiction over claims of unlawful discrimination in housing, state government employment, and the provision of goods and services by places of public accommodation." https://finance.vermont.gov/sites/finance/files/FY2021%20Executive%20Budget%20Book.pdf (last accessed Mar. 31, 2022). The State of Vermont provides a budget for the HRC, most of which comes from state funds. *Id.* at 274, 581.

Christie is one of five HRC commissioners appointed by the Governor pursuant to 9 V.S.A. § 4551(a). The commissioners receive compensation from the State. 9 V.S.A. § 4551(d). The Commission appointed Yang as Executive Director, who "oversee[s] the day-to-day operations of the agency and its staff." Vt. Amin. Code 11-1-1, Rules of the Vermont Human Rights Commission (hereinafter "HRC Rule"), Rule 1(e). Yang and five other HRC employees are classified as full-time state employees. Budget Recommendation, 582-86. Unless there is a conflict of interest, the State's Office of the Attorney General, represents the HRC in litigation. *See e.g., Miller v. Human Rights Commission*, Case NO. 21-CV-02936 and *Miller v. Horwitz*, 21-CV-02935 (dockets attached as Exhibits 3 & 4).

Given these considerations, the United States District Court for the District of Vermont has held that the HRC is a state actor immune from suit in federal court under the

11th Amendment. In *Jamil v. Vermont Attorney General's Office*, 2015 WL 475452 (D. Vt. Feb. 4, 2015), the plaintiff sued the HRC for Section 1983 violations. *Id*., at *1. The Court granted the HRC's motion to dismiss for failure to state a claim and held that because the HRC had not waived its 11th Amendment immunity, it is "entitled to immunity from suit in federal court," and this immunity "cannot be overcome in federal court." *Id*., at *7. The Court's finding in *Jamil* was consistent with controlling Second Circuit precedent. In *Baba v. Japan Travel Bureau International, Inc.*, 111 F.3d 2 (2d Cir. 1997), the Second Circuit affirmed the district court's dismissal of the plaintiff's federal due process claims against the New York Department of Human Rights ("DHR"), a sister organization of Vermont HRC, based on his disagreement with the agency's administrative determination.  The Second Circuit held that the plaintiff's claims against the DHR "are barred by the Eleventh Amendment" and stated it is "beyond cavil that the Eleventh Amendment bars" suits seeking "equitable and legal relief for past conduct against a state agency[.]" *Id*., at 5.

Second Circuit precedent not only supports the grant of 11th Amendment immunity to the HRC but also clearly establishes that its officials are similarly immune from suit for money damages in federal court. In *White v. Martin*, 26 F. Supp. 2d 385 (D. Conn. 1998), *affirmed sub nom White v. Commission on Human Rights and Opportunities*, 198 F.3d 235 (2d Cir. 1999), a complainant sued the former executive director of the Connecticut Commission on Human Rights and Opportunities ("CHRO"), the acting regional manager of the CHRO, and the CHRO investigator who investigated his claim, for, among other things, violations of Section 1983. *Id*. at 386. The plaintiff filed a complaint with CHRO alleging gender-based discrimination, and after an investigator issued an interim report finding there to be reasonable cause for discrimination, the CHRO reversed course and its final report

concluded there was no reasonable cause for discrimination. *Id.*, at 386-87. In a case remarkably similar to the instant matter, the plaintiff in *White* claimed that CHRO's change in findings "deprived him of his constitutional rights to due process and equal protection." *Id*. at 387. The court granted the CHRO defendants' motion to dismiss and held that all claims against them "in their official capacities are barred by the Eleventh Amendment." *Id.*, at 388. On appeal, the Second Circuit affirmed, holding that "sovereign immunity shielded CHRO defendants from the claims against them in their official capacities." *White*, 198 F.3d 235. *See also Nadimi v. Brown,* 8 F. App'x. 122, 125 (2d Cir. 2001) ("to the extent that defendants [Connecticut CHRO and its regional director and deputy director] were being sued in their official capacities, the claims for damages and retroactive injunctive relief were barred under the sovereign immunity doctrine of the Eleventh Amendment."); *Langston v. UFCW Local 919*, 2019 WL 6839336, at *1, *4 (D. Conn. Dec. 16, 2019) (dismissing racial discrimination claim against CHRO because "any claim for money damages" against it "as an instrumentality of the State of Connecticut is barred by the Eleventh Amendment.")

Consistent with the holdings in *White* and *Jamil*, the claims against the HRC, Yang in her official capacity, and Christie in his official capacity, must be dismissed under the 11th Amendment. All three are state actors: one is a state agency, Christie is an executive branch appointee, and Yang is the executive director of a state agency and a state employee. This Court should follow *Jamil*, a decision that involves the same agency and identical issues, and dismiss the HRC Defendants because they are immune from suit under the 11th Amendment.

C.     Defendants HRC, Christie and Yang Are Entitled to Absolute Immunity for Their Conduct Related to HRC, and All Claims Against Them, Including in Their Official and Individual Capacities, Must be Dismissed

The HRC Defendants enjoy quasi-judicial immunity for their conduct relating to the HRC and are absolutely immune from Plaintiff's claims. All claims against them, including in their individual capacities, must be dismissed.

Quasi-judicial immunity is a subcategory of judicial immunity. Judicial immunity provides that judges are absolutely immune from claims arising from their judicial function. *Stump v. Sparkman*, 435 U.S. 349 (1978) (finding judges absolutely immune from Section 1983 damages action for their "judicial" acts).  Courts have expanded judicial immunity to protect individuals operating in a quasi-judicial capacity. The Second Circuit has held that whether "non-judicial officers merit quasi-judicial absolute immunity depends upon the 'functional comparability of their judgments to those of the judge.'" *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994), *cert. denied*, 514 U.S. 1102 (1995) (*citing Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976). Courts consider six factors when analyzing an individual's functional comparability to a judge: (i) the need to assure that the individual can perform his functions without harassment or intimidation; (ii) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct, (iii) insulation from political influence; (iv) the importance of precedent; (v) the adversary nature of the process; and (vi) the correctability of the error on appeal. *Young*, 41 F.3d at 51. On balance these factors weigh in favor of finding the HRC Defendants are absolutely immune from suit.

The HRC is a quasi-judicial state agency. It is tasked with investigating and enforcing "unlawful discrimination in violation of chapter 139 of this tile discrimination in public accommodations and rental and sale of real estate." 9 V.S.A. § 4552. This chapter, known as

the Vermont Fair Housing and Public Accommodations Act, provides a statutory scheme that grants the HRC authority to investigative and enforce the law. The investigatory process starts when a person files a complaint with the HRC. 9 V.S.A. § 4554(a). If the complaint states a prima facie case, the HRC or its representative may accept it for investigation. *Id.* The HRC conducts an investigation to determine "whether there are reasonable grounds to believe that unlawful discrimination has occurred." 9 V.S.A. § 4554(c). As part of this investigation, the HRC may review documents, conduct site visits, and "take and record the testimony or statements of such persons as are reasonably necessary." *Id.* "When an investigation has been completed, an investigative report shall be prepared and submitted to the executive director for approval. The investigative report shall contain a listing of documents reviewed, witnesses interviewed, a statement of facts, a legal analysis, and a preliminary recommendation to the commissioners." HRC Rule 21. The HRC sends the Investigative Report to the parties, who may submit written responses. The matter is then scheduled for discussion at a Commission meeting, where the parties have an opportunity to present an oral argument and answer questions. HRC Rule 28. The HRC then makes a final determination. If the commissioners find there are reasonable grounds that discrimination may have occurred, then the HRC tries to negotiate a resolution between the parties. 9 V.S.A. § 4554(d). If none is reached, the HRC may file suit in state court. 9 V.S.A. §§ 4554(d); 4553.

Alternatively, the HRC Defendants are absolutely immune from suit because they enjoy prosecutorial immunity. It is well established that prosecutorial functions such as evaluating evidence, preparing a case for presentation at trial, or evaluating evidence and interviewing witnesses, are entitled to absolute immunity. *Buckley v. Fitzsimmons,* 509 U.S. 259, 273–74 (1993) (noting that those acts undertaken "must include the professional

evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made"); *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir.1998) (commenting that the Supreme Court "has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line") (quoting *Buckley*, 509 U.S. at 273 )). The Second Circuit has extended prosecutorial immunity to protect agency attorneys during administrative proceedings, such as HRC lawyers. *Rudow v. City of New York*, 822 F.2d 324, 327-28 (2d Cir. 1987) (finding New York HRC lawyer's conduct was "quintessentially prosecutorial in nature"). This absolute prosecutorial immunity applies where the conduct is "colorably prosecutorial in nature" and it "must not be undertaken in the clear absence of jurisdiction." *Id*., at 328.

Where, as here, an individual asserts claims against a human rights commission and its representatives because they are dissatisfied with the outcome of an investigation, courts have found that quasi-judicial and quasi-prosecutorial immunity bar such claims. Like Plaintiff in this case, the plaintiff in *White* brought suit in federal court because he was dissatisfied with the outcome of the Connecticut CHRO's investigation. The CHRO operated much like the HRC: Connecticut had a comprehensive investigatory scheme designed to remedy illegal discriminatory practices; there were detailed procedures for complaint reviews and investigations, the CHRO had the right to make reasonable cause and no reasonable cause determinations; the CHRO had authority to pursue claims in state court; and that start courts could review a CHRO decision. 26 F. Supp. 2d at 388-89. The CHRO's "finding of no reasonable cause and their decision not to prosecute plaintiff's claim are clearly quasi-judicial functions entitled to absolute immunity." *Id*. at 390. The CHRO and its officials were

therefore "entitled to absolute immunity as to plaintiff's section 1983 [claims] against them with respect to their quasi-judicial functions." *Id*. Further, "as part of the … administrative scheme for enforcing the antidiscrimination laws, these defendants must be permitted to perform their duties without the threat of individual liability for damages. …. Thus the CHRO defendants' reasonable cause determinations were acts made by them in their capacity as officers of the CHRO and were adjudicatory functions entitled to absolute immunity." *Id*. The Second Circuit affirmed this decision, finding that "what plaintiff is challenging is the CHRO's decision-making process and the decisions themselves, and that the CHRO defendants are protected from such challenges by the doctrine of absolute immunity." *White*, 198 F.3d 235.

This same reasoning supporting quasi-judicial and prosecutorial immunity applies to the HRC Defendants. The HRC investigates claims, issues an investigative report identifying the facts revealed in its investigation, and applies the law to the facts. As in Connecticut, the Vermont Fair Housing and Public Accommodations Act provides a statutory scheme under which the HRC investigates and enforces the statute. For HRC to perform its statutory mandate, it is essential that it exercise its authority without threat of liability for damages. Issues of discrimination, especially when centered around topics like race and gender, are often controversial. Recipients of adverse determinations, like Plaintiff's employer, commonly disagree with the findings. HRC, including its commissioners and employees, simply cannot do their jobs as required by statute if every disgruntled subject can sue for damages. This is precisely the basis for immunizing quasi-judicial acts, so that government adjudicative bodies can make the judgments required of them without exposing themselves and their employees to liability. It would set a dangerous precedent to allow individuals,

especially witnesses, who disagree with the HRC's conclusions to pursue damages against the agency and its employees. *See Young*, 41 F.3d 47. Lastly, the HRC's conclusions are not final legal determinations. The HRC has no legal authority to assess fines or issue declaratory or injunctive relief. A finding of reasonable grounds merely authorizes the agency to file suit, in which event its conclusions and recommendations are reviewed anew by a superior court, and potentially again on appeal to the Vermont Supreme Court. *Id.* at 54(identifying reviewability as a factor supporting quasi-judicial immunity). In the alternative, the HRC Defendants are entitled to prosecutorial immunity because their work interviewing witnesses, evaluating evidence obtained during the investigation, and determining whether there are reasonable grounds to pursue legal claims is "quintessentially prosecutorial in nature." *Rudow*, 822 F.2d at 327-28.

Cases decided in the Second Circuit since *White* have similarly ruled that human rights commissions' investigative conclusions are entitled to absolute immunity as quasi-judicial bodies. In *Colletta v. Northwell Health*, the plaintiff brought a 1983 claim against the regional director of the New York State Division of Human Rights for "issuing a determination of no probable cause." 2019 WL 7598666, at *9 (E.D.N.Y. Aug. 19, 2019), report and recommendation adopted, 2019 WL 5287961 (E.D.N.Y. Oct. 18, 2019). The court dismissed the claim and found that the regional director enjoyed absolute quasi-judicial immunity when "investigating charges of discrimination and in making determinations of whether probable cause exists." *Id*. The court reached the same conclusion in *D'Ambrosio v. Bast Hatfield, Inc.* 2015 WL 6454791, at *4 (N.D.N.Y. Oct. 26, 2015). There, the court dismissed a 1983 individual-capacity claims brought against the NYS Human Rights Regional Director when the complainant was dissatisfied with the conclusion reached following an investigation. The

court found that that "Plaintiff cannot pursue a Section 1983 individual-capacity claim . . . based on the decision dismissing plaintiff's . . . complaint, because [the official's] decision was made in a quasi-judicial capacity" and "entitled to absolute immunity." *Id*.

There is no reason to deviate from this directly relevant, well-established precedent within the Circuit. Accordingly, the HRC, Yang and Christie in both their official and individual capacities as they enjoy absolute immunity from claims related to their functions with the HRC. All claims against them must be dismissed.

      D.      The Final Determination is a Public Document and the HRC Defendants' Release of the Document was a Privileged Act for Which They Are Immune From Suit

The HRC Final Determination (Exhibit 1) is a public document under the Vermont Public Records Act (1 V.S.A. §§ 315 et seq.), the statutes governing the HRC, and HRC's own rules. 9 V.S.A. § 4555; HRC Rules.  The HRC Defendants cannot be held liable for releasing a public document they were obligated by law to release.

As a general matter, Vermont strongly favors disclosure of government documents. The Vermont Public Records Act, 1 V.S.A. §§ 315 et seq. ("PRA"), which emanates from Chapter I, Article 6 of the Vermont Constitution, states that the law is designed to "provide free and open examination of records." 1 V.S.A. § 315(a).  This policy furthers core governmental aims, because "[o]fficers of government are trustees and servants of the people and it is in the public interest to enable any person to review and criticize their decisions even though such examination may cause inconvenience or embarrassment." *Shlansky v. City of Burlington*, 2010 VT 90, ¶ 12, 188 Vt. 470, 13 A.3d 1075 (stating "open access to governmental records is a fundamental precept of our society"); *see also Rutland Herald v. City of Rutland*, 2013 VT 98, ¶ 12, 195 Vt. 85, 84 A.3d 821 ("the policy underlying the PRA clearly favors the right of access"); *Price v. Town of Fairlee*, 2011 VT 48, ¶13, 190 Vt. 66,

26 A.3d 26 (noting that Legislature's adoption of PRA "reaffirmed the fundamental principle of open government that public officials are trustees and servants of the people and .... [t]he PRA thus expresses a strong legislative policy favoring access to public documents and records" (quotations omitted)); *Wesco, Inc. v. Sorrell*, 2004 VT 102, ¶ 10, 177 Vt. 287, 865 A.2d 350 ("The [PRA] represents a strong policy favoring access to public documents and records."); *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (in context of PRA's federal counterpart, "[t]he basic purpose of [the] FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.") The PRA "shall be liberally construed to implement this policy[.]" 1 V.S.A. § 315(a).

The PRA requires broad disclosure of public documents. Under the PRA, "any person may inspect or copy any public record of a public agency[.]" 1 V.S.A. § 316. While nothing in the statute requires that public records be publicly posted, document custodians do not have the discretion to decline to produce document upon request. If a person requests access to the documents, "the custodian of a public record ***shall promptly*** produce the record for inspection[.]" 1 V.S.A. § 318(a) (emphasis added). There is no question that the HRC is a "public agency" under the PRA, as it is a "commission" and "authority of the State." 1 V.S.A. § 317(a)(2) (defining public agency subject to PRA to include "any … commission,  or authority of the State….)   *Id*.  HRC and its agents are therefore required to produce public documents upon request.

The Final Determination, including the Investigative Report, is a "public record" under the PRA, because it consists of "written or recorded information … , which is produced or acquired in the course of public agency business." 1 V.S.A. § 317(b). The HRC

investigated Dr. Clemmons' allegations of discrimination, prepared the Investigative Report, and found that there were reasonable grounds that discrimination occurred. All this happened pursuant to its statutory mandate and under its authority to investigate claims of discrimination, and thus fits squarely in the realm of its "agency business." *Id*. Under these circumstances, when Seven Days requested the report (Complaint, ¶ 115), the PRA ***required*** Yang to produce it. 1 V.S.A. § 318(a).

HRC's governing statutes and rules similarly provide that the Final Determination is public. While the initial complaint and investigative file are confidential documents, 9 V.S.A. §4555(a), HRC Rule 33, once the HRC determines that probable cause exists to believe that discrimination has occurred, "that determination and the names of the parties may be made public." 9 V.S.A. §4555(c).  The reasonable grounds determination set forth in the Final Determination includes both the vote tally and the investigative report upon which it was based. Given the State's preference for open and transparent government, both should be disclosed. 1 V.S.A. § 315(a). Plaintiff would interpret the public "determination" to include only the vote tally. That crabbed reading, however, is inconsistent with the HRC statutes and PRA. Publishing only the final vote tally of the commissioners would leave the public in the dark as to what transpired. Instead, the public is entitled to see the entire Final Determination, including the applicable facts the HRC found as part of its investigation, and the application of the law to those facts.

It has been the HRC's routine practice for nearly two decades to publish a final determination that includes both the investigative reports that reached a reasonable ground finding and the vote tally. As of 2011, the HRC opined that information "about all reasonable grounds cases are available to the public." Internet Archive: Way Back Machine from

February 18, 2010 to November 10, 2010,

https://web.archive.org/web/20101110040538/http://hrc.vermont.gov/HRC+CasesHuman

(last accessed March 29, 2022). The HRC website published "HRC reasonable grounds case

investigative reports, final determinations, and settlements from FY00 to" 2011, and provided

a link to the cases and the investigative reports. As of the February 18, 2022, nearly one

month after the Plaintiff filed the Complaint, the HRC's website posted the reasonable vote

tally and the investigative reports for seven years' of reasonable grounds cases (with the

exception of the Clemmons case).

https://web.archive.org/web/20220205101958/https://hrc.vermont.gov/legal/cases/reasonable-grounds. The website provided "links to investigative reports for cases where the [HRC]

found reasonable grounds to believe that discrimination occurred in housing, employment, or

a place of public accommodation. When the HRC finds that there are reasonable grounds to

believe that unlawful discrimination occurred, the HRC statute requires that the Investigative

Report, which is the Determination, and any Post-Determination Conciliation Agreement

(PDCA) become public documents."[5]

HRC's practice of treating the Investigate Report and vote tally as the Final

Determination and a public document is consistent with Vermont law holding that affidavits

of probable cause supporting criminal complaints are public documents. *See Oblak v. Univ of

Vermont*, 2019 VT 56; *State v. Tallman*, 148 Vt. 465, 472-73 (1987).  This is so because the

affidavit of probable cause supplements and is necessary for a complete public understanding

of the criminal information itself. Like the affidavit of probable cause, the HRC's

---

[5]Whether a document is posted on a publicly available website is not determinative of whether the document is considered "public" under Vermont law, as a document may be public without being so posted. However, HRC's longstanding practice reflects its consistent understanding of its own statutes and rules as including investigative reports and vote tallies as part of the public final determination.

Investigative Report details the basis for the vote tally; it is an integral part of the vote and thus is part of the Final Determination which must be made public.

Plaintiff concedes that the HRC's vote tally is a public document under 9 V.S.A. § 4555(a), but his assertion that the Investigative Report is a separate and confidential document as a matter of law appears to stem from his conflation of two separate documents: the investigative *file*, and the investigative *report*. The HRC's rules clarify the difference between complaint files, investigative files, and an investigative report. The HRC's involvement in any claim starts when a complainant files a complaint. "All allegations and complaints shall remain confidential, and no information about them shall be revealed by the Commission to the public, ***unless and until the*** Commission issues a determination of reasonable grounds to believe that unlawful discrimination has occurred or becomes a party to a conciliation agreement pursuant to this Rule." HRC Rule 7. Contrary to Plaintiff's interpretation, Rule 7 expressly contemplates that when there is a finding of reasonable grounds, information referenced in the complaint is no longer confidential even if the complaint itself remains confidential.

Rule 34 defines what is included in an investigative file. Rule 34 states:

> The Commission's investigative file includes all materials gathered by the Commission's investigators during the course of their investigation but does not include the Commission investigator's or counsel's work product or mental impressions of ay witness or documents. The investigative file does not include materials submitted by the complainant or gathered by the Commission's intake worker during the intake process since these materials precede the investigative phase of the Commission process. Such materials are confidential. The investigative file also does not include analysis, such as but not limited to, statistical analysis that the investigator has created with information provided by either party.

HRC Rule 34. [6]

---

[6] What Plaintiff calls the "First Report" is not a report at all, but rather a preliminary memorandum to Dr. Clemmons, the complainant. Ironically, it was part of the investigative file, and was therefore not released

The Investigative Report is defined in a separate Rule. Rule 21 provides:

> When an investigation has been completed, an investigative report shall be prepared and submitted to the executive director for approval. The investigative report shall contain a listing of documents reviewed, witnesses interviewed, a statement of facts, a legal analysis, and a preliminary recommendation to the commissioners.

HRC Rule 21.

While the investigative file remains confidential at all times, HRC Rule 33, the Investigative Report has more limited information in it. The Investigative Report lists the documents and evidence considered, without actually making public the audio recordings of interviews, employment, medical or school records, and other underlying documents, which are confidential. The Investigative Report thus contains none of the material in the "complaint files" or "investigative files" that is meant to be kept confidential.

Plaintiff alleges that confidentiality, not disclosure, "is a check against government abuse of witnesses and their defamation." ¶ 119. This approach is plainly inconsistent with the PRA, Vermont's stated preference for openness and transparency in government, as well as the PRA's federal counterpart, the FOIA. Under Plaintiff's approach, where the investigative report is kept confidential, the public will have no way to determine how the HRC and its commissioners arrived at its finding. This secrecy promotes abuse and corruption, not accountability. *U.S. v. Erie Cnty. N.Y.*, 763 F.3d 235, 240 (2d Cir. 2014) ("The presumption of access to judicial documents is based on the need for federal courts to have a measure of accountability and for the public to have confidence in the administration of justice."); *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 296 (2d Cir.

---

publicly by HRC. Instead, it was provided to VSP as part of the confidential investigative file pursuant to 9 V.S.A. § 4555(a), and VSP published the otherwise confidential document on its own website. *Statement of the Department of Public Safety on the Findings of the Human Rights Commission in March 2021*, available at https://vsp.vermont.gov/public/June2021statement (last accessed Mar. 31, 2022)

2012) ("Courts and commentators have long recognized the centrality of openness to adjudicatory proceedings: 'Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.'") (citing *In re Oliver*, 333 U.S. 257, 271 (1948)).

Despite Plaintiff's effort to characterize HRC Defendants' release of a public document to the press as some kind of illicit scheme (*see e.g.* ¶¶ 4-5, 92, 112, 114, 116) or "agreement to act in concert" (*see e.g.,* ¶¶ 115, 116-17, 126), what occurred here is nothing more than the ministerial act, required by the PRA, of a public officer providing documents as required to a requesting entity. Plaintiff's conclusory accusations to the contrary do not elevate HRC Defendants' compliance with the law to an improper conspiratorial act. *Iqbal,* 556 U.S. at 678 (noting "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and court "not bound to accept as true a legal conclusion couched as a factual allegation."). In fact, HRC Defendants would have subjected themselves to monetary sanctions had they *not* disclosed the documents as required. 1 V.S.A. § 318(a). Nor is it of any significance that HRC did not initially post the determination here on its website. *Cf.* Complaint ¶¶ 114, 122 (acknowledging that Investigative Report "unpublished" before Seven Days article). An agency is not required to post a public document, but the decision not to post does not alter the document's status as "public." Many – perhaps most - public documents are not posted on state websites; state officials are nevertheless required to produce them promptly upon request.  1 V.S.A. § 318(a).

The First Amendment also requires that the Final Determination be public. The Second Circuit has explained that the "notion that the public should have access to the proceedings and documents of courts is integral to our system of government." *U.S. v. Erie*

22

*Cnty. N.Y.*, 763 F.3d 235, 238-39 (2d Cir. 2014). The First Amendment commands public access to judicial documents if they satisfy the two-prong test referred to as the "experience and logic" test. *Id.*, at 239 (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006). That test considers "(a) whether the documents have historically been open to the press and general public (experience) and (b) whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* (internal citations omitted). The Second Circuit has held that the logic and experience test applies to quasi-judicial proceedings in the administrative context. *New York Civil Liberties Union*, 684 F.3d at 299-300.

The Final Determination easily satisfies both prongs of the test. As explained *supra*, the HRC has published the investigative report and the vote tallies for more than two decades.[7] Furthermore, the second prong is met because public access "plays a significant positive role" in the functioning of the HRC's investigative process. The inquiry for this prong "essentially asks whether openness enhances the ability of the government proceeding to work properly and fulfill its function. *New York Civil Liberties Union*, 684 F.3d at 302. Here, the HRC is a government agency, reviewed the actions of the VSP, and recommended a course of conduct after a three-year inquiry and ultimately found there are reasonable grounds to find the VSP discriminated against Dr. Clemmons. Making this Final Determination, including the Investigative Report, public "enhances the fairness of the [proceeding] itself[.]"

---

[7] The HRC and its employees are afforded deference when interpreting the statutes and its own rules. The Vermont Superior Court dismissed a claim against the HRC in *Besser v. Vermont Human Rights Commission*, Docket No. 90-2-03 Wncv (August 12, 2003) and held that, "…claims against the State for discretionary decisions, such as in this case, are barred by the doctrine of sovereign immunity even when the discretion is in fact abused, because they are presumed to be based on policy considerations." (citing to 12 V.S.A. § 5601(e)(1); *Searles v. Agency of Transp.*, 171 Vt. 562 2000)(mem.)(discussing the discretionary function exception and applying *United States v. Gaubert,* 499 U.S. 315 (1991).

*Id.*, at 303 (citing *United States v. Doe*, 63 F.3d 121, 126 (2d Cir. 1995). Simply put, there are

no grounds for keeping this document private.

      E.      **Plaintiff Fails to State a Claim Against the HRC Defendants for Deprivation of
Civil Rights Under 42 U.S.C. §1983**

            1.     **The HRC, Yang and Christie are Not "Persons" Who May Be Sued
Under 42 U.S.C. §1983**

It is black-letter law that states and state officials sued in their official capacities are

not subject to suit under §1983. Parsing the legislative history of the statute, the Supreme

Court held in *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989) that

""[N]either a State nor its officials acting in their official capacities are 'persons' under [42

U.S.C.]§ 1983." *Id.*   "Moreover, suits against state officers acting in their official capacities

are 'no different from a suit against the State itself.'" *Chris H. v. New York,* 764 F. App'x 53,

55 (2d Cir. 2019), *citing Will*, 491 U.S. at 71. "Therefore, state officials cannot be sued in

their official capacities for retrospective relief under section 1983." *Huminski v. Corsones*,

396 F.3d 53, 70 (2d Cir. 2005).

HRC is "an entity created by state law, Title 9, chapter 141, 9 V.S.A. §§4551-4556"

and for purposes of *Will v. Michigan* is "the state." *See* ¶¶14, 109. *See infra* Section II.B.

HRC is thus not a "person" subject to a section 1983 action.

Defendant Yang was at all relevant times the Executive Director of the HRC, ¶16, and

in that capacity, is a full-time employee of the State of Vermont. Budget Recommendation,

582-586. It would seem beyond question that she is a "state officer." Defendant Christie was

at all relevant times the Chair of the HRC, ¶15, and was entitled to per diem compensation for

that position, ¶109. Plaintiff asserts that Christie is "not a state employee," and cites to 9

V.S.A. §4551(d) and 3 V.S.A. §311(a)(2) to support his statement. ¶109. Those two statutes

do not support the assertion, and in fact prove exactly the opposite. Section 4551(d) provides

that "Each member of the Commission... shall receive compensation as provided by 32

V.S.A. § 1010." 32 V.S.A. §1010 in turn is contained within Ch. 15 ("Salaries and Fees"),

Subchapter 001 ("State Officers"), which provides for compensation by the State to various

state officers. The section of Title 3 cited by the Plaintiff does no more than establish that

many state employees (including not only members of boards, but also judges and assistant

attorneys general) are not part of the state "classified service," 3 V.S.A. §311. That provision

in no way suggests that the Chair of the HRC is not a "state officer." To the extent that Yang

and Christie are sued in their official capacities, they are state officials who may not be sued

for damages under 42 U.S.C. §1983. The Section 1983 claims against the HRC, Yang in her

official capacity, and Christie in his official capacity, must therefore be dismissed.

> 2.    Plaintiff Has Not Pled Plausible Facts Sufficient to Defeat Qualified
>        Immunity

In plain terms, the doctrine of qualified immunity protects state actors from suit for

their reasonable mistakes. In the language of the United States Supreme Court, "government

officials performing discretionary functions generally are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 817–18 (1982). The doctrine attempts to balance government accountability

and individual rights, and concludes that "where an official's duties legitimately require

action in which clearly established rights are not implicated, the public interest may be better

served by action taken 'with independence and without fear of consequences.'" *Id.*, at 819

(citation omitted).

The Supreme Court has been clear that qualified immunity is not merely an immunity

from liability – rather it "provides the defendant with an immunity from the burdens of trial as

well as a defense to liability." *John v. Fankell,* 520 U.S. 911, 915 (1997). "When a case can be dismissed on the pleadings … qualified immunity also provides officials with the valuable protection from 'the burdens of broad-reaching discovery.'" *Id.* at n.2, *citing Harlow*, 457 U.S. at 818. The doctrine provides "both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'"  *Ashcroft*, 556 U.S. at 672.

Consistent with the Court's interest in protecting covered defendants from the burden of discovery, the law is clear that where qualified immunity is implicated, a case should be dismissed on the pleadings if the plaintiff does not effectively plead the absence of qualified immunity. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "The entitlement is an *immunity from suit* rather than a mere defense to liability." *Id.*

Thus in *Ashcroft v. Iqbal*, on a "motion to dismiss the complaint for failure to state sufficient allegations to show that [defendant's acts involved] clearly established unconstitutional conduct," 556 U.S. at 669, the Supreme Court held that the plaintiff had failed to plead sufficient factual allegations to plausibly support his claim. *See also id.* at 675 ("we begin by taking note of the elements a plaintiff must plead to state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity"). Similarly, *Ashcroft v. al-Kidd* provided that "qualified immunity shields federal and state officials from money damages *unless a plaintiff pleads facts* showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." 563 U.S. 731, 735 (2011) (emphasis added).

The Second Circuit has not squarely addressed whether a plaintiff must plead facts that plausibly defeat qualified immunity. Several circuits, in reliance on *Gomez v. Toledo,* 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant."), have held that a plaintiff need not do so. *See e.g. Thomas v. Indep. Township*, 463 F.3d 285, 293 (3d Cir. 2006); *Cloaninger ex rel. Estate of Cloaninger v. McDevitt,* 555 F.3d 324, 332 n.10 (4th Cir. 2009); *Alvarado v. Litscher,* 267 F.3d 648, 651-51 (7th Cir. 2001); *Bissonette v. Haig,* 800 F.2d 812, 813 (8th Cir. 1986).

More recently however, in light of the Supreme Court's clear pronouncements in *Iqbal* and *Al-Kidd,* the circuits have trended the other way. Thus the Fifth Circuit held in *Backe v. LeBlanc,* 691 F.3d 645, 648 (5th Cir. 2012) that "a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity."  Similarly, the Sixth Circuit held in 2015 that "[t] avoid the qualified immunity defense, plaintiff was required to plead *facts* making out a violation of a constitutional right clearly established in a particularized sense." *Johnson v. Moseley,* 790 F.3d 649, 650 (2015) (emphasis in original). The D.C. Circuit is in accord. *Daugherty v. Sheer et al.*, 891 F.3d 386, 392 (D.C. Cir. 2018) (dismissing complaint for failure to "allege that [defendants] violated any clearly established right").  *C.N. v. Wilmar Pub. Schools,* 591 F.3d 624, 632 (8th Cir. 2010) (where plaintiff "failed to allege a violation of her constitutional rights, we conclude the individual [defendants] are entitled to dismissal on qualified immunity grounds").  And without directly opining on the question, the Second Circuit itself has dismissed cases on the pleadings for failure to allege sufficient facts to defeat qualified immunity. *See e.g.*, *Sadallah v. City of Utica*, 383 F.3d 34 (2d Cir. 2004) (J. Sotomayor).

27

Given the clear weight of authority and repeated pronouncements from the Supreme Court, the court must require the Plaintiff to plead sufficient facts to articulate the Defendants' violation of a clearly established right.

The court's analysis whether the right alleged to have been violated is "clearly established" must be searching: "courts must mind the Supreme Court's admonishment 'not to define clearly established law at a high level of generality.'" *al-Kidd*, 563 U.S. at 742. *Daugherty*, 891 F.3d at 390. A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "'[t]he contours of [a] right [are] sufficiently clear' that a 'reasonable official would [have understood] that what he is doing violates that right.'" *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd,* 563 U.S. at 741. Moreover, the court may take the two questions in either order: "[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Reichle v. Howards,* 566 U.S. 658, 664 (2012).

As applied to this case, it is abundantly clear that Leise has failed to allege a violation of a clearly established right. With respect to Yang, Leise alleges that:

> [She] participated in the drafting of the Investigative Report, its false findings and recommendations, and signed it. She participated in the change of the conclusion in the First Report from "lack of evidence of discrimination" to the conclusion in the Investigative Report that "grounds existed for discrimination." Defendant Yang participated in the release of the Investigative Report to Seven Days in violation of the law. Defendant Yang similarly violated HRC's rules which provide for limited release of the Investigative report to the parties and certain law enforcement agencies… [D]efendant Yang had the discretion to redact the names of the troopers but failed to do so because of malice and ill-will. Defendant Yang participated in the scheme

> with Seven Days, contributed to the Article's contents and
> covered up the real reasons for the change in conclusion from the
> First Report to the investigative Report, all to advance her career
> at the expense of the reputations and careers of VSP troopers
> including plaintiff.

¶ 112. For purposes of this Motion to Dismiss, it is not important that the allegations are uniformly false. What is important is that nowhere in Plaintiff's accusations is a statement of a clearly established right that has been violated.  Plaintiff's disagreement with the conclusions of the Investigative Report is not the same as a "clearly established right" for it not to have existed. Plaintiff has not pled and cannot prove a clearly established right for an investigation of racial misconduct to be resolved in his employer's favor. To the contrary, the HRC exists for the very purpose of determining whether racial discrimination has occurred and taking action to combat it, and it is anathema to its mission that an aggrieved witness to an investigation who believed the HRC got it wrong would have a civil rights action against the director. It is an understatement to say that such a right is not clearly established.

Plaintiff has not pled and cannot prove a clearly established right for a preliminary memorandum to be adopted as the Fina Determination. Plaintiff has not pled and cannot prove that he had a clearly established right to have his name redacted from the Investigative Report, and in fact concedes that Yang had the discretion to redact or not redact. ¶ 112.  And finally, Plaintiff has not pled and cannot prove that Yang's release of the Investigative Report was a violation of his clearly established right, where the HRC's longstanding practice has been to release the Investigative Report and vote tally as the Final Determination.

Leise's effort to transform the ordinary conduct of official business into something more nefarious by darkly alleging "malice and ill-will" "all to advance her career" is not helpful.  Allegations of improper motive do not rescue a plaintiff who otherwise cannot defeat qualified immunity.

> If anything, the leading cases … show that … motive does not automatically imbue the conduct in question with an unconstitutional air, where the official's actions have a legitimate basis. In *Crawford-El v. Britton,* the Supreme Court explained that 'proof of an improper motive is not sufficient to establish a constitutional violation – there must also be evidence of causation,' as well as clarity that the conduct in question violated a right. 523 U.S. 574, 593, 118 S.Ct. 1584, 140 L.Ed.2d (1998). The Court reasoned that the causation element provides a check against the 'serious problem' of spurious allegations of improper motive by government officials, notoriously 'easy to allege and hard to disprove.' *Id.* at 584-85, 592-93, 118 S.Ct. 1584.

*Daugherty*, 891 F.3d at 391. Plaintiff's accusation that Yang acted with malice in order to advance her career is precisely the sort of formulaic and conclusory statement, devoid of factual content, which the Supreme Court has repeatedly stated does not survive the plausibility analysis. *See Iqbal*, 556 U.S. at 682 (rejecting complaint as insufficient to defeat qualified immunity despite pleading that defendants were "principal architect" and "instrumental" in "invidious policy" where "as between … 'obvious alternative explanation' … and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.").

Plaintiff's allegations against Christie are even more threadbare and fare no better. He alleges that "Christie approved the Investigative Report," and knew it was different from the preliminary memorandum. ¶113. He also alleges that Christie spoke to the DPS Commissioner on April 14, 2021, three weeks *after* the vote to approve on March 25, 2021 ¶3, and learned that Commissioner Schirling was unhappy about the finding against VSP. He alleges that Christie "participated in the unlawful release of the Investigative Report," and "refused to provide plaintiff an opportunity to meet with HRC to discuss clearing his name." ¶113. Nowhere does Plaintiff identify a clearly established right that has allegedly been violated. Plaintiff's allegations of malice against Christie are even more conclusory than those

against Yang – Plaintiff does not even bother to suggest an improper motive for Christie, let alone offer any plausible facts to support it.

Because Plaintiff has not pled plausible facts demonstrating that Yang or Christie violated any clearly established constitutional right, the §1983 claims against them (Counts One, Two and Three) must be dismissed.

> 3.  Count One Alleging a Violation of Procedural Due Process Fails Because Plaintiff Has Not Plausibly Alleged a Deprivation of a Constitutionally Protected Liberty Interest/Stigma plus

The Supreme Court has been abundantly clear that defamatory statements made by a state actor do not give rise to claims under §1983. Count One must be dismissed because Plaintiff has not adequately pled that he has been deprived of a protected liberty interest. While he tries to amplify the allegedly false statement that "he is a racist" into a civil rights claim, there is no legal basis for doing so. "[M]ere injury to reputation, even if defamatory, does not constitute the deprivation of a liberty." *Connecticut Dept. of Pub. Safety v. Doe*, 538 U.S. 1, 6-7 (2003), *citing Paul v. Davis*, 424 U.S. 693 (1976).[8] "A free-standing defamatory statement made by a state official about an employee is not a constitutional deprivation. Instead, it is properly viewed as a state tort of defamation." *Donato v. Plainview-Old Bethpage Cent. School Dist.,* 96 F.3d 623, 630 (2d Cir. 1996).

The Second Circuit has summarized the very small category of defamation claims that will rise to the level of civil rights claims. "In *Paul,* the Supreme Court held that in order to state a claim under 42 U.S.C. § 1983 for a violation of the Due Process Clause, a plaintiff who complains of governmental defamation must show (1) the utterance of a statement about him

---

[8] *Connecticut Dept. of Public Safety v. Doe* overrules the Second Circuit's decision, 271 F.3d 38 (2d Cir. 2001), cited by Plaintiff in support of his stigma-plus theory.

or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden or alteration of his or her status or of a right in addition to the stigmatizing statement.  *Doe v Dept. of Pub. Safety*, 271 F.3d 38, 47 (2d Cir. 2001), *overruled by Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1. *See also, Sadallah*, 383 F.3d at 38. Plaintiff identifies Yang's and Christie's statements labelling him a "racist" as false and defamatory.  Oddly, neither of the Defendants ever made that statement or applied that label, and Plaintiff, despite repeatedly accusing them of doing so, does not cite a single instance of it. Even if any of the Defendants had actually called Leise a racist, that statement would not capable of being proved false. To date, no one has been able to look deep into the heart of a person and ascertain what biases, prejudices or preconceptions lie beneath. Leise says he is not a racist, and he may believe that to be true. Perhaps it is. But it can't be demonstrated true or false. And whether Leise does or does not harbor racist prejudices deep down, he may nevertheless have behaved in a discriminatory fashion with respect to Lydia Clemmons, as HRC concluded.  Because the alleged defamatory statement cannot be proved false, it does not meet the *Paul* test.

Even more fundamental is that Leise does not allege a "*state-imposed* burden or alteration of his or her status," *Doe v. Pub. Safety*, 271 F.3d at 710-711, in addition to the stigma. It is fundamental to the *Paul* test that the state have done something more than say something false that damages a person's reputation. For example, "a defamatory statement about an employee implicates a liberty interest when it is made during the course of that employee's termination from employment." *Donato* 96 F.3d at 630. Here, however, neither Yang nor Christie were in a position to do anything about Plaintiff's employment. They did

not hire, supervise, or discipline him. There is no allegation that they acted in concert with his employer to alter his employment status. To the contrary, Plaintiff notes that VSP took issue with HRC's Final Determination, and defended the various VSP officers involved. Plaintiff does not allege that his employer took any adverse employment action against him.

Moreover, the law requires that the alleged "state-imposed burden or alteration of status must be '*in addition* to the stigmatizing statement.'" *Sadallah*, 383 F.3d at 38 (emphasis in original). As then-Judge Sotomayor noted in *Sadallah*, "'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." *Id.* (citation omitted). Because Plaintiff does not allege any burden or alteration of his status other than the consequences of his supposedly tarnished reputation (and even those consequences are hazily pled), he does not meet the stigma plus test. As in *Sadallah*, the harms alleged by the Plaintiff are the direct "deleterious effects" of the alleged defamation, not a separate harm in addition to it.

Under these circumstances, Plaintiff has not met the requirements of the *Paul* test for elevating a simple defamation claim to a federal civil rights claims. The stigma-plus theory that Plaintiff proposes does not transform reputation into a protected liberty interest, and Count One must be dismissed.

        4.       **Count Two Alleging a Violation of Procedural Due Process Fails Because Plaintiff Has Not Plausibly Alleged a Deprivation of a Constitutionally Protected Property Interest**

Plaintiff's claim in Count Two, read generously, seems to be that he was deprived of his state employment without due process. While HRC concedes that an employer must provide state employees pre-termination "notice and opportunity for a hearing" (commonly referred to as "Loudermill" rights), there are several fatal problems with Plaintiff's novel theory.

First of all, he apparently hasn't been terminated, and he doesn't actually allege that he was. Instead, he makes evasive statements like: "Defendants' actions are tantamount to plaintiff's constructive discharge as any reasonable law enforcement officer in his position would find it intolerable to continue to work as a trooper" ¶134. "Plaintiff has been unable to wear his service uniform and resume his work as a trooper" ¶ 141. "[P]laintiff's work conditions became intolerable as he can no longer function effectively and safely as a law enforcement officer. Plaintiff's career in law enforcement has ended." ¶148. What Leise doesn't and apparently can't say is that VSP terminated his employment. He does not allege that VSP investigated or sanctioned him for unprofessional conduct under the authority of 20 V.S.A. Ch. 1, subchapter 2. He simply didn't think he could continue to be effective, and so stopped "wearing his service uniform," whatever that means. While he has artfully declined to say what his employment status is, the one thing he hasn't alleged is that adverse job action was taken against him by his employer.

Whether Plaintiff was "constructively discharged" or not is a question for a different lawsuit. But in any event, a person can't be discharged, actually or constructively, by anyone other than their employer. Constructive discharge is a theory of liability as against an employer – it does not apply to every action that makes it difficult, or even impossible, for a person to work.

Plaintiff's confusion about what is owed to public employees extends to the entity that must provide due process. It is, of course, the *employer* who must provide notice and an opportunity to be heard prior to taking action against public employees – not unrelated third parties. Even if Plaintiff had alleged that VSP took employment action against him as a result

of HRC's actions, it would be *VSP* that would be required to provide a Loudermill hearing, not HRC.

An errant driver who injures a pedestrian such that they cannot work has not "constructively discharged" them. The driver may be liable in tort for the pedestrian's loss of income if the pedestrian is rendered unable to work as a result. That does not mean that the driver has "constructively discharged" the pedestrian from his or her employment. Even if the pedestrian is a public employee, he or she is not entitled to a Loudermill hearing from the *driver*. And even if the driver was operating a state snowplow at the time of the collision, the pedestrian doesn't have a civil rights claim against the driver for failing to provide a Loudermill hearing before the collision that rendered them unable to work. Similarly, here, there is no basis for imposing upon someone other than Leise's employer a Loudermill obligation to provide notice and an opportunity to be heard before taking action that (allegedly) made it impossible for him to work.

To say the very least, Plaintiff's theory of a procedural due process violation is far from being a matter of "clearly established" law that will defeat qualified immunity. In fact, it does not state claim against the HRC Defendants.

         5.      Count Three Alleging a Violation of Substantive Due Process Fails Because Plaintiff Has Not Plausibly Alleged any Conduct That Shocks the Conscience

Plaintiff cannot rescue his deficient pleadings with respect to alleged deprivations of a liberty interest or property interest by resorting to a vague "substantive due process" claim. "The first step in substantive due process analysis is to identify the constitutional right at stake." *Lowrance v. Achtyl*, 2 F.3d 529, 537 (2d Cir. 1994). As described above with respect to Counts One and Two, Plaintiff has not adequately pled either a liberty or property right which the HRC took from him. If he had done so, the court would properly move on to

"consider whether the state action … was arbitrary in the constitutional sense and therefore violative of substantive due process." *Id.*

However, Plaintiff has not pled *facts* establishing that the HRC's conduct was conscience-shocking, arbitrary, or motivated by bad faith. He cites the *words* and claims that Defendants acted to "shape public opinion and self-promote politically." ¶152. But this is a conclusion, not a fact. Plaintiff offers no basis from which one can conclude that Yang, Christie or HRC had anything to gain from either the content of the report or its release. A substantive due process claim cannot be deemed plausible where "conclusory pleadings are unsupported by factual content." *Manza v. Newhard*, 470 F. App'x 6, 9 (2d Cir. 2012), *citing Iqbal,* 556 U.S. 662 (dismissing substantive due process claim). Plaintiff offers no facts establishing Christie's personal role in either the content of the report or its release. *See Maldonado v. Fontanes*, 568 F.3d 263, 274 (1st Cir. 2009) (granting dismissal on the pleadings on substantive due process claim where plaintiff didn't plead specific facts that mayor personally participated in pet-killing program).

Count Three does not plausibly assert a claim that the HRC Defendants violated Plaintiff's substantive due process rights, and therefore must be dismissed.

F.    Plaintiff Fails to State a Claim for Invasion of Privacy

Plaintiff fails to state a claim for invasion of privacy and the claim should be dismissed. "To state a claim under § 652E, the plaintiff must allege that the defendant gave publicity to a matter concerning the plaintiff that placed the plaintiff in a false light, 'the false light in which the [plaintiff] was placed would be highly offensive to a reasonable person,' and the defendant 'had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed.'" *Hoyt v. Klar*, 2021 WL 841059, at *2 (Vt. Mar. 5, 2021) (citing Restatement (Second) of Torts § 652E)).

Here, Plaintiff cannot establish that the HRC Defendants "published" the document as a matter of law because the Final Determination was already a public document. Plaintiff also fails to plead facts that plausibly allege the HRC Defendants' "reckless disregard as to the falsity" of the Final Determination.

An invasion of privacy claim does not lie where the information that was published was a public document. For instance, in *Cox Broadcasting Corp. v. Cohn*, the Supreme Court relied on the Restatement to find that "publishing the contents of public records are simply not within the reach of" invasion of privacy causes of action. 420 U.S. 469, 492-93 (1975) (quoting Restatement § 625B finding media company not liable for invasion of privacy where published the name of a rape victim, in apparent contravention of Georgia state law); Restatement § 625B cmt. c ("Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection."); Restatement § 625D cmt. b ("There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public. Thus there is no liability for giving publicity to facts about the plaintiff's life that are matters of public record[.]"). Vermont courts have similarly rejected claims for tortious invasion of privacy based on disclosure of public records. *Cornelius v. The Chronicle, Inc.*, 2019 VT 4, ¶ 5; *see also State v. Van Buren*, 2018 VT 95, ¶33 (discussing *Cox*); *Handler v. Arends*, 1995 WL 107328, at *5 (Conn. Super. Ct. Mar. 1, 1995) (finding no liability under invasion of privacy for giving publicity to facts about the plaintiff that are matters of public record and/or open to inspection by the public); *McCormack v. Okla. Publ'g Co.*, 1980 OK 98, ¶ 18 (1980) ("An action granted on right of privacy does not lie when public records . . . are used."). The upshot is that false-light invasion of privacy causes of action fail

when they are premised on the publication of information and documents that are public records. *See McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1220, appeal after remand 902 F.2d 372 (5th Cir.1990) (dismissing false-light cause of action under Restatement 652E because statements made within confines of judicial proceedings absolutely privileged).

Second, Plaintiff does not plead any plausible allegations of reckless disregard of the purported falsity of the Final Determination. Plaintiff alleges the report called painted him in a false light as a racist. ¶¶ 2, 6, 11, 12, 112, 127, 132-34, 141, 147, 148, 155, 159. This is simply not the case as a factual matter; after an intensive, three-year investigation the Investigative Report found that there were reasonable grounds to find that the VSP generally discriminated against Dr. Clemmons, not that Plaintiff was himself a racist. Exhibit 1, Investigative Report, at 3 ("This investigation recommends that the Human Rights Commission find that there are reasonable grounds to believe that the Vermont State Police discriminated against Dr. Lydia Clemmons on the grounds" of her race, color, and sex.). Plaintiff's argument that the HRC Defendants knew the Investigative Report was false because it differed from the July 2020 preliminary status memo (¶¶ 3, 12, 93, 112, 113) is not plausible as a matter of law. The Complaint alleges the commissioners voted on the Investigative Report on March 25, 2021, nearly nine months after the July 2020 document. (¶ 3). There is nothing requiring an investigation to stand still, and no basis for giving credit to the Plaintiff's inference that a final report that progresses over time must be "false." *Iqbal,* 556 U.S. 664. (court may "draw on its experience and common sense" in evaluating plausibility on motion to dismiss). The Investigative Report, completed after the conclusion of the investigation, recommended a finding of discrimination based on a painstaking three-year investigation.

Again, Plaintiff's claim fails as a matter of law and because of inadequately plead facts, and must be dismissed for failure to state a claim.

G.     Plaintiff Fails to State a Claim for Defamation

Plaintiff has failed to state a claim for defamation against the HRC Defendants and so it must be dismissed. Under Vermont law, the elements of a defamation claim are: (1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages. *Soojung Jang v. Trs. of St. Johnsbury Acad.*, 331 F. Supp. 3d 312, 344 (D. Vt. 2018). Where a plaintiff is a public figure, as for example a police officer, they also must plead that the defendant acted with actual malice. *Colombo v. Times Argus Ass'n Inc.*, 135 Vt. 454, 455 (1977) ("As a matter of background, it seems established quite firmly that actual malice is required as a basis for recovery in a libel action against a newspaper brought by a 'public official' or 'public figure.'") (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Plaintiff's defamation claim fails for numerous reasons.

First, Plaintiff's defamation claim against the HRC Defendants fails the fourth element of the test—lack of privilege in the publication--because they were absolutely privileged in releasing the Investigative Report as a public document. *See supra*, Section II.D. "Absolute privilege provides a complete shield against defamation actions but qualified privilege can be overcome by a showing of malice." *Couture v. Trainer*, 2017 VT 73, ¶10, 205 Vt. 319, 174 A.3d 1245 (2017). In *Couture*, the Vermont Supreme Court found that "statements and recordings made within the context of parole board hearings and petitions for relief of abuse" were made "as preliminary steps to judicial or quasi-judicial proceedings." *Id.*, ¶ 11.

Accordingly, such statements were absolutely privileged. *Id.*, ¶ 12. The Court reasoned that public policy favors the extension of absolute privilege because "[u]nhindered communication with parole officers and in petitions for relief from abuse is critical to ensure that members of the public can communicate sensitive and unflattering information to parole officers about parolees without fear of reprisal." *Id.*, ¶ 14.

This justification also applies with equal force to the HRC Defendants. They are obligated by law to publish final determinations, including the investigative reports, and the statements in them, some of which might not flattering to the individuals involved, should not render them liable for defamation. To do so would impose a chilling impact on the HRC, its work, and its investigative reports.

Second, the Complaint does not state a claim for defamation because the alleged defamatory information is fairly characterized as opinion that cannot be shown to be false. Plaintiff does not contend that the Final Determination got any of the facts wrong. He simply contends that HRC Defendants improperly drew an incorrect inference of discrimination from uncontested facts. According to Plaintiff, the basis for his defamation claim is that the Investigative Report and Seven Days article "accuse him of racism[.]" (¶ 159). Leaving aside that neither the Investigative Report nor Seven Days article make this accusation, the Investigative Report can be fairly characterized as opinion that cannot be disproved. The defendant prevailed on this precise argument in *Grega v. Pettengill*, 123 F. Supp. 3d 517, 551-53 (D. Vt. 2015). The Court explained that in "determining whether an alleged defamatory statement is a statement of opinion under Vermont law, it considers the following factors:

> (1) An assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a

determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which "might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Id*., at 552.

Here, the factors militate in favor of finding that alleged defamatory statements in the Final Determination are not actionable opinion. Plaintiff falsely claims that the HRC Defendants accused him of racism. They do not, but this term is indefinite and ambiguous. Such a statement is also not capable of being objectively characterized as true or false. Whether Plaintiff is "racist" (or sexist for that matter) is not objectively provable; nor is the conclusion actually reached in the Final Determination, that probable cause existed to believe VSP collectively behaved in a way that discriminated against Dr. Clemmons on the basis of race and gender, objectively provable or falsifiable.

The full context of the Final Determination and the HRC's role also support the conclusion that the Investigative Report is non-actionable opinion. The Investigative Report contains a "preliminary recommendation" from the investigator as to what the commissioners should find. Exhibit 1, Investigative Report, at 3, 98. Classified differently, this is an expression of the investigator's opinion. It then lays out in detail the facts as the investigation uncovered, the investigator's legal analysis, and considers complainant's and respondents' arguments. The Commissioners consider the report, and they vote whether they believe there are reasonable grounds for discrimination to occur. 9 V.S.A. §§ 4553, 4554(d). If there is a vote in favor of finding discrimination, this authorizes the HRC to attempt to resolve the case, and if none can be reached, then file suit. 9 V.S.A. §§ 4553, 4554(d). Like the investigator's

report, the Commissioners' vote is an expression of their opinion as to whether an inference of discrimination is supportable based on the facts presented, such that they may pursue the claim in court. It is clear error to classify either the report or the vote as a statement of fact.

Plaintiff's defamation claim must also be dismissed because he has not plausibly alleged sufficient harm. He claims he has suffered "loss of his career" (¶ 160) and that his "career in law enforcement has practically ended." (¶ 106). However, he has not alleged that he quit or that his employer made an adverse employment determination. He claims that he has lost income. ¶ 167. He has not alleged any specific facts regarding this loss, such as whether he has had to take unpaid leave, he was forced to take unpaid leave, or specify the amount of time he has been unable to work.

Plaintiff has also failed to plausibly allege that HRC Defendants acted with malice, which he is required to do since he is a public official. *See Colombo*, 135 Vt. at 457 (police officer and detective is a "public official within the meaning of *New York Times*" and must plead actual malice). Malice does "not simply connote ill will or spite; rather it is 'a term of art denoting deliberate or reckless falsification.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013) (quoting *Masson v. New Yorker Magazine*, 501 U.S. 496, 499 (1991)). Plaintiff makes conclusory statements that HRC Defendants acted with "reckless disregard of the[] truth or falsity" of information, *e.g.* ¶ 159, and speculates that they were motivated to "politically promote [themselves]as aligned with national movements such as Black Lives Matter", ¶ 2, and "promote HRC's leadership." ¶ 5. However, Plaintiff's allegations of improper motive are lacking in any underlying factual basis. He could just have easily have pled that HRC Defendants were motivated to curry favor with overlords from a distant planet. The plausibility burden in federal pleadings requires more than an act of imagination; it

requires some articulation of facts supporting a theory.  Not having articulated any underlying facts to support its allegations of improper motive, Plaintiff is not entitled to the inference that HRC Defendants acted with malice. There could be many reasons why HRC Defendants released the document, including most obviously that it was a public document. *See Iqbal*, 556 U.S. at 682 (as between an "'obvious alternative explanation'" and plaintiff's requested inference of discrimination, "discrimination is not a plausible conclusion.") As a result, Plaintiff's defamation claim against HRC Defendants should be dismissed.

      H.       Plaintiff Fails to State a Claim for Tortious Interference With Contract

      To prevail on a claim of tortious interference with a contract, a complainant must plead that the defendant "intentionally and improperly interferes with the performance of a contract … between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Kneebinding, Inc. v. Howell*, 2018 VT 101, ¶ 93, 208 Vt. 578, 619, 201 A.3d 326, 357 (2018).

      Assuming that the third-party in question here is Plaintiff's employer, VSP, Plaintiff has not alleged that VSP failed to perform its contract with Plaintiff. Indeed, Plaintiff has not alleged that his employer has taken any adverse employment decision against him or otherwise refused to pay him money pursuant to a contract because of the publication of the Final Determination. To the contrary, Plaintiff has alleged that VSP rejected HRC's determination of probable cause, advocated on behalf of VSP, and supported its officer and their conduct. *Public Safety on the Findings of the Human Rights Commission in March 2021*, available at https://vsp.vermont.gov/public/June2021statement (last accessed Mar. 31, 2022). This is fatal to his claim.

      Plaintiff also fails to allege facts showing that the HRC Defendant's purported "interference" with his employment contract was "intentional" or "improper." Nor can he.

The HRC investigated Dr. Clemmons' complaint and released its report consistent with its statutory mandate. It launched a three-year investigation, interviewing nearly two dozen individuals, including Plaintiff. When Seven Days asked for the Investigative Report, the HRC Defendants provided it because it was a public document, required by statute, and consistent with its internal rules. In other words, the HRC Defendants were merely doing their jobs. It is implausible that the HRC Defendants did this not because they were fulfilling their duties, but because they had a personal vendetta against Plaintiff and wanted to "intentionally" interfere with his employment contract. Indeed, Plaintiff does not allege that any of the HRC Defendants urged, encouraged, suggested, or implied that Plaintiff should be punished, let alone that any such interference was without a proper basis.

<u>CONCLUSION</u>

HRC Defendants are absolutely immune from suit for their actions in connection with HRC activity. They are also immune from suit in federal court under 11th Amendment. Even if any claims remained against HRC Defendants after application of absolute immunity, the Plaintiff has not adequately pled claims under 42 U.S.C. §1983 or any state law claims. The Complaint against HRC Defendants must be dismissed in its entirety.

DATED at Burlington, Vermont this 1st day of April, 2022.

LANGROCK SPERRY & WOOL, LLP



Lisa B. Shelkrot
Justin G. Sherman
PO Box 721, 210 College Street
Burlington, VT 05402
lshelkrot@langrock.com
jsherman@langrock.com
Phone:  802-864-0217

1416716.2