U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 JUL 22 AM 11: 33

CLERK
BY_____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

**ANDREW LEISE,**
    **Plaintiff,**

**v.**

    **Civil Case No.: 2:22-cv-9**

**VERMONT HUMAN RIGHTS COMMISSION,**
**KEVIN CHRISTIE, BOR YANG,**
**DA CAPO PUBLISHING, INC.,**
**JOHN AND JANE DOE I-X**
    **Defendants.**

### FIRST AMENDED COMPLAINT

NOW COMES plaintiff, Andrew Leise, by and through his attorneys, Cleary, Shahi & Aicher, P.C., and alleges as follows:

### NATURE OF ACTION

1.    This suit is for the violation of plaintiff's constitutional rights and related claims. Plaintiff is a state trooper who has dedicated nearly 22 years to public service and professional law enforcement with an impeccable record and a commitment to fair and nondiscriminatory policing. His claims relate to the conduct of defendant Vermont Human Rights Commission ("HRC") in handling a complaint made by Dr. Lydia Clemmons for racial and gender discrimination against the Vermont State Police ("VSP") and Vermont Department of Public Safety ("DPS") under Vermont's Fair Housing and Public Accommodations Act (FHPA).

2.    HRC's statutory charge is to educate, investigate and seek resolution of

claims of discrimination under FHPA. HRC's leadership[1] instead exploited the racial difference between Dr. Clemmons who is black, and VSP which is a predominantly white force of more than 300, to politically promote itself as aligned with national movements such as Black Lives Matter (BLM). HRC's leadership engaged in unlawful means to accomplish its goals, and in the process damaged the good names and reputations of a number of troopers including plaintiff by falsely, unjustly and publicly labeling them as racist.

3.     A nearly 3-year HRC investigation of Dr. Clemmons' complaint reached the conclusion by July 2020 that there was *no* evidence of discrimination. ("First Report"). HRC's leadership manipulated and falsified the First Report to reverse the conclusions and generate an investigative report that recommended a finding of discrimination. ("Investigative Report"). HRC commissioners were thereby induced to vote on March 25, 2021, to find there was grounds to believe VSP/DPS had discriminated against Dr. Clemmons.

4.     On June 10, 2021, the Investigative Report was unlawfully released by Bor Yang, the executive director of HRC, to defendant Da Capo Publishing, Inc. ("Da Capo or Seven Days") in exchange for favorable media coverage. The Investigative Report by law was confidential. Defendant Yang intended to humiliate and harm the individual troopers including plaintiff, and she did not even redact their names in the Investigative Report. The individual troopers were not parties to the matter before HRC and had no

---

[1]HRC's leadership includes Bor Yang, the Executive Director, Kevin Christie, Chair, and any commissioner who were aware of the machinations at HRC.

opportunity to defend themselves. The law permitted HRC to only disclose publicly the determination that reasonable grounds for discrimination existed and the names of the parties, Dr. Clemmons and DPS/VSP.

5.    The disclosure of the Investigative Report by HRC to Seven Days was part of an arrangement whereby Seven Days was given the Investigative Report in exchange for favorable coverage that would promote HRC's leadership, shape public opinion against VSP and its troopers, and eliminate scrutiny of the Investigative Report which would have been part of the due process right of the troopers to defend their good names. Consistent with this scheme, on June 23, 2021, Seven Days published an article that VSP had discriminated against a black woman. The article was entitled, "Vermont State Police Discriminated Against Black Woman Who Runs Clemmons Family Farm, Commission Says." (The "Article").

6.    Da Capo /Seven Days posted the false Investigative Report online, reported on its false contents in the Article, and singled out plaintiff by name as the only trooper profiled to falsely describe him as a racist. Seven Days used the plaintiff as the poster boy for the story. It not only published some of the false passages about plaintiff from the Investigative Report but did so selectively to enhance the falsehoods against him and further damage his name. Consistent with HRC's scheme to advance a false narrative in complicity with Seven Days, Seven Days did not exercise independent journalism including reaching out to plaintiff for comment or an opportunity to address the false charges against him. Similarly after the publication of the Article, HRC through defendant Christie declined to discuss with plaintiff the clearing of his name.

7.     Dr. Clemmons' complaint against VSP was essentially that because she is African-American, VSP troopers in Fall 2017 disregarded her problems with her tenant, a Hispanic man (the "Tenant"), in a landlord-tenant dispute. The evidence, however, showed that VSP and its troopers including plaintiff professionally and properly handled the contentious quarrel between Dr. Clemmons and the Tenant which was the subject of ongoing litigation in civil court. Dr. Clemmons, an owner of a 148-acre farm in Charlotte, had the resources to retain private attorneys and a security firm to deal with the Tenant, and enjoyed unfettered access to multiple VSP troopers up and down the chain of command as well as the State Attorneys in Windsor and Chittenden counties. In terms of wealth and access to the state power apparatus, Dr. Clemmons, a well-educated person of social standing, had the overwhelming advantage over the Tenant—an indigent person who was likely in need of mental healthcare services.  Dr. Clemmons was not a victim of discrimination by VSP.

8.     Dr. Clemmons was frustrated that the justice system could not swiftly remove the Tenant from her property, and decided to leverage the situation for financial gain by claiming that VSP did not provide her with adequate law enforcement services because she is a black woman.  Dr. Clemmons was able to raise at least $50,000 in donation(s) as a result of her false claim of discrimination and racism against VSP as well as plaintiff Cpl. Andrew Leise.  The Investigative Report portrayed Dr. Clemmons' expectation of VSP and the standard under FHPA for police services in a landlord-tenant dispute as a show of force that would bring the Tenant to his knees and have him forcefully removed from his home through multiple citations, false arrests and incarceration.

Anything short of making the Tenant vanish was considered by HRC's leadership as discrimination on the basis of race and gender against Dr. Clemmons.

9.    HRC's leadership saw an opportunity to exploit Dr. Clemmons' race, and score politically against VSP as a representative of the "white" law enforcement. The "ends justified the means" for HRC's leadership. HRC's leadership could care less about the reputations and careers of dedicated troopers like plaintiff because they were white, enjoyed little political power, and with the public sentiment focused on movements like BLM, it was open season on these troopers. Nor did HRC care for Dr. Clemmons' genuine sense of frustration with the Tenant. HRC should have guided Dr. Clemmons on the limited powers of law enforcement and the justice system as a whole in a constitutional democracy. Instead HRC inflamed Dr. Clemmons' sense of racial bias and belief that VSP's inability to remove the Tenant was because of her race.

10.    The Investigative Report was written as a lengthy document (105 pages) to give it the appearance of substance and legitimacy with a thorough investigation. Both HRC and Seven Days knew that the average reader would not closely review the lengthy Investigative Report to find its flaws and inconsistencies. The Investigative Report by the sheer number of pages overwhelms most readers. Hence the role played by Seven Days was particularly insidious because it held itself out as a conduit for the Investigative Report, and in the same way that HRC and its leadership abused the public trust, Seven Days abused the trust of its readers as an independent reporter.

11.    A public label of "racist" spells the end of a career for an otherwise

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

dedicated, fair minded, and unbiased law enforcement officer like plaintiff. The damage is particularly significant when HRC, a supposed neutral, non-political "commission" finds a law enforcement officer to be racist. A public announcement that the "Human Rights Commission" found racism carries with it in the public eye a certain degree of credibility and objectivity that can be difficult to overcome. There was little or no deterrence to HRC and its leadership from abusing their authority.

12.     HRC and its leadership abused their power, acted illegally, ignored the facts and the law, falsified the conclusions of the First Report, and contrary to their mission and public trust, treated Dr. Clemmons and the VSP troopers in a racist manner. The truth is that there was no discriminatory or racist conduct by VSP, its troopers or plaintiff. VSP and plaintiff exercised sound policing judgment, fairness and discretion with their available resources while maintaining the safety of all involved in a landlord/tenant civil dispute. Plaintiff harbors no prejudice on the basis of race, ethnicity or gender. While considerable progress remains to be made for the civil rights of people of color, law enforcement officers like plaintiff and his colleagues at VSP should not have been falsely labeled racist and deprived of the rights and protections that are afforded to everyone, even criminal defendants. Defendants should have to account for their conduct and address the damages caused.

## THE PARTIES

13.     Plaintiff is a resident of Chittenden County, State of Vermont.

14.     Defendant Vermont Human Rights Commission (HRC) was established by statute, Title 9, Chapter 141, §§4551- 4556, to investigate and handle complaints of

discrimination in violation of Title 9, Chapter 139, discrimination in public accommodations and rental and sale of real estate. 9 V.S.A. §4552(b)(1). In certain instances, HRC can bring enforcement actions against the State. HRC has the capacity to sue in its name or be sued. 9 V.S.A. §4553(a)(6).

15.     At all relevant times herein, defendant Kevin Christie was a resident of the State of Vermont, a member and the Chair of HRC. Defendant Christie is named as a defendant in his official and personal capacity.

16.     At all relevant times herein, defendant Bor Yang was a resident of the State of Vermont, and the Executive Director of HRC. Defendant Yang is named in her official and personal capacity.

17.     At all relevant times herein, defendant Da Capo Publishing, Inc. (Da Capo or Seven Days), is a domestic profit corporation registered in Vermont with its principal business office located at 255 South Champlain Street, Suite 5, Burlington, Vermont, 05041. Defendant Da Capo at all relevant times operated a newspaper with the registered assumed name, Seven Days.

18.     Defendants John and Jane Doe I-X are fictitiously named defendants whose identities will have to be determined in discovery, and this complaint will be amended at such time. These individual actor(s) carried out the actions of HRC and Seven Days, and their status and/or involvement was of such nature that exposes them to individual liability under any and all causes of action asserted. Plaintiff reserves the right to name such individuals as defendants once the nature and extent of their involvement is explored in discovery.

## JURISDICTION

19.     This Court has jurisdiction to address a federal question under 28 U.S.C. §1331. Venue is proper in this Court under 28 U.S.C. §1391(b)(2).

## FACTS

20.     Between September and December 2017, plaintiff, a Corporal with VSP was one of a number of state troopers at the Williston Barracks who responded to calls made by Dr. Clemmons. Dr. Clemmons is an owner and operator of the Clemmons Farm in Charlotte, Vermont ("Clemmons Farm" or the "Farm"). The Clemmons Farm, a148-acre property, is described as "[o]ne of the rare African-American owned farms in Vermont and in the nation." <https://www.clemmonsfamilyfarm.org/>.

21.     On or about September 18, 2017, Dr. Clemmons reported to VSP that the Tenant had paid his security deposit with silver coins that she suspected were stolen. This report led to the Tenant's arrest by VSP on September 21, 2017, and the transfer of his custody to the Hartford Police which had been investigating the theft of some silver coins in 2015; the Tenant was a suspect in that investigation.

22.     On September 22, 2017, a criminal complaint was filed by the Windsor County State's Attorney in Windsor County Criminal Court against the Tenant for stolen silver coins. Pursuant to court procedure, the Tenant was released with conditions requested by the State's Attorney and imposed by Court. The conditions of release did not prohibit the Tenant from returning to his lodging at the Barn House at Clemmons Farm.

23.     The Tenant's lease included the use of a bedroom on the upper level of the Barn House as well as a bathroom and the kitchen on the main floor. Others had access to

the main floor, and it was highly likely there would be encounters between Dr. Clemmons and the Tenant. The State's Attorney failed to address the potential friction that could ensue with the Tenant and Dr. Clemmons sharing the same space at the Barn House. Without applicable conditions of release, law enforcement agencies have limited ability to address disputes that are essentially governed by civil law and lack criminality.

24. The Investigative Report started with the false narrative that VSP discriminated against Dr. Clemmons by creating the untenable situation at the Farm. (Investigative Report, p.12). Even though VSP was not responsible for setting the conditions of the Tenant's release, the Investigative Report persisted on this baseless accusation and falsely elevated it to evidence of discrimination.

25. The Investigative Report next focused on a letter dated March 2, 2017, from the owner of the coins to Hartford Police that expressed concern about retaliation by the Tenant. *Id.* p.11. The Investigative Report suggested that VSP overlooked this letter in setting the conditions of the Tenant's release. Putting aside that VSP did not set the conditions of release, the letter was written six months earlier to a different law enforcement agency. Regardless, a competent State's Attorney would have anticipated potential friction between a criminal defendant and the complaining party living at the same premises. Not only did the Investigative Report reach a false conclusion about VSP's responsibility for the conditions but proceeded to falsely consider it as evidence of discrimination by VSP against Dr. Clemmons.

26. The Investigative Report noted a civil action for eviction was brought by Dr. Clemmons but it was delayed due to her failure to follow the notice requirements to the

Tenant under the governing law. Consistent with its agenda to create a false narrative of discrimination, HRC blamed a trooper for having suggested to Dr. Clemmons to evict the Tenant "right away." (Investigative Report, fn. 24). In doing so, HRC assumed that a well-educated, intelligent person like Dr. Clemmons would, because of her race, conflate the trooper's suggestion to act "right away" with the notice requirements of the eviction process. HRC's treatment of Dr. Clemmons was demeaning and racist.

27. The Investigative Report recounted that on October 6, 2017, Dr. Clemmons reported to VSP the Tenant's truck had blocked access to the wheelchair ramp. The responding trooper considered the situation a civil matter, not criminal. Although the conditions of release were amended by Windsor Criminal Court on October 4, 2017, to prohibit abuse or harassment of Dr. Clemmons, they had not been yet served on the Tenant.

28. HRC considered VSP's failure to issue a civil citation to the Tenant for an unregistered truck as evidence of discrimination against Dr. Clemmons. HRC ignored good policing practices, reasonableness and de-escalation techniques. The issuance of a civil citation with a monetary fine under the circumstances could be viewed as punitive against the Tenant, and would have done little to ease tensions and maintain safety. The needless erosion of the Tenant's confidence in fair treatment by law enforcement would have been a disservice to Dr. Clemmons because his cooperation was one of the best options to reaching a resolution. The trooper's decision and professional discretion not to issue a ticket to the Tenant for an unregistered truck was prudent, promoted safety, and had nothing to do with race.

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

29.     Dr. Clemmons had the truck towed by October 13, 2017. By taking such bold action against the Tenant, Dr. Clemmons demonstrated her high confidence in VSP's handling of the Tenant and her safety. Otherwise, she would not have exposed herself to retaliation by the Tenant. Instead of citing this incident as an example of Dr. Clemmons' belief that VSP had supported her, HRC found she was discriminated against because VSP questioned her credibility for telling the tow company the tow was authorized by VSP. However, VSP had every right to know whether one of the parties had misrepresented police authority. It had nothing to do with race, and everything to do with sound law enforcement.

30.     On October 7, 2017, Dr. Clemmons reported to VSP that the Tenant's two dogs, Doberman pinschers, were off-leash at the Farm. Dr. Clemmons pointed to the amended conditions of release that prohibited harassment but those had not yet been served on the Tenant. HRC concluded it was discriminatory for VSP to have failed to arrest the Tenant, and instead opened a new case file on the dog complaint. VSP issued an internal email requesting expedited service of the amended conditions of release on the Tenant, and service was accomplished the next day, October 8, 2017. The decision not to arrest the Tenant for having dogs off-leash was reasonable and consistent with the law. HRC's standard for proper police service, however, was the abusive arrest of the Tenant for a couple of dogs off-leash.

31.     On October 12, 2017, shortly after the parking and dog incidents, Dr. Clemmons continued to demonstrate feeling protected and empowered by VSP, so much so that she emailed the Tenant with the schedule of the events planned in October at the

Farm and the Barn House. Dr. Clemmons advised the Tenant that these events were "directly managed" by her and consisted of:

(i)     10/11/17 to 10/16/17, a guest would stay at the 2 BR apartment and spend time with Dr. Clemmons in the kitchen;

(ii)    10/12/17, a group of 18 visitors from 1:00 p.m. to 4:30 p.m. would meet Dr. Clemmons at the Barn House and tour the grounds;

(iii)   10/13/17, a group of 35 people would be at the Farm House for an event hosted by Dr. Clemmons, 5:00 p.m. to 6:30 p.m.;

(iv)    10/14/17, a cooking class would be held in the kitchen of the Barn House, 2:00 p.m. to 4:00 p.m. and co-hosted by Dr. Clemmons;

(v)     10/15/17, a second cooking class would be held in the kitchen of the Barn House, 11:00 a.m. to 1:00 p.m. and co-hosted by Dr. Clemmons; and

(vi)    10/15/17, a third cooking class would be held in the kitchen of the Barn House, 3:30 p.m. to 5:00 p.m. and co-hosted by Dr. Clemmons.

(Investigative Report, fn. 52).

32.    Dr. Clemmons' email warned the Tenant that any interference whatsoever with these events would prompt her to call VSP. As she put it:

> I will consider any interference whatsoever by you in the smooth running of this business, and in my ability to peacefully conduct this business and interact with our guests and visitors, as a form of abuse or harassment and I will call the State Police.

*Id.*

33.    Dr. Clemmons' email reflected her state of mind that VSP had handled the situation with the Tenant so well and effectively that her guests including herself (60+ people) could visit the Farm and socialize there. Dr. Clemmons even provided the Tenant with specifics of the events, giving him time and opportunity to plan any disruption. Had Dr. Clemmons felt at the time that VSP was not protecting her because of some discriminatory motive, she would not have been as daring and vocal with the Tenant. Any

reasonable person reading Dr. Clemmons's email would conclude that she had the utmost confidence in the services provided by VSP and its troopers.

34.     Dr. Clemmons planned these social events at the Farm and specifically at the Barn House where the Tenant lived. Dr. Clemmons did not hold these events at other locations on the 148-acre Farm including a separate large residence and farmhouse. With the convenience of outdoor tents, social events can be held at a variety of locations. Indeed, cooking classes held in outdoor tents are trendy and the subject of popular television shows.[2] For HRC to have recognize the obvious fact that Dr. Clemmons was not acting like a victim of racial discrimination, would have undermined HRC's agenda to fabricate a narrative of discrimination.

35.     The Investigative Report did not indicate that any of these events planned by Dr. Clemmons were interrupted by the Tenant. VSP's effective, reasonable and fair policing had successfully managed the situation at the Farm with the Tenant. Again, HRC failed to acknowledge the obvious results of good and fair law enforcement by VSP.

36.     On October 16, 2017, the criminal court issued another amended conditions of release that prohibited the Tenant from coming within 300 feet of Dr. Clemmons, her residence or vehicle. These amended conditions of release were served on the Tenant on October 29, 2017. The Investigative Report noted the reason for the two-week delay in service was "unclear," but lack of evidence did not deter it from concluding it was racial discrimination.

---

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

[2] *See e.g.* https://www.pbs.org/food/shows/great-british-baking-show/

37.    Dr. Clemmons invited 10-15 guests for an event at the Barn House on October 22, 2017. (Investigative Report, p.18). Based on the amended conditions of release, Dr. Clemmons understood the Tenant could not be within 300 feet of her. Dr. Clemmons orchestrated a showdown with the Tenant by bringing herself within 300 feet of him. Dr. Clemmons went into the kitchen where the Tenant was already using as was his right under the lease. Dr. Clemmons then reported the encounter to VSP as a violation of the conditions of release. The Tenant also called VSP to complain that Dr. Clemmons was harassing him.

38.    Plaintiff was dispatched to the Farm to respond to the complaints about the kitchen encounter on October 22, 2017. He activated his video and audio recording device upon arrival, and met Dr. Clemmons and her brother, Josh Clemmons, in the driveway upon arrival. This was plaintiff's first encounter with Dr. Clemmons and the Tenant. As an astute, seasoned trooper, plaintiff quickly recognized the untenable situation with Dr. Clemmons and the Tenant living/working in the same space. Plaintiff attempted to address the parties in a fair and reasonable manner while controlling the risk of aggravation and escalation between the parties and maintaining his own safety. Plaintiff was properly concerned that Dr. Clemmons had brought herself within 300 feet of the Tenant, and explained his concern in a professional, respectful and non-confrontational verbal tone. This was documented by audio/video.

39.    Plaintiff took a statement from the Tenant. Plaintiff was advised by Dr. Clemmons and Josh Clemmons that they would drop off their statements later. Plaintiff successfully de-escalated the situation and handled the cross-complaints by the parties.

40.    Dr. Clemmons verbally pressured plaintiff to have the Tenant's belongings removed from the downstairs portion of the Barn House before the arrival of her guests at 9:00 a.m. Even though Dr. Clemmons did not have the legal right to exclude the Tenant from the kitchen, plaintiff worked diligently to address her wishes. To appease Dr. Clemmons, plaintiff had to build a rapport with the Tenant quickly whom he had just met for the first time. Plaintiff used effective communication to gain cooperation, and helped the Tenant move his belongings out of the hallway. Plaintiff commended the Tenant for being cooperative in resolving the situation. Josh Clemmons remarked that plaintiff went above and beyond for helping to move the Tenant's belongings out of the hallway so that Dr. Clemmon's event could begin on time. Dr. Clemmons happened to have stepped away and was not present when Josh Clemmons made this comment. Dr. Clemmons' attitude was that she wanted plaintiff gone as well by the time her guests arrived. The presence of a law enforcement uniform was viewed by her as a negative. This was a far cry from someone who felt there was inadequate police attention.

41.    After peacefully resolving the encounter in the kitchen, plaintiff advised all parties that he would prepare a report and send it to the State's Attorney for review. Plaintiff later learned that the criminal court had issued an amended conditions of release which were served on the Tenant on October 31, 2017. Those conditions were not applicable at the time of the encounter on October 22, 2017, and hence there was no criminality for the Tenant to be within 300 feet of Dr. Clemmons.

42.    HRC's anti-law enforcement agenda did not allow it to consider plaintiff's involvement for what it was—exemplary law enforcement. He settled a landlord-tenant

quarrel peacefully and in a timely manner for Dr. Clemmons' function to proceed. HRC falsely considered the technique used by Plaintiff to attain the Tenant's cooperation as evidence of favoring the Tenant. HRC then engaged in a mean-spirited, *ad hominem*, attack of plaintiff, starting with a description of his tone as "impatient, brusque, accusatory, confrontational and peppered with perfunctory politeness." (Investigative Report, p.20). The Investigative Report disregarded plaintiff having gone above and beyond to appease Dr. Clemmons when she did not have a court order or other documentation that excluded the Tenant from the kitchen.

43. The Investigative Report falsely concluded that plaintiff had engaged in discriminatory conduct—the alleged conduct and plaintiff's comments are set forth below:

| HRC's False Version | Facts |
|---|---|
| plaintiff described the ambiguous conditions of release as "gray" to Dr. Clemmons, a black person | this is an example of the absurdity of the Investigative Report and the disingenuous reasons to find racism |
| plaintiff expressed his dismay at the unworkable conditions of release | any reasonable person would make the same observation |
| plaintiff observed Dr. Clemmons had brought herself into the kitchen which the Tenant was allowed to use | Dr. Clemmons admitted this. |
| plaintiff failed to probe the status of Dr. Clemmons as a witness in the criminal case | plaintiff was aware of Dr. Clemmons' status as a witness; there was no further detail relevant to plaintiff's task that day |
| plaintiff probed the status of the eviction action | a reasonable inquiry given the civil nature of the landlord tenant dispute |
| plaintiff failed to investigate whether the Tenant had tampered with the locks to the Airbnb in the building | plaintiff's priority was to meet Dr. Clemmons' demand under time pressure that the kitchen be cleared, situation stabilized by 9 a.m., and police be gone for the arrival of her guests |

| | |
|---|---|
| plaintiff opined that the conditions of release had not been violated | True. |
| plaintiff assisted the Tenant to move his belongings from the hallway and kitchen to his room | plaintiff did so to meet Dr. Clemmons' demand to clear the kitchen by 9:00 a.m. |
| plaintiff took a statement from the Tenant re his complaint against Dr. Clemmons and helped him with his statement | any reasonable officer would have done so in response to a complaint by someone unable to articulate well |
| plaintiff expressed skepticism of Dr. Clemmons' representation that her guests were arriving at 9 a.m. when no-one had arrived by 9:30 a.m. | any reasonable officer would consider the credibility of the witnesses/parties in such a situation |
| Plaintiff treated the Tenant in a friendly way and encouraged him to be safe, a gentleman and cooperative | any reasonable officer would do so to encourage someone like the Tenant to cooperate and de-escalate |
| plaintiff tried to calm down the Tenant in a call from him later that day to report kitchen items were taken by Dr. Clemmons; plaintiff suggested that perhaps there was a mistake | a very sensible response by plaintiff to an ongoing quarrel between two individuals who had the legal right to occupy the same space |
| in the same call, plaintiff downplayed the Tenant's report that he was threatened by Josh Clemmons | any reasonable officer would do so in an ongoing quarrel between two individuals who had the legal right to occupy the same space |

(Investigative Report, pp.20-24). No reasonable person would construe the above alleged conduct by plaintiff as deprivation of police services to Dr. Clemmons. Only a biased person with an agenda would view this conduct as discriminatory on basis of race or gender.

44.     The Investigative Report falsely found evidence of discrimination when another trooper on the evening of October 22, 2017, tried to diffuse a 911 call by the Tenant to report that Dr. Clemmons had taken water bottles from the kitchen.

45.     The Investigative Report falsely cited as evidence of discrimination that plaintiff, in an email to his colleagues on October 23, 2017, shared his impression that Dr. Clemmons was "intelligent, persistent and manipulative." Plaintiff's description of Dr. Clemmons was accurate and supported by the record including her attempt to provoke the tenant by planning events in the spaces he had the right to occupy and the confrontation on October 22, 2017, and pressuring plaintiff to clear the Tenant and his belongings for the arrival of her guests by 9:00 a.m. Dr. Clemmons wanted plaintiff to be gone as well to avoid the embarrassment of the presence of a uniformed officer.

46.     The Investigative Report falsely cited as evidence of discrimination that plaintiff shared with his colleagues his belief that the dispute between Dr. Clemmons and the Tenant was civil, not criminal, in nature. Plaintiff forwarded the information regarding the October 22, 2017, incident to the State's Attorney's office and followed his Lieutenant's directions. If plaintiff's assessment was incorrect that the dispute was civil in nature, the State's Attorney's office would have acted accordingly.

47.     The Investigative Report falsely cited as evidence of discrimination that Plaintiff cautioned his colleagues about arresting anyone in this situation as it could prompt an accusation of biased policing. Plaintiff's caution was warranted as both Dr. Clemmons and the Tenant were persons of color in protected classes. Yet HRC took plaintiff's sensitivity about the protected status of Dr. Clemmons and the Tenant as evidence of racism.

48.     The Investigative Report falsely cited as evidence of discrimination that

plaintiff and his lieutenant did not react to Dr. Clemmons' notification on October 25, 2017, that she intended to remove the Tenant's personal property. (Investigative Report, pp.26-27). Dr. Clemmons relied on sections 11 and 14 of the lease to remove the Tenant's belongings. *Id.* 27, n.17. HRC concluded "[i]t appears from the lease that she was within her rights to do this as a landlord." *Id.* Yet HRC expected VSP and plaintiff to treat the Tenant as a criminal suspect for asserting his rights as a tenant. It is not a law enforcement function or service to adjudicate landlords/tenants rights and then attach criminality to the conduct of the losing party. Dr. Clemmons completely misunderstood the role of law enforcement, and HRC, knowing better, exploited that misunderstanding by playing the race card.

49.     On October 27, 2017, Dr. Clemmons had the Tenant's belongings removed and stored in a room that was locked. The Investigative Report falsely cited as evidence of discrimination a trooper's decision to treat the situation as a civil matter including minor damage to the door frame of the room in question which the Tenant admitted happened when he opened the door. HRC expected VSP to abuse its authority in line with the historical pattern in other regions of the Country where white privilege used the police to oppress people of color with false arrests and criminal charges for petty and insignificant disputes.

50.     The Investigative Report falsely cited as evidence of discrimination that on October 28, 2017, plaintiff advised the Tenant by email that the Tenant's version of an encounter with Josh Clemmons was not consistent with a witness statement. HRC has no expertise in policing, and it is not its function to second guess the decision of a seasoned

trooper like plaintiff to confront a witness with credibility issues. This type of micro-management of policing is not the standard for determination of discrimination under Vermont's Fair Housing and Public Accommodations Act.

51. The Investigative Report falsely cited as evidence of discrimination that plaintiff emailed Dr. Clemmons on October 29, 2017, to inquire about the Tenant's allegations that his boots and camera were missing. Plaintiff's email read:

> Hello Lydia, Greg has called to report that his $450 Logging boots and $80 trail camera have been stolen. He advised that only you and Josh have access to the event center/apartment via keys. He did not report any forced entry. Just checking to see if those items could have been moved somewhere to the side while either your or Josh were cleaning up the entryway of your event center. He is requesting a criminal investigation if they are not located. Thank you for your continued assistance with this difficult landlord/tenant situation.

(Investigative Report, p.29). HRC disregarded the fact that plaintiff consistently treated the dispute as a landlord/tenant situation regardless of whether Dr. Clemmons or the Tenant was the subject of a complaint.

52. The Investigative Report falsely cited as evidence of discrimination that on October 29, 2017, the revised conditions of release issued by Court on October 16, 2017 was served on the Tenant by VSP troopers. The Investigative Report could not determine the reason for the delay, and based on absence of evidence concluded it must have been discriminatory.

53. The Investigative Report falsely cited as evidence of discrimination that on October 30, 2017, amidst continuing complaints and counter-complaints by Tenant and Dr. Clemmons, VSP troopers cited the Tenant for violation of conditions but did not charge him for the alleged theft of silverware. HRC's approach in this instance was consistent

with its overall expectation that the function of law enforcement is to protect the wealthy and powerful like Dr. Clemmons by crushing the underprivileged like the Tenant who are also likely in need of mental health services.

54. On November 1, 2017, plaintiff sent Dr. Clemmons an e-mail indicating that because the amended conditions of release had not been served on the Tenant by October 22, 2017, he could not be charged with a crime for the kitchen encounter. Dr. Clemmons replied to say amongst other things, "thank you very much for closing the loop on this" as well as "we understand, and we do appreciate all of the excellent work you are doing," and "thank you again." The Investigative Report did not emphasize these exchanges which were inconsistent with HRC's resulted oriented approach against VSP and plaintiff.

55. The Investigative Report falsely cited as evidence of discrimination that on November 2, 2017, a trooper did not criminally charge the Tenant based on Dr. Clemmons' report that someone had vandalized a lock in the Barn House. Again HRC expected abuse of police powers to engage in false arrest without probable cause.

56. On November 2, 2017, another revised conditions of release was issued by the Court which further restricted the Tenant's movements. The revised conditions of release was served on the Tenant on November 10, 2017.

57. The Investigative Report falsely cited as evidence of discrimination that on November 10, 2017, after the Tenant accused Dr. Clemmons of theft, an internal VSP email emphasized the need for Dr. Clemmons to return the Tenant's property which she admitted

to have taken. Clearly VSP did not treat Dr. Clemmons criminally, but was attempting to facilitate a resolution or reduction in tensions.

58.     The Investigative Report falsely cited as evidence of discrimination that on November 12, 2017, Dr. Clemmons reported the theft of certain items from the Barn House, and a deputy Chittenden County State's Attorney advised the responding trooper that there was insufficient evidence for a search warrant of the Tenant's room. Dr. Clemmons advised the trooper that she had spoken with the Tenant's mother, who believed he had mental health issues. HRC, again, expected VSP to criminally charge a person when the State's Attorney had opined there was no probable cause.

59.     The Investigative Report falsely cited as evidence of discrimination that following a ruling by Chittenden Superior Court on November 15, 2017 that granted the Tenant a temporary stalking order against Dr. Clemmons, a VSP Sergeant noted in an email: "Neither party has demonstrated any violence, however both are very manipulative, vocal and seem content playing the victim by re-agitating this ongoing saga." (Investigative Report, p.38). The Sergeant's email was correct and appropriate under the circumstances.

60.     The Investigative Report falsely cited as evidence of discrimination an encounter on November 15, 2017, when plaintiff and his Sergeant went to the Farm to serve Dr. Clemmons with a court issued stalking order. The reason for HRC's conclusion was not any conduct by the troopers, but their mere existence as uniformed white men. According to the Investigative Report: "Dr. Clemmons described the experience of being served in her home by two white, male troopers as a traumatic one that solidified her sense she was being treated in a discriminatory manner on the basis of race, color and sex." *Id.*

p.38. While Dr. Clemmons' feelings may be informed generally by incidents of police abuse of people of color, both historically and contemporary, it was HRC's function to help her understand that the vast majority of law enforcement including plaintiff are dedicated to serve their communities in a fair and professional manner.

61. In fact, HRC's investigator described the audio recording of the November 15, 2017, encounter as professional, polite and informative:

> [the troopers'] general tone was professional, polite, and informative. References to being arrested, photographed, and handcuffed were explained as what could happen to anyone who violated an order and as part of a resulting process. They came across on the recording as a standard warning to not violate the order so that embarrassment could be avoided. From this investigator's point of view, they were not explicitly presented as threats but were designed to get the listener's attention.

*Id.* p.38.

62. Dr. Clemmons herself at the time made comments like: "Thank you, I appreciate your service, and I didn't know how much you guys actually do in terms of the dialogue, and it's so time consuming, but I really appreciate it." Plaintiff had exhibited his heightened sensitivity by attempting to put Dr. Clemmons at ease with small talk such as complimenting her on the artifacts in her home. When plaintiff and his Sergeant were leaving, Dr. Clemmons stated "Thank you, thank you, thanks again I really appreciate it, we're going to write a movie, Hollywood!"

63. The Investigative Report noted that on November 15, 2017, after serving Dr. Clemmons with the stalking order, plaintiff and his Sergeant visited the Tenant, urged him to move and treated him harshly compared to Dr. Clemmons:

> Sgt. Ravelin treated Barreda very differently than he treated Dr. Clemmons. He was impatient and slightly threatening. Barreda was told that he could

be arrested and booked – the same thing that had been conveyed to Dr. Clemmons, although on what basis was not clear since he was not being served with a TRO. Ravelin was dismissive of his efforts to report alleged wrongdoings by the Clemmons and emphasized that he needed to move out.

*Id.* 39.

64.     It did not matter to HRC that plaintiff's encounter on November 15, 2017 with Dr. Clemmons was exemplary and professional. Plaintiff went beyond the call of duty to show understanding for Dr. Clemmons who was likely upset by the no-stalking court order issued against her. Nor did HRC care that plaintiff and his Sergeant urged the Tenant to move from the Farm. All that HRC cared about was the racial difference between Dr. Clemmons and the troopers at a politically opportune time for police bashing.

65.     Consistent with its approach, HRC focused on a minor mistake made by Sgt. Ravelin for informing both parties that the Court had ordered Dr. Clemmons to return the Tenant's property. Even though Sgt. Ravelin was motivated in earnest to help end the conflict, HRC had to blemish his career by accusing him in the Investigative Report of "manufacturing untrue facts." *Id.* 39. HRC knew this accusation was false and highly detrimental to the career of a law enforcement officer but it would have been contrary to its racist, anti-police agenda to compliment the two troopers and forgo the vindictive jab at Sgt. Ravelin.

66.     The Investigative Report falsely cited as evidence of discrimination that when the Tenant on November 16, 2017 reported his property was stolen, VSP failed to investigate him for property damage and theft. *Id.* 41. This accusation was consistent with HRC's expectation that police services to Dr. Clemmons meant abusive, unlawful and retaliatory measures to be taken by VSP against the Tenant.

67.     The Investigative Report falsely cited as evidence of discrimination that VSP failed to investigate a report by Josh Clemmons on November 23, 2017, of vandalism at the Barn House. The tit-for-tat complaints had made it clear that the parties were utilizing more and more of VSP's limited resources for posturing.

68.     The stalking order issued at the Tenant's petition was dissolved on November 27, 2017, but the Court summoned Dr. Clemmons and her family to a hearing---"once more causing immense humiliation, embarrassment and anguish for [her] and [her] entire family." (Investigative Report, pp.40-41). The legal process was clearly a source of significant stress to Dr. Clemmons starting with the inadequate conditions of release, the "untenable" situation at the Farm, the lengthy eviction process, the unpredictable stalking orders, and the reluctance of two State Attorneys offices to aggressively prosecute the Tenant. Instead of educating Dr. Clemmons about the challenges with the legal process, HRC reinforced her misguided belief that her problems were caused by VSP because of her race.

69.     The Investigative Report falsely cited as evidence of discrimination that VSP failed to investigate the Tenant for the potential theft of his former girlfriend's truck and property. *Id.* pp.42-44. The Investigative Report devoted nearly three pages to this subject when the Tenant's former girlfriend had no relevance to Dr. Clemmons' discrimination complaint against VSP. This is yet another example of HRC's mudslinging strategy.

70.     The Investigative Report recounted that a trooper on November 28, 2017,

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

cited the Tenant with a violation of his conditions of release. *Id.* 44. The citation was based on Josh Clemmons' report that the Tenant had been in areas at the Barn House which were not available to him. *Id.* 44. The Investigative Report failed to objectively consider this citation as police services provided to Dr. Clemmons.

71.     The Investigative Report described the effort by Dr. Clemmons through her attorney in early December 2017 to pressure the Chittenden State's Attorney and VSP to enforce the conditions of release. *Id.* 45. The Investigative Report failed to discuss the potential ethical implications of an attorney using the criminal prosecution of an adverse party in a civil dispute to gain an advantage in the civil case. Rule 4.5 of the Vermont Rules of Professional Conduct states: "A lawyer shall not present, participate in presenting, or threaten to present criminal charges in order to obtain an advantage in a civil matter." The Comment to this Rule provides:

> The civil adjudicative process is primarily designed for the settlement of disputes between parties, while the criminal process is designed for the protection of society as a whole. Threatening to use, or using, the criminal process to coerce adjustment of private civil claims or controversies is a subversion of that process; further, the person against whom the criminal process is so misused may be deterred from asserting the person's legal rights, and thus the usefulness of the civil process in settling private disputes is impaired. As in all cases of abuse of judicial process, the improper use of criminal process tends to diminish public confidence in our legal system.

72.     Whether Dr. Clemmons' attorney had actually violated Rule 4.5 required further investigation at the time. However, the failure of the Investigative Report to address this issue is consistent with HRC's expectation that proper police services to Dr. Clemmons had no bounds in legality or ethics. Instead of objectively observing that overreaching was

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

improper, HRC highlighted the efforts by Dr. Clemmons' attorney to arguably use the criminal justice system to gain an advantage in the civil dispute with the Tenant.

73.     The Investigative Report noted a portion of an email from a VSP Lieutenant on December 1, 2017, to a deputy State's Attorney that stated both Dr. Clemmons and the Tenant were manipulative and unwilling to compromise. (Investigative Report, p.46). The Investigative Report did not credit the Lieutenant with his evenhanded approach which was entirely supported by the record, and instead used this email as evidence of bias against Dr. Clemmons.

74.     The Investigative Report noted that on December 4-5, 2017, Dr. Clemmons hired a security company because she had lost confidence in VSP's responsiveness and willingness to enforce the conditions of release. (Investigative Report, p.46). However, the retention of private security was part of fund raising by Dr. Clemmons by leveraging the false narrative that VSP had failed to protect her, and HRC knew or should have known the true facts. Dr. Clemmons' decision to hire a security company came on the heel of two citations issued by VSP to the Tenant for violation of the conditions of release.

75.     On December 6, 2017, plaintiff and another trooper responded to Dr. Clemmons' report that her security guards had found weapons in a room the Tenant was not allowed to access. The trooper located three firearms in the closet of a room used for storage across the hallway from the Tenant's room on the third floor. There was no legal prohibition against the Tenant possessing firearms, and therefore the weapons located in the closet were returned to his room. Plaintiff and the trooper also observed a lock removed from a door on the second floor and another lock partially removed from another

door on that floor. The Tenant was cited for trespass based on Dr. Clemmons' assertion that he was not allowed in that room, and for violation of condition of release. The Investigative Report failed to acknowledge that plaintiff's actions were consistent with Dr. Clemmons' expectations when she called VSP.

76.     The Investigative Report falsely cited as evidence of discrimination emails on December 6, 2017 between Lt. Lucas and DSA Olney that questioned the credibility of the parties. The fact that within a day or two of its hiring, the security company found weapons in Tenant's belongings that had been removed by Dr. Clemmons some five weeks earlier and stored in the room, would raise red flags for any reasonable observer.

77.     HRC further revealed its anti-law enforcement bias and lack of respect for the troopers by noting that Lt. Lucas was out of touch "with reality" for suggesting to DSA Olney on December 6, 2017, the Tenant had not been violent or argumentative. (Investigative Report, p.48). The Investigative Report did not cite any evidence that the Tenant had been violent or argumentative.

78.     The Investigative Report falsely cited as evidence of discrimination that later on December 6, 2017, when plaintiff and a trooper served the Tenant in Burlington with a citation for violation of conditions of release and trespass, plaintiff attempted to have the Tenant identify his room out of concern that Dr. Clemmons would not move his things. The Tenant was having difficulty telling the troopers which room(s) was part of his lease. It turned out that the lease did not specify which room was assigned to him. (Investigative Report, p.49). Plaintiff's approach was good policing to incentivize the Tenant to be forthcoming about the location of his room—an issue relevant to the trespass citation. To

suggest, as HRC did, that plaintiff favored the Tenant, only showed HRC's bias and anti-police agenda.

79. On December 7, 2017, the Tenant reported that two men had entered his apartment and threatened him with mace. It turned out the men worked for the security firm hired by Dr. Clemmons. Plaintiff spent much time including six hours beyond his shift to address the tension between the Tenant and Dr. Clemmons' security. The Investigative Report falsely cited as evidence of discrimination plaintiff's effort as having provided assistance to the Tenant. However, if plaintiff had any bias or racist sentiment, he would have used this development to cite Dr. Clemmons and his security firm for criminal conduct. Plaintiff had been consistently helpful to Dr. Clemmons from his initial involvement but HRC's agenda was once again an obstacle to the truth.

80. The Investigative Report falsely cited as evidence of discrimination that VSP would not arrest the Tenant and remove him from the Farm based on Dr. Clemmons' report on December 8, 2017 that he had papered over the Barn House windows. The security personnel hired by Dr. Clemmons were shining flashlights into the building late at night and harassing the Tenant . The Investigative Report did not provide an analysis of the supposed criminality of placing paper over windows under the circumstances.

81. The Investigative Report contains a section entitled: "December 9, 2017–More evidence of damage to the Barn House." (Investigative Report, p.56). The reported missing hinges/door was based on photos taken by the Clemmons' security firm on December 6, 2017, the same day that plaintiff and another trooper visited the Barn House, and later that day served the Tenant in Burlington with a citation.

82.    The Investigative Report falsely cited as evidence of discrimination VSP's failure to arrest the Tenant based on Dr. Clemmons' report on December 10, 2017 that certain items in the kitchen could be used in bombs. *Id.* pp.57-59. Dr. Clemmons and her brother called Homeland Security, FBI, the local fire department, and (through their attorney) the State Attorney's office. No evidence of a bomb threat was found. The Investigative Report failed to objectively view this incident as evidence that Dr. Clemmons continued to receive law enforcement services despite an overreaction.

83.    The Investigative Report falsely cited as evidence of discrimination that when plaintiff returned to work on December 10, 2017 after being off-duty and saw an email earlier in the day from Josh Clemmons about the recent events, plaintiff respectfully advised Josh Clemmons to contact trooper Marchand who had been originally assigned to the case and was investigating it. *Id.* pp.59-60. The Investigative Report stated it was "logical" for Mr. Clemmons to email plaintiff in view of his recent involvement but disregarded that if plaintiff had acted in a biased and discriminatory manner, it would have been entirely "illogical" for the victims to reach out to him for further assistance. HRC's bias prevented it from drawing the only logical inference that plaintiff had been helpful to the Clemmons family and he was not perceived as biased or prejudiced.

84.    The Investigative Report quoted an internal email sent by Lt. Lucas to his superior on December 11, 2017 to outline the efforts underway in conjunction with Chittenden State Attorney's office to issue further citations to the Tenant. Lt. Lucas refuted the accusation by Dr. Clemmons' attorney that VSP had not been responsive because of Dr. Clemmons' race. *Id.* 61-62. The Investigative Report appeared to find support in the

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

30

accusation by Dr. Clemmons' attorney, but failed to address whether the attorney was using the race card to advocate on behalf of her client.

85.     On December 14, 2017, a temporary restraining order (TRO) was issued against the Tenant which resulted in the removal of his weapons. On December 17, 2017, VSP responded to a report by Clemmons' security guard of a potential pistol in the Barn House. VSP discovered it was an air gun. On December 18th, Dr. Clemmons contacted VSP to report she had forgotten to show the responding trooper evidence of property damage. A trooper returned to the Farm and was shown an uninhabited building called the "museum" which was in disrepair. The trooper observed damaged wood trims, holes in sheetrock and cracked glass panes in interior doors, all consistent with the overall condition of the building. The Investigative Report was critical of VSP for the failure to cite the Tenant for the dilapidated condition of the museum. *Id.* 64.

86.     The Investigative Report falsely cited as evidence of discrimination that when plaintiff took the initiative on December 19, 2017 to find the Tenant at his girlfriend's apartment and serve him with the TRO, plaintiff tried not to embarrass him in front of his new girlfriend. *Id.* 65. It was abusive and telling for a "Human Rights" commission to be critical of a law enforcement officer's treatment of a citizen with a sense of dignity. HRC's racist and anti-police agenda blinded it to the fact that the Tenant also enjoyed human rights. HRC's website declares in part that it "[e]nvisions a society in which People treat each other with dignity and respect." https://hrc.vermont.gov. Yet when the police treated the Tenant with dignity HRC found it to be evidence of discrimination.

87.     The flash citation served by plaintiff on the Tenant required him to be at

Court on December 21, 2017. However it was not delivered by VSP to the State's Attorney's Office by the deadline of 8:30 a.m. that morning, and as a result no court action was taken on that citation. *Id.* 65-66. The physical delivery of the basket at the Barracks for delivery to the State Attorney's office can be delayed for a variety of reasons. The delay on this day had nothing to do with plaintiff. The Investigative Report falsely portrayed this as retaliatory to an online Internal Affairs complaint filed over three hours later at 11:55 a.m. by Dr. Clemmons. Even though the timeline did not support even the mention of retaliation, HRC was undeterred by the truth and the mudslinging continued.

88. On December 21, 2017, Dr. Clemmons sent an email to VSP command requesting the removal of another trooper and plaintiff from her case because she felt they were racially biased. *Id.* 66. Objectively, there was no evidence of any bias or racism by plaintiff or other troopers. Over the course of the preceding two months from October 22, 2017 when plaintiff has his first encounter with Dr. Clemmons he had made every reasonable effort to provide her with proper law enforcement services and assistance. Dr. Clemmons clearly conflated her sense of frustration with the civil and criminal justice system with suspicion that she was a victim of racial bias by VSP. HRC should have educated her that a trooper's refusal to abuse his/her powers is not evidence of racism.

89. On December 28, 2017, the Chittenden Superior Court, after an evidentiary hearing, extended the TRO against the Tenant to a year. The Investigative Report quoted and highlighted the Court's decision that accepted Dr. Clemmons' evidence over the Tenant's. The Investigative Report gave the false impression that VSP and its troopers could have acted like a judge and hold an evidentiary hearing, take testimony, accept one party's

evidence over another's, and had the authority to issue TRO orders. Instead of educating Dr. Clemmons on the separate functions of the actors in the civil and criminal justice systems, HRC continued to muddy the waters to advance its race based political agenda against law enforcement.

90.    The Investigative Report acknowledged that neither the Chittenden nor the Windsor State Attorneys pursued any of the criminal charges against the Tenant. This was not surprising given the limited resources of prosecutors and the overall trend in the criminal justice system away from incarceration. One would expect the State's "Human Rights Commission" to understand the societal misgivings about excessive imprisonment of the population, particularly the indigent and those in need of mental health services. By conflating Dr. Clemmons' stressful situation with VSP's failure to charge the Tenant with even more criminality (which as evidenced by the inactions of the State Attorney's offices would have gone nowhere), HRC remained true to its objective of political gain.

91.    On February 6, 2019, the Chittenden Superior Court extended the no-stalking order issued against the Tenant by three years. The Investigative Report treated the Court's ruling as yet another example of decisive action against the Tenant that should have been taken by VSP. In addition to the above criticism of HRC for equating court authority with VSP's, HRC failed to acknowledge that these court orders, practically speaking, have limited effectiveness due to considerations against prosecution and incarceration. HRC's unrealistic view of the role of law enforcement in the overall criminal justice system was not the result of naivete, but a deliberate falsehood employed to enhance its findings against VSP.

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

33

92.     HRC, on June 10, 2021, illegally released the Investigative Report to Seven Days for publication. The controlling statute, 9 V.S.A. §4555, clearly states in subsection (a)(1) that with certain exceptions, "[t]he Human Rights Commission's complaint files and investigative files shall be confidential." The exceptions address the release of the investigative file to the parties and law enforcement agencies. The statute provides that "[i]f the Commission determines that there are reasonable grounds to believe that discrimination has occurred, that determination and the names of the parties may be made public after the parties have been notified of the Commission's determination." 9 V.S.A. §4555(c). Plaintiff was not a party to the matter before HRC, and his reputation and career would have been spared if HRC had complied with the law to publicly release only the determination that reasonable grounds existed to find VSP had discriminated against Dr. Clemmons on the basis of race and gender. Such a disclosure would not have involved the disclosure of the individual identities of the troopers including plaintiff who had responded to Dr. Clemmons. Had Seven Days complied with the law, it would not have become a conduit for HRC's illegal and false scheme which damaged plaintiff's career and reputation. The individual harm done by defendants to the troopers named, including plaintiff, was intentional and motivated by ill will, and their names could have been readily redacted even if the decision was made to unlawfully release the Investigative Report.

93.     The Investigative Report was manipulated to change the initial conclusion of a HRC investigator that the discrimination charge could not be sustained. A report dated July 16, 2020, was issued by HRC investigator, Nelson M. Campbell, to two individuals whose names were redacted but in context appear to be Dr. Clemmons and her brother, Josh

Clemmons. ("First Report"). Investigator Campbell wrote that "[t]here is *insufficient* evidence to support the existing legal standard (which I discuss below) that would show that the VSP treated either of you or your family in a discriminatory manner based either on sex or race and color." *Id.* p.1, emphasis added.

94.     Investigator Campbell further explained in the First Report, the applicable legal standard of "markedly hostile" treatment by a service provider such as merchants:

> There are several reasons for my findings and recommendation. In the first instance, for purposes of race and color, a complainant must show "markedly hostile" treatment by the Respondent. That standard derived from a year 2000 Maryland federal district court case1 involving merchants, not law enforcement, but it has never been embraced by the Second Circuit (our circuit). To prove marked hostility, courts examine indicators of objectively unreasonable conduct including: "(1) [conduct that was][ ] profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination." Those could be adapted to law enforcement of course, but the Second Circuit has noted that it can be difficult to distinguish instances of "declining civility" versus hostility based on race and color. It is not robust.

*Id.*

95.     Investigator Campbell noted that in addition to a weak legal basis for the charges against VSP, there was no "comparable" case for law enforcement services rendered to a white family seeking police services in a similar situation:

> Absent (or in addition to) sufficient evidence of marked hostility due to race and color, you need a "comparator" - that is, in this case - a white individual or family in similar circumstances, who was delivered services by the VSP in a more favorable way than your family. At one point, I had considered [redacted] as a possible comparator, however (as Leise noted on Thursday in his interview) he was also considered a "person of color"- not white. I also note Leise's email of 10/23/17 to Lt. Lucas and Sgt. Hammond regarding

the VCOR: "I just don't want to see someone go down, arrest someone, and then the ACLU gets involved due to both parties backgrounds, etc. and that the biased state police made a bad judgement call." The instances of comparison found in the other incident reports are not extensive enough for me to make a comparison. This means I do not have a comparator or evidence to support an already weak legal standard. I will return to the issue of discrimination based on sex further below while I review the bases for my recommendation. Please be aware that I am highlighting the areas below, but my report will go into far greater detail.

*Id.*

96. Investigator Campbell described VSP as an organization with a top down command structure that puts out fires and mediates but does not have the ability and resources to function like a victim's advocate. Ms. Campbell advised Dr. Clemmons that from VSP's perspective, "[t]hey accommodated you a great deal and delivered services to you above and beyond including time off (Leise)." *Id.* p.2. Ms. Campbell noted that from Dr. Clemmons' perspective, her situation with the Tenant was "[t]he most important thing in the world" but "[i]n the context of every other case that was going on at the time in Chittenden County, it wasn't." *Id.* p.3. Investigator Campbell concluded: "I cannot find sufficient evidence to support the legal standard that the decision of the VSPs, their actions and non-actions were based on race and color." *Id.*

97. Investigator Campbell explained to Dr. Clemmons that troopers are bound by legal constraints, and the conditions of release imposed by court contributed to the frustrating situation at the Farm with the Tenant. As she put it: "Troopers and Sergeants were bound by legal constraints and court orders. *Windsor County really messed things up with the conditions of release as you well know.* It created frustration on your end and theirs and it contributed to the creation of a fraught relationship and confrontations with [redacted]

that turned into nothing because they could not be enforced." *Id.* p.3, emphasis added. The Investigator concluded that arguably there could have been additional citations issued to the Tenant, but she did "[n]ot find evidence sufficient to support the legal standard, that the failure to do so was based on race and color." *Id.* (extra comma in original).

98.     Investigator Campbell acknowledged in the First Report the limited function of a law enforcement agency like VSP, and that "[r]eality in fact is he [Tenant] would not have been kept in jail at all or only overnight in most instances." *Id.* 3.   Investigator Campbell added the Tenant may have become more angry with police strong arm tactics. *Id.* Investigator Campbell concluded again that "I cannot find sufficient evidence to support the legal standard that the decision of VSPs, their actions and nonactions were based on race and color." *Id.* 4.

99.     Investigator Campbell explained to Dr. Clemmons that her claim of sex discrimination also failed.   Investigator Campbell noted the Tenant provided a comparable case of police services to a male who had complained about Dr. Clemmons.   Investigator Campbell noted that VSP's treatment of the Tenant was less favorable than hers.   By way of example, Investigator Campbell referred to the audio recording of the service of the TRO on Dr. Clemmons by plaintiff and Sgt. Ravelin on November 15, 2017:

> I obtained an audio recording of that meeting. I am cognizant that I am unable to see facial expressions or body language. I am also cognizant that having police officers in one's home, particularly under such awful circumstances is traumatic. I do not dismiss or disbelieve how you felt. However, the audio presents a version of the encounter that is at variance with your account of it and the assertions made in the complaint and interview. They spent about an hour and six minutes with you. Their tone was professional, polite and informative. References to arrest, photos and the like were informational and explained as part of various processes and were not presented as threats towards you. They listened to many of your

complaints about [redacted] and offered advice about going to court to contest the temporaly order and recommended what kind of evidence you should take with you. The meeting ended with laughter, and compliments from them on your [redacted] and on the [redacted] and comments about the situation someday becoming a movie. After leaving you, they went to see [redacted] where they spent about 22 minutes. They treated him very differently than they treated you. They were impatient, slightly threatening in the way I had expected you to have been threatened based on your description. They were dismissive of his efforts to report things you had allegedly done to him. They kept emphasizing that he needed to move out. I will send you a link to the audio. In sum, there is no support for disclimination based on sex attached to that encounter. In addition, collectively, the reasons supplied by the VSP that make it impossible to prove race and color, also make it impossible to prove pretext in the context of sex discrimination. To the extent they treated [redacted] "better" or with kid gloves, their reasons - not escalating the situation, "ambiguous" CORs, lack of direct evidence - apply.

100. Over the course of approximately three months from September to December 2017, Dr. Clemmons engaged in the following:

(a) induced the Tenant to move into the Barn House and make a new home/job there;

(b) report the Tenant to the police shortly after he moved in solely because he used silver coins for his rental deposit;

(c) have the Tenant arrested and subjected to criminal charges for an alleged crime of theft of coins not involving her property;

(d) have the Tenant's activities strictly regulated at his home and workplace by way of court-imposed conditions of release;

(e) provoke the Tenant by scheduling social functions in the same spaces that he had the right to occupy as a tenant and voluntarily bring herself in contact with him;

(f) report the Tenant repeatedly to VSP with the expectation that he would be criminally charged and/or arrested;

(g) proceed with an eviction action;

(h) unilaterally remove the Tenant's belongings, lock them up in a storage room and complain to VSP when he attempted to access his property;

(I) attempt to gain an advantage in the eviction action by pressuring VSP and the State's Attorney's office to prosecute the Tenant;

(k) report falsely to Homeland Security and the FBI that the Tenant posed a bomb threat;

(l)     enjoy access to resources such as private attorneys and a security firm;

(m)    communicate readily with two State's Attorney's offices and VSP troopers up and down the ranks; and

(n)     engaged in fund raising by leveraging the false narrative that because of her race she was denied police services.

101.    In many parts of the country, historically people of color and particularly black people have experienced racial discrimination and treated as second class citizens. People of color were given menial jobs, low wages, lived as tenants at the mercy of landlords, arrested for the slightest irregularity, criminally prosecuted, and threatened with the loss of their homes and livelihood. People of color did not enjoy the same access to government resources and power as the wealthy, white, privileged class. Although some progress has been made in the recognition of the civil rights of people of color, much work remains to be done to eliminate racial discrimination and injustice.

102.    Dr. Clemmons enjoyed considerable economic and social superiority relative to the Tenant. Dr. Clemmons was well-educated, lived on and operated a large and prestigious historic farm, and enjoyed social recognition and status as a person of privilege. Seven Days in its article described her as "a Black woman who is a member of the prominent Charlotte family that owns and runs the historic Clemmons Family Farm." The Tenant was poor or indigent, appeared to have mental health issues, and enjoyed no status or privileges in society. He was given a menial job by Dr. Clemmons, paid low wages, lived as her tenant, and the slightest suspicion that someone like him should not be in possession of silver coins led to his criminal prosecution and repeated efforts to enhance his prosecution for incarceration and loss of liberty.   Dr. Clemmons exhibited the type of access to state power that is typical for the privileged in society.  She was not a victim of discrimination

and did not act like one. Dr. Clemmons leveraged the situation as one of the police not protecting a black family.

103.    Dr. Clemmons may have experienced stress and upset by the actions of the Tenant which she perceived as threatening her security and peace. Yet she misplaced her frustration with the justice system, which in a democracy and the rule of law, is not the most efficient in addressing conflicts such as the one involving Dr. Clemmons and the Tenant. Her experience had nothing to do with discrimination on the basis of race or gender, and everything to do with a law enforcement agency and its troopers that maintained their integrity and high level of professionalism.

104.    In every encounter with Dr. Clemmons, plaintiff acted professionally and fairly in the best tradition of law enforcement. From October 22, 2017, his first encounter when he rolled up his sleeves and helped move the Tenant's belongings from the kitchen to meet Dr. Clemmons' demand for her social event, to the November 15, 2017 service of a restraining order on Dr. Clemmons (issued by the same justice system that HRC holds up as the gold standard for truth finding when favorable rulings were made for Dr. Clemmons) with utmost respect and sensitivity to her feelings, and the many hours of his personal time spent late into the night on December 7, 2017 to settle the friction between the Tenant and security firm. As Dr. Clemmons in her own words had said to plaintiff: "Thank you, I appreciate your service, and I didn't know how much you guys actually do in terms of the dialogue, and it's so time consuming, but I really appreciate it."

105.    A good opportunity for HRC to discharge it statutory mission to educate

and find reconciliation was usurped by defendants who were interested in self-promotion, politics and publicity/headlines. The defendants' action and scheme placed Vermont's largest law enforcement agency in the rank of racist with a false news story and the illegal release of a biased Investigative Report. There was no due process of law that was owed to each trooper named in the Investigative Report, including plaintiff, before HRC, in concert with Seven Days, damaged their reputations and careers. Criminal defendants are afforded considerably far more rights in this State than plaintiff and his trooper colleagues, while the consequences of loss of reputation and career can be as grave. Defendants' actions were reprehensible and they must be held accountable.

106.    Plaintiff's personal and professional reputation has been seriously damaged, and his career in law enforcement has practically ended as a result of defendants' conduct in damaging his otherwise untarnished reputation. Plaintiff's name is indefinitely attached to the Investigative Report and the Seven Days article which will negatively affect his future ability to work in law enforcement, or for that matter, any professional employment and provide for his family financially.

## COUNT ONE
## (VIOLATION OF PROCEDURAL DUE PROCESS CLAUSE–LIBERTY INTEREST, 42 U.S.C. §1983)

107.    Plaintiff refers to and incorporates the allegations in paragraphs 1-106.

108.    42 U.S.C. §1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

## A.    Person Acting Under Color of Law

109.    At all relevant times, defendant HRC was acting under color of state law as an entity created by state law, Title 9, chapter 141, 9 V.S.A. §§4551-4556. However, HRC is not an "arm of the state" like a state agency which is protected against suit in federal court under the Eleventh Amendment. HRC is governed by five members who are appointed by the Governor with the advice and consent of the Senate, each for a term of five years. *Id.* §4551(a)-(b). Members are compensated a maximum of $1,000 per year but not as a state employee. *Id.* §4551(d); 3 VSA §311(a)(2). The Governor does not have the authority to remove members, and the State does not have veto power over HRC actions. The State exercises no control over HRC except for the Governor's appointment of the members, and such authority is not enough to make HRC the functional equivalent of a state agency.

110.    HRC has jurisdiction to investigate complaints of discrimination in violation of Chapter 139, public accommodations and rental and sale of real estate. 9 V.S.A. §4552(b)(1). HRC's jurisdiction extends to the State "[w]hen the party complained against is a State agency . . ." in fair employment practices and workers' compensation discrimination claims. *Id.* Accordingly HRC can be, and is, adverse to the State, and pursues litigation against the State for the enforcement of these laws . *See e.g. Human Rights Comm'n v. State*, 2012 VT 88, ¶1, 192 Vt. 552, 554, 60 A.3d 702, 704 (FEPA disability discrimination against Agency of Transportation); *Vt. Human Rights Comm'n v. State* , 2015 VT 138, ¶ 1, 201 Vt. 62, 66, 136 A.3d 188, 192 (FEPA equal wage action against the DOC

and Department of Human Resources). As an adversary of the State, HRC's statutory responsibility to prosecute certain laws prevents it from maintaining any loyalty or ties to the State that would compromise its independence. For HRC staff who are licensed attorneys and as such provide legal advice to HRC relative to any complaints against the State, it would raise ethical conflicts if such staff are also on the State's payroll as employees.

111.    The statutory scheme for HRC does not require the State treasury to pay a judgment against HRC such as a potential judgment for money damages against HRC and/or individually named defendants in this case. HRC is not structured to function like a state agency. As a statutory entity created to enforce certain laws, HRC is a state actor but lacks the relationship, control and intimacy with the State that would render it an "arm of the state" subject to the protection under the Eleventh Amendment.

112.    Defendant Bor Yang through her own individual actions violated the Constitution. Defendant Yang participated in the drafting of the Investigative Report, its false findings and recommendations, and signed it. She participated in the change of the conclusion in the First Report from "lack of evidence of discrimination" to the conclusion in the Investigative Report that "grounds existed for discrimination." Defendant Yang participated in the release of the Investigation Report to Seven Days in violation of the law. Defendant Yang similarly violated HRC's rules which provide for limited release of the investigative report to the parties and certain law enforcement agencies:

> 33.    The complaint and investigative files maintained by the Commission are confidential and will *only be released* to the parties, their attorneys and to any state or federal law enforcement agency seeking to enforce anti-discrimination statutes upon reasonable request. The

> identities of non-party witnesses may be revealed as part of the
> investigative file upon request unless the executive director has
> determined that there is good cause to protect the witnesses'
> identities. Information, that is otherwise protected from public
> disclosure pursuant to 1 V.S.A. §317 (as from time to time
> amended), may be withheld from the parties and their attorneys or
> provided in redacted form at the discretion of the executive director.

(Rules of The Vermont Human Rights Commission, Rule 33, emphasis added). Even with

a limited release, defendant Yang had the discretion to redact the names of the troopers but

failed to do so because of malice and ill-will. Defendant Yang participated in the scheme

with Seven Days, contributed to the Article's contents and covered up the real reasons for

the change in conclusion from the First Report to the Investigative Report, all to advance her

career at the expense of the reputations and careers of VSP troopers including plaintiff.

Defendant Yang individually violated plaintiff's due process liberty interest by labeling him

as a racist, damaging his good name, and depriving him of his ability to work as a trooper,

all without a hearing or due process. Her conduct was malicious, unlawful, wanton and

motivated by ill will. In a posting dated June 5, 2020, on the site of Vermont Commission

on Women, defendant Yang exhibited her anti-police bias and agenda by writing, in part:

> Now that you are listening, we demand the following:
>
> .           .           .
>
> Immediately terminate officers who have engaged in two or more incidents
> of bias in the community .     .     .

Defendant Yang's comments shows that she has no regard for the due process rights of law

enforcement officers and her goal in unlawfully releasing the Investigative Report was to

end the careers of plaintiff and other troopers involved with Dr. Clemmons.

113.    Defendant Kevin Christie through his own individual actions violated the

Constitution. Defendant Christie approved the Investigative Report by his vote that it provided grounds to believe VSP had discriminated against Dr. Clemmons on the basis of race and gender. Defendant Christie was aware of the First Report, and knew it was manipulated to generate the false assertions and conclusions in the Investigative Report. In a conference call on April 14, 2021, at the request of DPS Commissioner Michael Schirling, defendant Christie was advised that DPS was "shocked" by the change in the conclusion of the Investigative Report that "[s]tated exactly the opposite of the First Report . . . ." Defendant Christie was advised that changes in the "tone, tenor, and voice" of the Investigative Report suggested the findings were manipulated. Defendant Christie confirmed that HRC had decided not to pursue litigation against VSP/DPS at that time, and understood that other than the dialogue with him there was no other outlet to raise VSP/DPS concerns or appeal. In less than a month from this conversation, defendant Christie participated in the unlawful release of the Investigative Report and supported the Seven Days' defamatory Article and contributed to its contents. In a letter dated July 28, 2021, defendant Christie ratified the unlawful release of the Investigative Report as well as the false contents of the Investigative Report. He refused to provide plaintiff an opportunity to meet with HRC to discuss clearing his name. Defendant Christie not only approved and ratified the deprivation of plaintiff's liberty interest but denied plaintiff the opportunity for a post-deprivation meeting. Defendant Christie approved the labeling of plaintiff as a racist, damaged his good name, and deprived him of his ability to work as a trooper, all without a hearing or due process. His conduct was malicious, unlawful, wanton and motivated by ill will.

114.    Defendant Da Capo/Seven Days as a private entity acted in concert with HRC, a state actor, to the extent necessary for liability under section 1983. Defendant Da Capo was a willful participant in HRC's scheme to publicly indict DPS/VSP and the troopers including plaintiff with false accusations, to damage their reputations, and to deprive them of their constitutional right to due process. In return for access to an "unpublished" Investigative Report, Da Capo spun the story in HRC's favor and portrayed itself as a source of breaking news. To make the "story" more appealing to its readers and thereby increase the return on its article, Da Capo decided to focus on plaintiff, disproportionally enhance his involvement, place him in a false light, and knowingly and maliciously defame him.

115.    Defendant Da Capo's request to HRC for the Investigative Report was an overt act indicative of the agreement to act in concert. HRC in an executive session discussed and approved the release of the Investigative Report upon request. Da Capo/Seven Days made the anticipated request on June 10, 2020 and HRC promptly complied.

116.    Consistent with the agreement to act in concert, HRC did not post the Investigative Report on its website to make it available directly to the public at large. According to defendant Yang's communication with Seven Days, investigative reports become public upon a determination of discrimination. Yet the Investigative Report was first released to the press starting with Da Capo/Seven Days. The attempt by HRC to manipulate the release of the Investigative Report was part and parcel of its scheme and conduct in concert with Da Capo/Seven Days.

117.     Da Capo acknowledged in its article its early access to the Investigative Report by noting it was "unpublished" by HRC. This came in the opening sentence of the Article: "In an *unpublished* report, the Vermont Human Rights Commission has found . . . ." (Seven Days Article, 6/23/21, emphasis added). The Article added: "The Human Rights Commission's report was never made public and does not appear on the public body's website." The fact that the Investigative Report was not made public from June 10, 2021 when it was given to Da Capo/Seven Days, to June 23, 2021 when the Article was published, *and* Da Capo/Seven Days knew the Investigative Report had remained "unpublished" by the time it "broke" the story, is further evidence of the scheme and action in concert with HRC.

118.     Da Capo/Seven Days knew as a matter of law the Investigative Report was confidential. 9 V.S.A. §4555. The controlling statute, 9 V.S.A. §4555, clearly states in subsection (a)(1) that with certain exceptions, "[t]he Human Rights Commission's complaint files and investigative files shall be confidential." The exceptions address the release of the investigative file to the parties and law enforcement agencies. Subsection (c) provides: "If the Commission determines that there are reasonable grounds to believe that discrimination has occurred, that determination and the names of the parties may be made public after the parties have been notified of the Commission's determination." 9 V.S.A. §4555(c). Had HRC complied with the law and its own rules, it would have made public the determination that it concluded there was reasonable ground for discrimination on the basis of race and gender in a complaint brought by Dr. Clemmons against DPS/VPS. The Investigative Report and the names of the individual troopers would not have been disclosed publicly.

119.    The reason for the confidentiality of investigative reports is commonsensical and reasonable. Investigative reports are written by HRC staff without the checks and balances associated with an adversarial process and due process. The author(s) can be wrong, ill informed, or act maliciously with an agenda. Individual witnesses who were compelled by the investigative authority of HRC to provide evidence are identified in the reports, and they may become, as did plaintiff in this case, the subject of personal, *ad hominem*, attacks without the right and opportunity to defend themselves. Confidentiality is a check against government abuse of witnesses and their defamation. Witnesses such as plaintiff did not enjoy the traditional due process rights such as notice, hearing, confrontation and examination of witnesses, and presentation of evidence. Da Capo/Seven Days was aware of the vulnerability of named witnesses in such investigative reports.

120.    The statutory provisions applicable to HRC are readily available in Title 9, chapter 141, and can be accessed online in a matter of minutes. <https://legislature.vermont.gov/statutes/title/09>. Chapter 141 is entitled "Human Rights Commission" and consists of six sections, §§4551-4556. The heading for section 4555 includes "disclosure, confidentiality." A glance at the headings of each section guides the reader to the applicable statute which can be easily read and understood. Not only was Da Capo/Seven Days charged with the knowledge of the law but the information was readily available.

121.    The Seven Days article included the following statement by defendant Yang:

> "That report is made available to the public upon request but there is no obligation on the HRC's part to post anything on our website or to otherwise announce the decision," she wrote. "A decision was made to not post this report on our website but to make it available

> upon request. The basis for that decision was discussed in executive session."

*Id.* Seven Days published this statement to distract the readers from its arrangement with HRC. The unsuspecting reader was taken to a supposed HRC decision made at an executive session which would thereby end speculation as to the reason Seven Days received the Investigative Report.

122. Da Capo knew Dr. Clemmons did not want the Investigative Report to be made public. The Article indicated that per defendant Christie, the "Clemmons had requested the report not be made public. . . , " adding that "the family was concerned about reactions to the report from both the general public and the former tenant." *Id.* Defendant Christie in his July 28, 2021, letter stated that HRC's typical practice was to post the investigative reports but in Dr. Clemmons' case it decided not to do so---"[t]he departure from typical practice is that the HRC did not post this investigative report on its website due to concern of harassment by the complainant." (Christie 7/28/21 letter). Da Capo/Seven Days was conveniently resigned to the inconsistency in defendant Christie's story that the Investigative Report was not posted online out of concern for the Clemmons family but instead it was made available to the press for even greater publicity. Seven Days did not advise its readers that HRC was not even required to make public its determination that reasonable grounds existed for discrimination. 9 V.S.A. §4555(c)(use of permissive language "may be" relative to HRC's decision to make public its determinations and the names of the parties). The Article failed to advise the readers that HRC rules did not provide for the online posting of investigative reports. The publication of Christie's story

without challenge was yet another effort to distract from the deal between Seven Days and HRC.

123. Da Capo/Seven Days sensationalized the story by a disclosure under the guise of "transparency" to create a fake moment of editorial intimacy with its readers, and share that it too was concerned about the harassment of the Clemmons family resulting from the publicity that they did not want. Seven Days reported that after a discussion amongst its news editors and consultation with a journalism ethics specialist in Wisconsin, it was persuaded by the "newsworthiness" of the story told in the Investigative Report:

> For the sake of transparency, we want to publicly note the factors that influenced our decision to publish a story two weeks after obtaining the report. Those include the newsworthiness of the story and the fact that it involves a *public report* prepared by a public body that raises concerns about the Vermont State Police — at a time when Vermonters are engaged in vigorous discussions and debate about systemic racism.

*Id.* To add a sense of public mission, Seven Days misled the readers by describing the Investigative Report as a "public report." The entire charade about Da Capo/Seven Days and HRC having been concerned about the well-being of the Clemmons family and having struggled with the difficult question of how to best serve the public on such an important and timely story, was to sensationalize the story and self-promote, another indication of action in concert.

124. Da Capo/Seven Days failed to disclose to its readers as part of the feigned transparency many important points including but not limited to:

> (a)    the identity of the person who had tipped it to request the Investigative Report for a HRC determination made three months earlier,
>
> (b)    what was the date of the HRC executive session to approve the release of the Investigative Report upon request, given that "Seven

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

50

Days requested the report on June 10, and commission staff emailed it that day," (Seven Days Article 6/23/21),

(c)    that the Investigative Report by law was confidential,

(d)    the inconsistencies in HRC's story as well as it rules regarding posting and releasing upon request the investigative reports and the process in Dr. Clemmons' case (see above),

(e)    that investigator Campbell was no longer with HRC,

(f)    that investigator Campbell was not contacted to check whether *she* had changed the conclusions of the First Report or the changes were made by her superiors under her electronic signature and falsely attributed to her,

(g)    what was the actual evidence that supposedly came to the attention of HRC between July and November 2020 which caused the 180 degree flip-flop in the conclusions that were reached over the course of the preceding three years of investigation,

(h)    a link to the First Report along with a link to the Investigative Report,

(i)    that the individual troopers named in the Investigative Report had not been given the opportunity to defend themselves against the serious accusations of race and gender discrimination,

(j)    the identities of the "[s]everal members of the public [who] subsequently [after June 10]contacted us [Seven Days] to express worry that writing about the report could endanger the Clemmons family"?

(k)    why did HRC decide not to abide by the Clemmons family wish to keep the Investigative Report confidential,

(l)    how did these supposed members of the public become aware of the contents of the Investigative Report which per Seven Days had not been made public?

(m)    why Seven Days did not contact plaintiff for his comments when the journalism ethics specialist it consulted would have advised that the Code of Ethics for the Society of Professional Journalist provides "Diligently seek subjects of news coverage to allow them to respond to criticism or allegations of wrongdoing."

(n)    Josh Clemmons who was present during some of the VSP interactions including plaintiff's on October 22, 2017, did not believe there was any discrimination by the troopers imcluding the plaintiff, and so indicated to HRC. Josh Clemmons' impression was that plaintiff had done outstanding work and solved the problem on the October 22, 2017, kitchen encounter by de-escalating the situation.

(o)    Dr. Clemmons had leveraged the situation with the Tenant for fund raising under the false guise of a black family left unprotected by the police.

125.     Consistent with its arrangement with HRC, Da Capo/Seven Days wrote a biased article that favored HRC and falsely portrayed HRC's involvement and findings. In addition to the above omissions and misrepresentations noted in paragraph 124, Da Capo/Seven Days engaged in the following, without limitation, to spin the story in HRC's favor:

(a)     misrepresented the news story with the headline: "Vermont State Police Discriminated Against Black Woman Who Runs Clemmons Family Farm, Commission Says." The objective headline would have been akin to: "Vermont Human Rights Commission Struggles with Mismanagement and Keeping True to its Mission."

(b)     misrepresented HRC's mission as "[e]nforcing the state's civil rights laws." (Seven Days article, 6/23/21). Seven Days knew HRC's charge is limited to complaints of discrimination in violation of FHPA, and in certain cases against the State. 9 V.S.A. §4552(b)(1). Seven Days exaggerated HRC's charge to avoid the complex issue of the applicability of public accommodations laws to police services and the standard or metrics used to determine potential discriminatory denial of services.

(c)     failed to disclose that HRC had manipulated/influenced Seven Days to violate the confidentiality of the Investigative Report.

(d)     failed to disclose that HRC was seeking publicity for self-promotion and political gain, contrary to its statutory charge to educate and resolve complaints.

(e)     failed to address the true reason behind the flip-flop in conclusions between the First Report and the Investigative Report, and whether it was the result of corruption and influence.

(f)     covered up the story behind potential disagreements at HRC about the First Report by publishing, without challenge, Bor Yang's generic explanation that it is "not unusual for a staff attorney to sway back and forth as they consider new and evolving evidence in a case." (Seven Days article, 6/23/21).

(g)     misrepresented the findings of the Investigative Report as "bluntly worded" when the Investigative Report was a rambling, biased, conflicted, unmanageable document that contained absurdities such as the observation that plaintiff had referred to the conditions of release as "gray" in a situation involving a "black" person.

(h)     emphasized at the beginning and throughout the Article, HRC's false premise that VSP had "allowed" the Tenant to "prey on" and "terrorize" Dr. Clemmons and "destroy" a Farm building. *Id.* Seven

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

52

Days knew that VSP had no authority to control the Tenant's conduct or unilaterally "remove" him for any extended period of time from the Farm. *Id.* Seven Days failed to explain to its readers the limited power of law enforcement to physically remove people from their homes. Seven Days failed to tell its readers that the police power expected by HRC was unconstitutional, abusive, contrary to the separation of powers and the liberties and freedoms of the people.

(i)     failed to challenge HRC's exaggeration of the Tenant's conduct by noting there was no physical violence by the Tenant and the scope of the actual damage to the Barn House.

(j)     failed to report the ongoing involvement of two State Attorney's offices in Windsor and Chittenden counties with the authority to charge the Tenant, formulate the conditions of release and seek other relief from the courts,

(k)     omitted that these State Attorneys had considerably more access to the courts–the institution that has the final authority to deprive individuals of their freedom; and that essentially these State Attorneys did nothing to help Dr. Clemmons,

(l)     failed to report that even Dr. Clemmons' private attorney was unable to obtain a restraining order from the court until December 14, 2017, and the court hearing was not held until December 28, 2017.

(m)     failed to report that in a state that disfavors incarceration of its people particularly those in need of mental health services, the question was whether it was realistic to expect the Tenant to be imprisoned by the courts for his alleged conduct,

(n)     failed to raise the question of whether it was reasonable for HRC to blame VSP for "allowing" the Tenant to harass Dr. Clemmons when in actuality the State Attorneys did not prosecute and the courts did not incarcerate him.

(o)     misled its readers about the significance of Dr. Clemmons' situation which while upsetting to her, was (as the First Report indicated) a common type of tit-for-tat conflict seen daily in courts regardless of race. Seven Days falsely elevated the significance of Dr. Clemmons quarrel with the Tenant by equating it with the George Floyd case: "This particular report, regarding Vermont's largest police agency, lands in the midst of a national reckoning on policing and race. Even before a Minneapolis police officer killed George Floyd, a Pew Research Center poll found that 84 percent of Black adults and 63 percent of white adults felt police treat Black people less fairly."

(p)     misled its readers on the issue of race by publishing, without challenge, Dr. Clemmons' remark that "Had her family been white, . . . , the authorities would have removed Barreda immediately from the family farm." According to investigator Campbell, there was no

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

53

comparable case of police treatment of a white family. *Id.* ¶95, *supra*.

(q) misled its readers on the issue of race by publishing, without challenge, that "The Clemmons report echoes complaints that Kiah Morris made regarding the Bennington Police Department." There was no allegation or evidence that the Tenant, unlike the perpetrator in Kiah Morris' situation, was motivated by racism. The Bennington PD was accused of the failure to properly respond to a claim of racist harassment of a black person. The "Clemmons report" shows numerous VSP resources and staff devoted to a landlord-tenant quarrel with no racial dynamics. HRC concluded that VSP had discriminated against Dr. Clemmons because it did not act like a para-military force in a banana republic to make the Tenant "disappear."

(r) misrepresented that one reason for investigator Campbell's change of the conclusion in the First Report was a September 23, 2020 posting on VSP Facebook about the lyrics of a song. The posting happened to be on the same day the authorities in Louisville, Kentucky, announced no charges for police shooting of a black woman. The Facebook posting was noted in footnote #309 of the Investigative Report in context of the writer's rant and unwarranted attack on Lt. Lucas. (Investigative Report, pp.96-97). The passage that the investigator changed her mind (supposedly) as "the evidence kept coming in" appeared in another paragraph on a different topic. Seven Days focused on the irrelevant contents of footnote #309 to enhance the prejudicial and false character of the Article.

126.    Defendants shared the common unlawful goal of publicly disseminating the

Investigative Report and thereby grabbing an anti-law enforcement headline that fit the

current national issues with racial justice. As a result defendants damaged the reputations

and the ability to work in law enforcement of the troopers involved including plaintiff. Da

Capo posted the Investigative Report, published a misleading and exaggerated article lacking

balance and input from the accused troopers such as plaintiff, failed to post the First Report,

and falsely elevated HRC's investigation of a landlord-tenant quarrel to be on par with

national issues such as the murder of George Floyd. All this was part of an agreement

between Da Capo/Seven Days and HRC that required them to act in concert.

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

54

## B.    False and Stigmatizing Statements about Plaintiff

127.    Defendants HRC, Yang and Christie falsely accused plaintiff in the Investigative Report as a racist, and unlawfully made the false accusation public. *See* ¶s 38-43, 45-48, 50-51, 60-64, 78-79, 83, 86-88, and 92.    HRC devoted a section of the Investigative Report to plaintiff, starting with the false statement that "Cpl. Andrew's [sic] Leise's treatment of Dr. Clemmons and Josh Clemmons on October 22 and beyond, in contrast to his treatment of Barreda, is a significant example of disparate treatment based on race, color, and sex." (Investigative Report, p.88).    The Investigative Report falsely concluded: "Leise's treatment of Barreda and his treatment of both Clemmons, particularly Dr. Clemmons, is not evidence of professional conduct – it is evidence of pretext and it is proof of discrimination against Dr. Clemmons on the basis of race, color, and sex." *Id.* p.90. Josh Clemmons, however, did not believe there was any discriminatory or racist conduct by plaintiff, and maintained his position that Cpl. Leise had done an outstanding job in addressing the situation with the Tenant.    HRC downplayed and/or disregarded the critical evidence from Josh Clemmons, and falsely branded plaintiff as having discriminated against him and his sister on the basis of race. The accusation that a public employee particularly a law enforcement officer is racist is a serious stigma, one that denigrated plaintiff's competence as a professional trooper and impugned his professional reputation in such a fashion as to effectively put a significant roadblock in his continued ability to engage in his profession as a law enforcement officer.

128.    Defendant Da Capo's focus on plaintiff in the Seven Days article was to

personalize the face of the targeted law enforcement agency for the "bogeyman" effect with its readers which in turn would stimulate interest in the story. Defendant Da Capo not only acted in concert and conspiracy with HRC to deprive the troopers and plaintiff of their due process rights but singled out plaintiff to personally abuse him for a more appealing story.

129.    Plaintiff was one trooper out of some dozen who were involved and wrongfully accused of racism in the Investigative Report. Yet Seven Days focused only on plaintiff, named him, and in a misleading manner described his encounters with the parties. Seven Days falsely highlighted plaintiff's conduct as racist. Plaintiff harbors no prejudice or bias against others for their race, ethnicity or gender. He has been proactive in participating in fair and impartial policing practices as an informal FIP barracks leader within the Vermont State Police directly under a VSP Commander. Like many Americans, plaintiff's extended family includes people of color and ethnicity, and he harbors no racist beliefs or sentiments.

130.    In addition to the misrepresentations and/or omissions listed in paragraphs 124 and 125 which contributed to the false article, Seven Days specifically presented plaintiff's involvement in a false and misleading light in a number of ways including, without limitation:

> (a)    omission that the amended conditions of release that imposed a 300' barrier had not been served on the Tenant by the time of the kitchen encounter on October 22, 2017, and therefore the Tenant could not have been arrested or cited criminally (¶41, *supra*);
> (b)    omission that Dr. Clemmons had held a number of events in mid-October with over 60 guests at the Farm, threatened the Tenant to report him to VSP if any disruption, and there was not any (¶s31-35, *supra*);

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

(c)     omission that on October 22, 2017, the Tenant was already in the kitchen before Dr. Clemmons chose to enter the kitchen to set up her call to VSP that the Tenant was within 300' of her (¶37, *supra*);

(d)     omission that upon his arrival and learning both parties had access to shared areas, plaintiff commented the conditions of release were "gray" under circumstances, and the Investigative Report suggested the use of "gray" with a "black" person showed racial bias. (¶43, *supra;* Investigative Report p.20). Had Seven Days reported this absurd observation, the credibility of HRC and its findings would have been eroded in general and specifically as to plaintiff;

(e)     omission that the reason plaintiff sought the Tenant's cooperation to move his belongings from the kitchen and helped him, was to satisfy Dr. Clemmons' demand that the kitchen be cleared by the time of arrival of her guests at 9:00 a.m. (¶40, *supra*). Seven Days gave the false impression that plaintiff was eager to be friendly and helpful to the Tenant because Dr. Clemmons was black;

(f)     omission that Josh Clemmons expressed to plaintiff that he went above and beyond for helping to move the Tenant's belongings out of the hallway so that Dr. Clemmon's event could begin on time.

(g)     omission that Dr. Clemmons by email thanked plaintiff for his help on October 22, 2017. (Investigative Report, p.21).

(h)     omission that investigator Campbell in First Report found Dr. Clemmons lacked credibility. Specifically, relative to the encounter with plaintiff and Sgt. Ravelin on November 15, 2017, the investigator told Dr. Clemmons : "[t]he audio presents a version of the encounter that is at variance with your account of it and the assertions made in the complaint and interview." *Id.* ¶99, *supra.* Seven Days, however, reported the Investigative Report found evidence of racial bias by plaintiff because he "doubted her [Dr. Clemmons'] honesty." This aspect of the article coupled with the omission that the investigator had also questioned Dr. Clemmons' credibility placed plaintiff in a false light.

(i)     omission that after receipt of the First Report, Dr. Clemmons advised the investigator for the first time she was falsely polite to the "white" troopers because as a black woman she was in fear of incarceration. This explanation should have raised red flags because the credibility concern was not so much Dr. Clemmons' behavior but her description to the investigator of the behavior of plaintiff and Sgt. Ravelin. (Investigative Report, p.39). Seven Days should have informed its readers that it appeared Dr. Clemmons had played the race card with HRC.

(j)     omission that investigator Campbell described the tones of plaintiff and Sgt. Ravelin on the November 15, 2017, encounter with Dr. Clemmons as "professional, polite and informative" *Id.* ¶s 61, 99,

*supra*. Instead Seven Days reported criticism of plaintiff's tone toward Dr. Clemmons, and that according to an associate professor in linguistics, plaintiff's speech reflected "the systemic racism and implicit racial bias that characterize institutions in the United States."

(k) misrepresentation by implication that an associate professor in linguistics is qualified to opine on plaintiff's state of mind, and her opinion is legally relevant to the standard for showing discrimination under the statute in question.

(l) omission that on November 15, 2017 after serving Dr. Clemmons with the TRO, plaintiff and Sgt. Ravelin visited the Tenant and treated him in a threatening manner and urged him to move out. *Id.* ¶63, *supra*.

(m) failure to report that on the November 15, 2017, visit with Dr. Clemmons, plaintiff complimented her art collection and made small talk, all in an effort to ease her upset for having become the subject of a court issued restraining order. *Id.* ¶64, *supra*.

(n) failure to report that Dr. Clemmons said to plaintiff: "Thank you, I appreciate your service, and I didn't know how much you guys actually do in terms of the dialogue, and it's so time consuming, but I really appreciate it." *Id.* ¶s 62,104, *supra*.

(o) failure to report that in every of the handful of encounters with Dr. Clemmons, plaintiff attempted to be helpful and responsive in a professional manner. *Id.* ¶104, *supra*.

(p) failure to report that at the outset of his involvement, plaintiff on 10/23/17 had issued an internal email to express caution about the treatment of both the Tenant and Dr. Clemmons as members of a protected class: "I just don't want to see someone go down, arrest someone, and then the ACLU gets involved due to both parties backgrounds, etc. and that the biased state police made a bad judgement call." *Id.* ¶s 45, 95, *supra*.

(q) failure to report that on December 7, 2017, plaintiff spent many hours including his personal off-duty time to address the tension between Dr. Clemmons' security firm and the Tenant, and did so without siding with the Tenant and issuing a criminal citation to the security firm or Dr. Clemmons. *Id.* ¶79, *supra*.

(r) omission that Seven Days did not contact plaintiff for his comments, and the process before HRC is such that plaintiff did not have the rights of the parties.

(s) omission that Josh Clemmons who was present during some of the VSP interactions including plaintiff's on October 22, 2017, did not believe there was any discrimination by the troopers imcluding the plaintiff, and so indicated to HRC. Josh Clemmons' impression was that plaintiff had done outstanding work and solved the problem on

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

58

the October 22, 2017, kitchen encounter by de-escalating the situation.

(t) omission that Dr. Clemmons had leveraged the situation with the Tenant for fund raising under the false guise of a black family left unprotected by the police.

## C. **Stigma-Plus Without Due Process**

131. Official government actions that are akin to the adjudication of disputed facts in particular cases are subject to the requirements of procedural due process. *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245, 93 S. Ct. 810, 821, 35 L. Ed. 2d 223 (1973). The issuance of the Investigative Report and the determination of reasonable grounds for discrimination by HRC on March 25, 2021, were adjudicative as they made fact findings in a particular complaint asserted by Dr. Clemmons as detailed above.

132. The Fourteenth Amendment protects the liberty interest of public employees such as plaintiff when their reputation and standing in the community are seriously damaged or current employment and/or future employment opportunities are lost as a result of government action. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573-74, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). "[T]o constitute deprivation of a liberty interest, the stigmatizing information must be both false . . . and made public . . . by the offending governmental entity." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980). The requisite stigma is present when the government accuses a government employee publicly and falsely of racism.

133. The false and defamatory public impression of plaintiff as a racist created by HRC and publicized and compounded by Seven Days severely damaged plaintiff's reputation, standing in the community, and his ability to continue his career as a law

enforcement officer. HRC and Seven Days imposed an indelible stigma on plaintiff and his impeccable reputation, good name, honor and integrity as a law enforcement officer and effectively ended his career.

134.    As a result of the release of the Investigative Report and the Seven Days Article, plaintiff has been unable to return to work as a VSP trooper. The "badge of infamy" imposed on plaintiff by HRC has substantially impaired his ability to safely and effectively operate as a law enforcement officer in the community and the criminal justice system. A law enforcement officer labeled by a state commission such as HRC as a racist, a label compounded by a news article online will not be acceptable as a witness by prosecutors or the judiciary. Defendants' actions are tantamount to plaintiff's constructive discharge as any reasonable law enforcement officer in his position would find it intolerable to continue to work as a trooper. Plaintiff's job was protected under state law by requirement of a showing of cause before he can be terminated. Plaintiff has suffered a loss of income as a result of defendants' conduct. Plaintiff has been seeking employment in positions that do not involve his engagement with the public while wearing a VSP uniform. By and large these positions offer lower pay and benefits, and are less prestigious.

135.    Stigma-plus is present in plaintiff's case with public allegations that "'[d]enigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession.' *Gordon v. Nicoletti,* 84 F. Supp. 2d 304, 311 (D. Conn. 2000); *accord Donato v. Plainview-Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 630-31 (2d Cir. 1996)." *Martinez v. City of N.Y.,* 2003 U.S. Dist. LEXIS

7295, at *19-20 (S.D.N.Y. Apr. 29, 2003). As required in this Circuit for stigma-plus, there is a "[t]angible and material state-imposed burden or alteration of his or her [plaintiff's] status or of a right . . . ." *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001).

136. The actions of the defendants have ended plaintiff's prospect for future employment in law enforcement. Stigma-plus exists when some of the consequences of the stigmatizing conduct are potential and may be realized in future. *Donato v. Plainview Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 632 (2d Cir. 1996) (stigma-plus satisfied where "[p]otential future employers undoubtedly will consult plaintiff's prior employer" and discover the stigmatizing statements).

137. The stigma-plus imposed by HRC (a state actor) on plaintiff (a state employee), is not analogous to any action that can be taken by a private actor. The "Human Rights Commission" is a generally trusted governmental function, and the decisions of a Human Rights Commission can be viewed by the public with a sense of fairness, neutrality and absence of political influence. HRC is tasked with discharge of statutory responsibilities including investigation, subpoena power, authority to compel testimony and access to documents, and pursuit of prosecutions even against the State. 9 V.S.A. §4553. A private actor has no such authority or cachet. A private actor may be capable of making defamatory statements but lacks the authority and the credentials of HRC to impose the "badge of infamy" of racism on individuals by unlawfully releasing an investigative report. Individual defendants because of their positions with HRC were able to impose the loss of plaintiff's

reputation and career in law enforcement. Identical actions to HRC's could not have been undertaken by a private actor. *Doe, supra,* 54.

138.    Plaintiff was not afforded any hearing or opportunity to clear his name before or after the release of the Investigative Report by HRC to Seven Days on June 10, 2021. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). "Only when the whole proceedings leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented." *Doe, supra,* 51-52. *Cf. Stone v. Town of Irasburg* , 2014 VT 43, ¶ 32, 196 Vt. 356, 369, 98 A.3d 769, 778.

139.    On July 29, 2021, HRC through defendant Christie declined to meet with plaintiff to discuss with him the restoration of his reputation. Defendant Christie thereby reaffirmed the defendants' malice and ill-will toward plaintiff, and deprived plaintiff of the opportunity for a post-deprivation name-clearing. *Stone v. Town of Irasburg*, 2014 VT 43, ¶ 35, 196 Vt. 356, 371, 98 A.3d 769, 779.

140.    Defendants' conduct violated clearly established statutory and constitutional rights of which a reasonable person in their position would have known. Defendants' conduct was not objectively reasonable.

### D.    **Damages Caused by Defendants**

141.    As a result of the violation of plaintiff's constitutional due process right in liberty interest, plaintiff has suffered and will continue to suffer loss of income for the remainder of his work life. Plaintiff has been unable to wear his service uniform and resume

his work as a trooper with the public label of racist unlawfully imposed on him by the defendants. No reasonable law enforcement officer in plaintiff's circumstances can be publicly branded as a racist and continue to wear his service uniform with a sense of respect and dignity that the job demands. Plaintiff's career of nearly 22 years with an impeccable record was ended by defendants' actions.

142. Plaintiff seeks compensatory damages for loss of income for the balance of the career he would have enjoyed with VSP until retirement. He also seeks what is described in the case law as "garden variety" emotional damages for upset, humiliation, embarrassment and damage to his good name. To the extent not inconsistent with an award of compensatory damages, plaintiff seeks nominal damages for the violation of his constitutional rights. Had HRC and Seven Days complied with the law, plaintiff who was not individually a party before HRC, would not have become personally the subject of public humiliation and disgrace by the defendants. Plaintiff further seeks recovery of his attorney's fees, interest, and costs.

**E.** **Punitive Damages**

143. Defendants' conduct was malicious, intentional, willful, wanton and exhibited ill will toward plaintiff. HRC and its leadership intentionally acted illegally by publicly releasing the Investigative Report, intentionally violated plaintiff's constitutional rights, violated its statutory obligations and betrayed its public trust by engaging in manipulative behavior and self-promotion, and was guided by racist values. Seven Days was motivated by profit and self-promotion as a news organization. Defendants chose to destroy plaintiff's career in law enforcement and crush his reputation because of his race and

uniform. It did not matter to the defendants that plaintiff had invested his entire career of nearly 22 years in law enforcement, had pride in service to the public and was able to support his family. Plaintiff was targeted as a representative of the "white police" to pay a price for defendants' political agenda. Punitive damages are appropriate to punish defendants and deter others from such conduct.

## COUNT TWO
### (VIOLATION OF PROCEDURAL DUE PROCESS CLAUSE–PROPERTY INTEREST, 42 U.S.C. §1983)

144.    Plaintiff refers to and incorporates the allegations in paragraphs 1-143.

145.    "The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 9, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978).

146.    Plaintiff's job as a VSP trooper was protected under state law, and he could not be discharged without just cause. *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001) (noting that public employees terminable only for cause have a "constitutionally protected property interest in their tenure"; accordingly they are to be provided with "notice and opportunity for a hearing." citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)).

147.    By unlawfully releasing the Investigative Report to the press, defendants HRC, Christie and Yang, as detailed above, placed a false "badge of infamy" on plaintiff as a racist without providing him with notice, a hearing and due process. Defendant Da Capo

participated in the violation of plaintiff's due process constitutional right by publishing the Investigative Report as well as the article that enhanced the false allegations against plaintiff.

148.     As a result of defendants' violation of plaintiff's due process rights, plaintiff's work conditions became intolerable as he can no longer function effectively and safely as a law enforcement officer.  Plaintiff's career in law enforcement has ended.  The defendants were motivated by ill will and intended to deprive plaintiff of his due process right by inditing him publicly and preventing him from defending himself.  Defendants did not expect that a trooper like plaintiff would have the will to assert his legal rights when steamrolled by a negative public reaction to the charge of racism.  The plan and expectation of the defendants was that VSP and its troopers including plaintiff would suffer, without asserting their legal rights, the public humiliation delivered by the false findings of racism which a biased news source like Seven Days would not challenge.

149.     Plaintiff's job as a trooper was effectively taken from him by defendants' unlawful, wanton and deliberate actions.  Plaintiff was deprived of his property interest in his employment as a trooper without any due process of law.  As a result he has suffered loss of income and will have future losses and other consequential economic losses.  Plaintiff seeks recovery of compensatory and punitive damages per the allegations in paragraph 141-143 incorporated here. Plaintiff seeks recovery of his attorney's fees, interest and costs.

## COUNT THREE
### (VIOLATION OF SUBSTANTIVE DUE PROCESS CLAUSE, 42 U.S.C. §1983)

150.     Plaintiff refers to and incorporates the allegations in paragraphs 1-149.

151.     "Substantive due process protects individuals against government action that

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

is arbitrary, conscious-shocking and oppressive in a constitutional sense, but not against governmental action that is incorrect or ill-advised. (Citations)" *Lowrance v. C.O.S. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994). *See also Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989) (requiring evidence that official action was "arbitrary or irrational or motivated by bad faith"), *cert. denied*, 496 U.S. 941, 110 L. Ed. 2d 671, 110 S. Ct. 3225 (1990). The due process clause "was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 196, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989)(*quoting Davidson v. Cannon*, 474 U.S. 344, 348, 88 L. Ed. 2d 677, 106 S. Ct. 668 (1986).

152.    The scheme detailed above involving the defendants constituted government action that violated plaintiff's substantive due process, and was arbitrary, conscious-shocking, irrational, oppressive and motivated by bad faith in a constitutional sense. Defendants deliberately and intentionally devised a plan that manipulated and falsified the First Report to generate the opposite conclusion in the Investigative Report, unlawfully released the confidential Investigative Report with the complicity of the press to shape public opinion, self-promote politically, indict VSP troopers in the court of public opinion and deprive them of their due process right. Defendants acted maliciously and intended to harm the troopers including plaintiff by damaging their names, reputations and careers because they are white and wore the VSP service uniform. As a result, plaintiff has suffered loss of his career, loss of income, and the other losses and harms alleged above. Plaintiff seeks compensatory, nominal and punitive damages as well as his attorney's fees, interest and costs.

## COUNT FOUR
## (INVASION OF PRIVACY)

153.   Plaintiff refers to and incorporates the allegations in paragraphs 1-152.

154.   "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restat 2d of Torts, § 652E.

155.   The facts detailed above satisfy the elements of a claim for invasion of privacy. Defendants gave publicity to the Investigative Report which in part concerned plaintiff, place him individually and specifically before the public in a false light as a racist, a highly offensive label particularly for a law enforcement officer, and defendants did so intentionally to ruin his reputation and career. At a minimum defendants were reckless for failing to redact plaintiff's name as well as the names of the other troopers who had no notice or ability to exercise their due process rights. Defendants' conduct was not absolutely or conditionally privileged. The unlawful scheme was not part of the official duties of a superior executive officer of a state. The illegal dissemination of the Investigative Report did not, and cannot, serve an interest of the publisher which interest is lawfully protected by the public's knowledge of the defamatory statement.

156.   As a result of defendants' conduct, plaintiff has suffered loss of his career, loss of income, and the other losses and harms alleged above. Plaintiff seeks compensatory, nominal and punitive damages as well as interest and costs.

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

67

## COUNT FIVE
## (DEFAMATION)

157.     Plaintiff refers to and incorporates the allegations in paragraphs 1-156.

158.     "To create liability for defamation there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Restat 2d of Torts, § 558; *Stone v. Town of Irasburg* , 2014 VT 43, ¶ 61, 196 Vt. 356, 380, 98 A.3d 769, 785. "One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession, or of his public or private office, whether honorary or for profit, is subject to liability without proof of special harm." Restat 2d of Torts, § 573.

159.     Defendants published defamatory factual material as detailed above in the Investigative Report and the Seven Days Article regarding plaintiff to accuse him of racism, a defamation per se, which also caused harm and injury in fact to plaintiff. Defendants' conduct was malicious and not privileged. Defendants had knowledge of the falsity of the statements and/or acted in reckless disregard of their truth or falsity.

160.     As a result of defendants' conduct, plaintiff has suffered loss of his career, loss of income, and the other losses and harms alleged above. Plaintiff seeks compensatory, nominal and punitive damages as well as interests and costs.

## COUNT FIVE
## (INTERFERENCE WITH CONTRACT)

161. Plaintiff refers to and incorporates the allegations in paragraphs 1-160.

162. "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him." Restat 2d of Torts, § 766A; *Stone v. Town of Irasburg*, 2014 VT 43, ¶ 66, 196 Vt. 356, 382, 98 A.3d 769, 786. Defendants' conduct as detailed above constituted intentional interference with plaintiff's employment as he has been prevented from working as a trooper. Defendants' conduct was not privileged or otherwise protected from liability for intentional interference with contract.

163. "One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." Restat 2d of Torts, § 766B. Defendants' conduct as detailed above constituted intentional interference with plaintiff's prospective employment as a law enforcement officer. Defendants' conduct was not privileged or otherwise protected from liability for intentional interference with contract.

Cleary Shahi & Aicher
110 Merchants Row
Post Office Box 6740
Rutland, VT 05702-6740

(802) 775-8800

164.    As a result of defendants' conduct, plaintiff has suffered loss of his career,

loss of income, and the other losses and harms alleged above. Plaintiff seeks compensatory,

nominal and punitive damages as well as interests and costs.

WHEREFOR, plaintiff seeks recovery of compensatory damages, nominal damages,

punitive damages, interest, attorney's fees, costs and such other relief as may be proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

Dated this 13th day of May, 2022.

Respectfully Submitted,

Cleary Shahi & Aicher, P.C.
PO Box 6740
Rutland, Vermont 05702
(802) 775-8800
kss@clearyshahi.com
ATTORNEYS FOR PLAINTIFF