UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 MAR 24  PM 2: 03

CLERK
BY_____ LAW
DEPUTY CLERK

ANDREW LEISE,                          )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )      Case No. 2:22-cv-00009
                                       )
VERMONT HUMAN RIGHTS                   )
COMMISSION, KEVIN CHRISTIE, BOR        )
YANG, DA CAPO PUBLISHING, INC., and    )
JOHN AND JANE DOE I–X,                 )
                                       )
        Defendants.                    )

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO
FILE SUPPLEMENTAL FIRST AMENDED COMPLAINT, DENYING
DEFENDANTS' SPECIAL MOTIONS TO STRIKE, AND GRANTING IN PART
AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**
(Docs. 12, 13, 33, 34, 58)

Plaintiff Andrew Leise, a Vermont State Police ("VSP") trooper, brings this action against Defendants the Vermont Human Rights Commission ("VHRC"); Bor Yang, Executive Director of VHRC, in her official and personal capacities; Kevin Christie, Chairman of VHRC, in his official and personal capacities (collectively with VHRC and Ms. Yang, the "VHRC Defendants"); Da Capo Publishing, Inc. ("Seven Days"), a Vermont corporation that publishes the newspaper Seven Days; and John and Jane Does I–X, the "individual actor(s) [who] carried out the actions of [V]HRC and Seven Days[.]" (Doc. 58-4 at 7, ¶ 18.).

Plaintiff's claims arise out of a November 2020 determination by VHRC that there were reasonable grounds to find that VSP discriminated against Lydia Clemmons, PhD, based on her race and gender. Plaintiff claims VHRC's determination (the "Final Determination"), its wrongful release of a confidential investigative report (the "Investigative Report"), and Seven Days's subsequent reporting about the same falsely

portrayed him as racist and sexist. In his First Amended Complaint ("FAC"), he asserts six causes of action against Defendants: (1) a procedural due process claim (liberty interest/stigma plus) under 42 U.S.C. § 1983 (Count I); (2) a procedural due process claim (property interest/constructive termination) under § 1983 (Count II); (3) a substantive due process claim for arbitrary and oppressive government action under § 1983 (Count III); (4) an invasion of privacy claim under Vermont law (Count IV); (5) a defamation claim under Vermont law (Count V); and (6) a tortious interference with contract claim under Vermont law (Count VI).

Five motions are pending before the court. On February 14, 2022, Seven Days filed a motion to dismiss for failure to state a claim (Doc. 12) and a special motion to strike pursuant to Vermont's anti-SLAPP statute, 12 V.S.A. § 1041. (Doc. 13.) On April 1, 2022, VHRC Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) (Doc. 34) and a special motion to strike pursuant to 12 V.S.A. § 1041. (Doc. 33.) On May 13, 2022, Plaintiff moved for leave to file a Supplemental First Amended Complaint ("SFAC"). (Doc. 48.)

Plaintiff is represented by Kaveh S. Shahi, Esq. VHRC Defendants are represented by Justin G. Sherman, Esq. and Lisa B. Shelkrot, Esq. Seven Days is represented by Matthew B. Byrne, Esq.

## I.      Factual and Procedural Background.

### A.      Procedural History.

Plaintiff filed his initial Complaint on January 18, 2022. On May 13, 2022, after Defendants moved to dismiss, Plaintiff moved for leave to amend his Complaint (Doc. 48), which Seven Days opposed. The court held a hearing on June 17, 2022 at which it conditionally granted Plaintiff's motion for leave to amend, ruling that it would consider Defendants' motions in light of Plaintiff's FAC. The court granted in part and denied in part Seven Days's motion for judicial notice. (Doc. 15.) It agreed to take judicial notice of the Investigative Report and Seven Days article which are the basis of Plaintiff's

2

claims, but not Seven Days's remaining requests.[1] At the conclusion of the hearing, the court took Defendants' special motions to strike (Docs. 13, 33) and motions to dismiss (Docs. 12, 34) under advisement.

On July 14, 2022, Plaintiff moved for leave to file his SFAC (Doc. 58), which Seven Days and VHRC Defendants oppose. Plaintiff replied on August 5, 2022, at which time the court took Plaintiff's motion for leave under advisement.

On August 9, 2022, Seven Days filed a notice of supplemental authority, alerting the court to an unpublished August 8, 2022 order of the Vermont Superior Court, Rutland Unit, dismissing a defamation claim because it found the reporting "on official police reports and criminal proceedings related to those reports" was "protected by Vermont statute, the Vermont Constitution, and the United States Constitution." (Doc. 63-1 at 3.)

On November 16, 2022, VHRC Defendants filed a notice of supplemental authority, alerting the court to an unpublished October 14, 2022 decision of the Vermont Supreme Court, which affirmed the trial court's dismissal of a lawsuit against the VHRC commissioners. (Doc. 64 at 1.) VHRC Defendants also cited an August 16, 2022 decision by the Supreme Court of Delaware, in which the court held that "shockingly racist and tone deaf" comments a plaintiff made to protect his "white, Christian heritage" did not "state or imply provably false and defamatory facts" about the plaintiff. *Id.* at 2 (internal quotation marks omitted).

One month later, on December 13, 2022, Seven Days filed a second notice of supplemental authority (Doc. 65), alerting the court to a December 13, 2022 decision of the Vermont Superior Court, Chittenden Unit, which adopted the reasoning of the August 8, 2022 order of the Vermont Superior Court, Rutland Unit, cited by Seven Days in its first notice of supplemental authority.

---

[1] In addition to the VHRC report and Seven Days article, Seven Days asked the court to take judicial notice of the State of Vermont's Online Directory and an Opinion and Order from an action in which Seven Days was the plaintiff, *Courthouse News Serv. v. Gabel*, 2021 WL 5416650 (D. Vt. Nov. 19, 2021). The court denied those requests for judicial notice because the Online Directory is not relevant as Plaintiff does not deny he is still employed by VSP and because the Opinion and Order may be relied upon without judicial notice.

**B.     Plaintiff's Motion to Supplement His First Amended Complaint.**

Plaintiff moves to supplement his FAC pursuant to Fed. R. Civ. P. 15(d) to include allegations pertaining to: (1) a July 1, 2022 email from an employee of the University of Vermont Medical Center ("UVMMC") purporting to rescind a job offer previously extended to Plaintiff because of "the VHRC findings" (Doc. 58-1 at 1), and (2) a July 11, 2022 affidavit of Laura Clemmons, Dr. Clemmons' sister (the "Laura Clemmons Affidavit"). (Doc. 58-2.) Defendants assert that Plaintiff's proposed amendments are procedurally improper and have no impact on the analysis of their motions to dismiss.

Rule 15(d) provides: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Courts analyze Rule 15(d) motions using the "same standards used to evaluate motions to amend pleadings under [Rule 15(a),]" *Bemben v. Fuji Photo Film U.S.A., Inc.*, 2003 WL 21146709, at *1 (S.D.N.Y. May 19, 2003), and have broad discretion in determining whether to allow a party to file supplemental pleadings under Rule 15(d). *See Kahn v. Gen. Motors Corp.*, 865 F. Supp. 210, 215 (S.D.N.Y. 1994) ("This [c]ourt has broad discretion to allow supplemental pleadings.").

"Absent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility, the motion [to supplement] should be freely granted." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995). The party opposing a Rule 15(d) motion "bears the burden of establishing that amendment would be futile[,]" *Destine v. Joseph*, 2021 WL 5827652, at *1 (S.D.N.Y. Dec. 8, 2021), by demonstrating that "the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Defendants contend the Laura Clemmons Affidavit sets forth facts which predate the FAC and is thus not a supplemental pleading under Rule 15(d). In addition, they complain that Plaintiff's successive amendments have needlessly delayed this litigation and increased its expense. Plaintiff counters that Defendants fail to allege bad faith,

undue delay, or prejudice and asserts that his supplementation remains appropriate under the liberal standards of Rule 15(d).

The UVMMC July 1, 2022 email "serve[s] both to add information about events that have occurred subsequent to the date of the original complaint, and to clarify Plaintiff's prior allegations." *Bemben*, 2003 WL 21146709, at *1. UVMMC's purported rationale for not hiring Plaintiff is relevant to whether Plaintiff has plausibly alleged he suffered actual harm as a result of Defendants' conduct. The court thus considers the document in evaluating the pending motions to dismiss.

The Laura Clemmons Affidavit is dated July 11, 2022 and contains assertions by Ms. Clemmons that she "believe[s] [Dr. Clemmons] can weaponize race to give her an advantage in situations of conflict or when she wishes to maintain power" and that Dr. Clemmons made false statements to Seven Days. (Doc. 58-2 at 1.) She avers: "If anyone had contacted me about the accusation of racism by [Dr. Clemmons] against the [VSP], I would have given the same information as outlined here with any additional details if requested." *Id.* at 2.

The Laura Clemmons Affidavit is "closely related to [the allegations] raised in the [FAC] and throughout the litigation thus far[,]" because it pertains to whether Defendants' alleged failure to adequately investigate Dr. Clemmons' claims was evidence of actual malice. *See Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008) (granting leave to supplement where the plaintiff's new allegations "involve[d] the same subject matter . . . , many of the same people[,] and the same employer" and "took place shortly after the [event] that [was] the subject of this litigation"). Although Plaintiff claims he was only able to obtain the Laura Clemmons Affidavit after the FAC was filed, the affidavit itself refers to events that predate the FAC. To the extent that the SFAC incorporates new allegations based on the Laura Clemmons Affidavit, it does not "set[] out any transaction, occurrence, or event that happened *after* the date of the pleading to be supplemented[,]" as Rule 15(d) requires. Fed. R. Civ. P. 15(d) (emphasis supplied). Although this would ordinarily be dispositive, the court credits Plaintiff's claim that the affidavit itself was not available. Defendants

concede that the supplementation does not affect the merits of their motions. In light of Rule 15(d)'s "liberal policy favoring a merit-based resolution of the entire controversy between the parties[,]" *Witkowich*, 541 F. Supp. 2d at 590 (internal quotation marks omitted), Plaintiff's motion for leave to supplement his FAC (Doc. 58) is GRANTED.

## C.   The SFAC's Factual Allegations.

### 1.   The Disputes at Clemmons Family Farm.

Plaintiff is a VSP corporal based at the VSP's Williston Barracks. In the fall of 2017, he was one of the VSP troopers who responded to incidents at Clemmons Family Farm in Charlotte, Vermont.

Dr. Clemmons, an African-American woman, is the owner and operator of Clemmons Family Farm, a 148-acre farm that hosts classes and events. In September 2017, Dr. Clemmons reported to VSP that her tenant Greg Barreda, a Hispanic male, had paid a security deposit in silver coins, which Dr. Clemmons suspected were stolen. Mr. Barreda was arrested and charged in Vermont Superior Court with the theft of the coins. On September 22, 2017, Mr. Barreda was released on conditions which initially did not prohibit him from returning to the Clemmons Family Farm but were subsequently amended to require him to stay three hundred feet from Dr. Clemmons.

Between October 2017 and December 2017, VSP responded to Clemmons Family Farm more than ten times to address conflicts between Dr. Clemmons and Mr. Barreda regarding the latter's truck, dogs, possessions, firearms, alleged violations of his conditions of release, and alleged trespasses. As a result, Mr. Barreda was charged with four violations of his conditions of release and one count of unlawful trespass. Plaintiff responded to complaints by both Dr. Clemmons and Mr. Barreda and "attempted to address the parties in a fair and reasonable manner while controlling the risk of aggravation and escalation between the parties and maintaining his own safety." (Doc. 58-4 at 14, ¶ 38.)

On November 15, 2017, Mr. Barreda was granted a temporary stalking order against Dr. Clemmons in Vermont Superior Court. On that same day, Plaintiff and a VSP Sergeant served Dr. Clemmons with the stalking order at Clemmons Family Farm. On

November 27, 2017, the stalking order was vacated. On December 14, 2017, Dr. Clemmons was granted a temporary restraining order against Mr. Barreda, which Plaintiff served on Mr. Barreda five days later. On December 28, 2017, Mr. Barreda was evicted from Clemmons Family Farm pursuant to a Vermont Superior Court order.

On December 21, 2017, Dr. Clemmons filed a written complaint with VSP Internal Affairs to request the removal of Plaintiff and another officer from her case because of their alleged racial bias. In early 2018, Dr. Clemmons filed a complaint with VHRC against VSP and the Vermont Department of Public Safety ("DPS") for denial of "services, facilities, goods, privileges, advantages, benefits, or accommodations" on the basis of her race, color, and sex in violation of 9 V.S.A. § 4502(a).

### 2.   VHRC's Investigation.

VHRC Investigator Nelson Campbell, Esq. spent approximately three years investigating Dr. Clemmons' discrimination complaint. In the course of her investigation, Investigator Campbell reviewed "documents, court filings, bodycam recordings of troopers' words and actions in interactions with Dr. Clemmons, internal emails, and other witness testimony[.]" (Doc. 12-2 at 20.)

Plaintiff alleges that on July 16, 2020, Investigator Campbell provided a draft report to the parties which concluded there was insufficient evidence to show VSP discriminated against Dr. Clemmons on the basis of sex or race because VSP's treatment was not "markedly hostile" and because there was a lack of a racial "comparator" of "a white individual or family in similar circumstances, who was delivered services by the VSP in a more favorable way than [Dr. Clemmons'] family." (Doc. 58-4 at 35-36, ¶¶ 93-95.) Investigator Campbell allegedly stated that Mr. Barreda, a male, was a comparator for purposes of the sex discrimination claims and was treated less favorably than Dr. Clemmons. *Id.* at 38, ¶ 99.

### 3.   The Investigative Report.

On November 10, 2020, Ms. Yang approved the final version of the Investigative Report, which Plaintiff contends VHRC "manipulated and falsified" to "reverse the conclusions and generate an investigative report that recommended a finding of

7

discrimination." *Id.* at 2, ¶ 3. VHRC allegedly sought "to politically promote itself as aligned with national movements such as Black Lives Matter[,]" *id.* ¶ 2, and "exploit[ed] Dr. Clemmons' race [to] score politically against VSP as a representative of the 'white' law enforcement." *Id.* at 5, ¶ 9. VHRC members were allegedly "induced" by the Investigative Report to find reasonable grounds to conclude VSP discriminated against Dr. Clemmons. *Id.* at 2, ¶ 3.

The 105-page Investigative Report details interactions between VSP, Dr. Clemmons, and Mr. Barreda between September and December 2017. It includes two exhibits: a photograph of the Clemmons Family Farm property and a color-coded table of the calls that Dr. Clemmons and Mr. Barreda made to VSP. Applying the burden-shifting framework the Supreme Court set in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Investigative Report concludes that Dr. Clemmons established a prima facie case of discrimination. Although it finds VSP's asserted legitimate, non-discriminatory reasons for its actions "persuasive on their face," which "initially swayed the investigation towards making a no reasonable grounds recommendation[,]" after analyzing evidence of pretext, the Investigative Report ultimately concludes that "VSP's reasons were illegitimate." (Doc. 12-2 at 85.)

The Investigative Report's pretext analysis includes numerous references to Plaintiff and states that Plaintiff "denigrated Dr. Clemmons to Barreda and disparaged her, telling him he would cover for him and that she was unreasonable. He then characterized her as dishonest on perhaps the most ridiculous basis imaginable—her guests were late on a Sunday morning to their location—rural Charlotte." *Id.* at 88. A subsection entitled "Continuous preferential treatment of Barreda by [Plaintiff]" states:

> [Plaintiff's] treatment of Dr. Clemmons and Josh Clemmons on October 22 and beyond, in contrast to his treatment of Barreda, is a significant example of disparate treatment based on race, color, and sex. [Plaintiff's] rudeness, accusatory attitude[,] and his dismissiveness of the Clemmons[es]' concerns, even though he had never met them before, strongly suggest that [Plaintiff] either already had an unfavorable opinion about Dr. Clemmons prior to his arrival, or that he formed one upon seeing her and her brother.

*Id.* at 93 (emphasis in original).

Citing an undated "linguistical analysis of [Plaintiff's] interaction with the Clemmons[es] on October 22, 2017" by Maeve Eberhardt, an associate professor at the University of Vermont, which was "requested" by Dr. Clemmons, *id.*, the Investigative Report quotes Dr. Eberhardt as follows: "Empirical studies of interactions between police officers and citizens show systematic differential treatment of African Americans and Whites, and this pattern is replicated here as well." The analysis notes Mr. Barreda "presents as White" and Dr. Clemmons "presents as African American[.]" *Id.*

Finding that "[Plaintiff] frequently expressed concern for Barreda's welfare, but never the welfare of the Clemmons[es]" and had a "dismissive attitude toward complaints from women," *id.* at 94-95, the Investigative Report concludes that "[Plaintiff's] treatment of Barreda and his treatment of both Clemmons[es], particularly Dr. Clemmons, is <u>not</u> evidence of professional conduct—it is evidence of pretext and it is proof of discrimination against Dr. Clemmons on the basis of race, color, and sex." (Doc. 12-2 at 95) (emphasis in original).

Acknowledging that her "own perspective shifted over almost three years as the evidence kept coming in[,]" *id.* at 102, Investigator Campbell cites Plaintiff's "disparaging, sexually discriminatory[,] and highly inappropriate conversation with Barreda about Dr. Clemmons" as "result[ing] in a reassessment of the issue of whether the VSP *intended* to provide quality policing services for the Clemmons[es] and raised the very credible possibility of discrimination by [Plaintiff] based on sex, race[,] and color." *Id.* at 100 (emphasis in original). Investigator Campbell concluded that Plaintiff had "internalized" VSP's "highly negative" views of Dr. Clemmons "before he arrived" at Clemmons Family Farm for the first time. *Id.*

### 4.    The Final Determination.

VHRC's four-page Final Determination records two March 25, 2021 votes of VHRC's members. The members, chaired by Mr. Christie, voted unanimously, with one abstention, in favor of finding reasonable grounds to believe that VSP and the Vermont Department of Public Safety illegally discriminated against Dr. Clemmons on the basis of (1) race and color and (2) sex, in violation of Vermont law.

Plaintiff alleges that he is not racist or sexist and that his conduct reflected "exemplary law enforcement." (Doc. 58-4 at 16, ¶ 42.) In every encounter with Dr. Clemmons, he contends he "acted professionally and fairly in the best tradition of law enforcement." *Id.* at 41, ¶ 104. Plaintiff's SFAC includes a chart identifying thirteen allegedly false statements in the Investigative Report, *id.* at 16-18, ¶ 42, which he alleges ignores or minimizes evidence that does not support the findings contained therein.

### 5.    Release of Documents to Seven Days.

Plaintiff alleges that while the Final Determination is a public document, the Investigative Report is not and was "unlawfully released" in violation of 9 V.S.A. § 4555 to Seven Days on June 10, 2021 "in exchange for favorable media coverage." *Id.* at 2, ¶ 4. Plaintiff asserts that "[V]HRC in an executive session discussed and approved the release of the Investigative Report upon request." *Id.* at 47, ¶ 115. Thereafter, Defendants allegedly had an "arrangement" whereby Seven Days would "promote [V]HRC's leadership, shape public opinion against VSP and its troopers, and eliminate scrutiny of the Investigative Report which would have been part of the due process right of the troopers to defend their good names." *Id.* at 3, ¶ 5. "Consistent with this scheme, on June 23, 2021, Seven Days published an article . . . entitled, 'Vermont State Police Discriminated Against Black Woman Who Runs Clemmons Family Farm, Commission Says'" (the "June 23 Article"). (Doc. 58-4 at 3, ¶ 5.)

The June 23 Article acknowledges that the Final Determination and Investigative Report were "unpublished" and were not available on VHRC's website. (Doc. 12-1 at 2.) Seven Days requested the report on June 10, 2021, and VHRC "staff emailed it that day." *Id.* at 3. The June 23 Article notes:

> Bor Yang, executive director of the commission, acknowledged in an email that reports become public documents when the commission determines reasonable grounds exist to believe discrimination occurred.

> "That report is made available to the public upon request but there is no obligation on the [V]HRC's part to post anything on our website or to otherwise announce the decision," she wrote. "A decision was made to not post this report on our website but to make it available upon request. The basis for that decision was discussed in executive session."

From the time the determination was made in March, Yang wrote, the commission has six months to attempt to negotiate a legal settlement with the state police. If one is not reached, the commission has the option to sue on Clemmons' and the public's behalf.

"We are still in the negotiations phase and so I will not be providing further comment on the case," she wrote.

*Id.*

The following paragraphs of the June 23 Article identify Plaintiff by name:

State police Cpl. Andrew Leise arrived. In under a minute, according to the report, he accused Clemmons of nullifying the court-ordered conditions of release by "coming to her place of business and being within 300 feet of Barreda, despite the fact that she was under no legal restraint that prohibited her from coming to her place of business."

Investigator Campbell reviewed dashcam and bodycam footage. She wrote that Leise's initial tone toward Clemmons and her brother was "alternately impatient, brusque, accusatory and confrontational peppered with occasional perfunctory politeness."

Leise stayed for an hour and helped Barreda move his belongings. He also "coached Barreda about what to put in his statement" to police, the report says, and thanked him for being a "gentleman." Leise later informed the Williston barracks in an email that, because Clemmons' guests began arriving a half hour later than she said they were due, he doubted her honesty.

*Id.* at 5. Seven Days provided a link to the Final Determination and Investigative Report beneath a heading that stated: "Read the full report below[.]" *Id.* at 7.

The June 23 Article notes Vermont Public Safety Commissioner Michael Schirling characterized Plaintiff's conduct as a "de-escalat[ion]" technique and criticized the Investigative Report for taking "significant liberties with the facts to interpret them in the light least favorable to the responding troopers in an unfair way[.]" *Id.* at 3, 5. The June 23 Article quotes Ms. Yang as saying that it is "not unusual for a staff attorney to sway back and forth as they consider new and evolving evidence in a case." (Doc. 12-1 at 3.)

Plaintiff alleges that Seven Days "focused only on [him]" despite the dozens of VSP troopers involved and "falsely highlighted [his] conduct as racist." (Doc. 58-4 at 57, ¶ 129.) The SFAC identifies twenty-two alleged misrepresentations or omissions in and

from the June 23 Article that "presented [P]laintiff's involvement in a false and misleading light[,]" *id.* at 57-60, ¶ 130, and lists seventeen "omissions and representations" and eighteen ways Seven Days attempted to "spin the story[.]" *Id.* at 51-55, ¶¶ 124-25.

### 6. Plaintiff's Alleged Damages.

Plaintiff alleges that his "personal and professional reputation has been seriously damaged[] and his career in law enforcement has practically ended as a result of [D]efendants' conduct[.]" *Id.* at 42, ¶ 106. He asserts that he "has been unable to return to work as a VSP trooper[,]" *id.* at 61, ¶ 134, but concedes he is still employed by VSP. He alleges that this is "tantamount to [his] constructive discharge as any reasonable law enforcement officer in his position would find it intolerable to continue to work as a trooper." *Id.* He alleges he has "suffered a loss of income" and "has been seeking employment in positions that do not involve his engagement with the public while wearing a VSP uniform[,]" which offer "lower pay and benefits, and are less prestigious." (Doc. 58-4 at 60, ¶ 134.) He claims UVMMC refused to hire him as a security guard because of Defendants' false characterization of him as a "racist." *Id.* at 6, ¶ 11.

Plaintiff seeks compensatory damages "for loss of income for the balance of the career he would have enjoyed with VSP until retirement"; "garden variety" emotional damages for "upset, humiliation, embarrassment[,] and damage to his good name"; nominal damages "for the violation of his constitutional rights"; attorney's fees, interest, and costs; and punitive damages. *Id.* at 64-65, ¶¶ 142-43.

## II. Conclusions of Law and Analysis.

### A. Whether Defendants' Special Motions to Strike Should Be Granted.

Defendants move to strike Plaintiff's SFAC under Vermont's anti-SLAPP law, which provides that "[a] defendant in an action arising from the defendant's exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances under the U.S. or Vermont Constitution may file a special motion to strike under this section." 12 V.S.A. § 1041(a). "[T]he exercise, in connection with a public issue, of the right to freedom of speech or to petition the

government for redress of grievances under the U.S. or Vermont Constitution" is statutorily defined as:

> (1) any written or oral statement made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;
>
> (2) any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;
>
> (3) any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public; or
>
> (4) any other statement or conduct concerning a public issue or an issue of public interest which furthers the exercise of the constitutional right of freedom of speech or the constitutional right to petition the government for redress of grievances.

*Id.* § 1041(i)(1)–(4).

Under Vermont law, filing a special motion to strike stays all but "limited discovery" which a court may order to assist in its decision-making. A hearing must be held within thirty days. *Id.* § 1041(c)(1)–(2), (d). Under Vermont's anti-SLAPP law, the court "shall grant" the motion, "unless the plaintiff shows that: (A) the defendant's exercise of his or her right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law; and (B) the defendant's acts caused actual injury to the plaintiff." *Id.* § 1041(e)(1). "In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *Id.* § 1041(e)(2). If the motion is granted, "the court shall award costs and reasonable attorney's fees to the defendant." *Id.* § 1041(f)(1).

Although this court has previously held that special motions to strike under 12 V.S.A. § 1041 can be brought in federal court,[2] these decisions predate the Second

---

[2] *See, e.g.*, *Soojung Jang v. Trs. of St. Johnsbury Acad.*, 331 F. Supp. 3d 312, 333-337 (D. Vt. 2018); *Country Home Prods., Inc. v. Banjo*, 2015 WL 13505447, at *7 (D. Vt. Oct. 14, 2015); *Ernst v. Kauffman*, 50 F. Supp. 3d 553, 563 (D. Vt. 2014); *Bible & Gospel Tr. v. Twinam*, 2008 WL 5245644, at *1 (D. Vt. Dec. 12, 2008), *modifying report and recommendation*, 2008 WL 5216845 (D. Vt. July 18, 2008).

Circuit's decision in *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020). There, the Second Circuit held that California's anti-SLAPP law, which "requires outright dismissal unless the plaintiff can 'establish[] a probability that he or she will prevail on the claim[]'" conflicted with Fed. R. Civ. P. 12 and 56 and was therefore "inapplicable in federal court[.]" *Id.* at 86-87 (quoting Cal. Civ. Pro. Code § 425.16(b)(3)). The relevant test is "whether a Federal Rule of Civil Procedure answers the same question as the special motion to strike." *La Liberte*, 966 F.3d at 87 (alterations adopted) (internal quotation marks and citations omitted). "If so, the Federal Rule governs[.]" *Id.* Because California's statute "establishes the circumstances under which a court must dismiss a plaintiff's claim before trial, a question that is already answered (differently) by Federal Rules 12 and 56[,]" California's anti-SLAPP law "abrogates" Rule 12(b)(6)'s plausibility standard and "nullifies" Rule 56's requirement that a case proceed to trial if a party can "identify[] any genuine dispute of material fact[.]" *Id.* (alteration adopted) (second alteration supplied) (internal quotation marks and citations omitted).

Defendants argue that *La Liberte* is distinguishable because Vermont's anti-SLAPP statute differs from California's as it requires a plaintiff to "show[]" a defendant's exercise of free speech "was devoid of any reasonable factual support and any arguable basis in law" and caused "actual injury to the plaintiff." 12 V.S.A. § 1041(e)(1).[3] It also requires the court to resolve factual issues based not only on pleadings but on affidavits. *Id.* § 1041(e)(2).

Vermont's anti-SLAPP statute permits a judge at the pleading stage to weigh evidence and resolve disputed issues of fact. It does not require the judge to construe evidence in the light most favorable to a plaintiff; it does not require the court to accept

---

[3] The Vermont Supreme Court has not clarified the applicable burden of proof. The Massachusetts Supreme Judicial Court, interpreting the provision of the Massachusetts anti-SLAPP statute on which Vermont's statute is modeled, has held that a defendant's proof must be by a preponderance of the evidence. *See Benoit v. Frederickson*, 908 N.E.2d 714, 718 (Mass. 2009); *see also Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129 n.10, 200 Vt. 465, 481 n.10, 133 A.3d 836, 848 n.10 (2015) ("The burden-shifting language in § 1041(e)(1) and (2) was modeled on the Massachusetts anti-SLAPP statute.").

well-pleaded factual allegations as true; and it allows, and may even require, a plaintiff to present evidence beyond the pleadings to sustain the plaintiff's burden of proof. *See Chandler v. Rutland Herald Publ'g*, 2015 WL 7628687, at *3 (Vt. Nov. 19, 2015) ("[Plaintiff] provided no affidavits (nor any specific information) in support of his assertions. His generalized contentions are insufficient to meet his burden on the statute."); *Ernst v. Kauffman*, 50 F. Supp. 3d 553, 563 (D. Vt. 2014) (holding "unsworn pleading . . . fails to meet plaintiffs' burden"). In these respects, Vermont's anti-SLAPP statute directly conflicts with Fed. R. Civ. P. 8[4] and 12(b)(6)[5] and seeks to import elements of Fed. R. Civ. P. 56 into the pleading process.

Because Vermont's anti-SLAPP statute, like California's, "establishes the circumstances under which a court must dismiss a plaintiff's claim before trial, a question that is already answered (differently) by Federal Rules 12 and 56[,]" it does not apply in federal court. *La Liberte*, 966 F.3d at 87 (internal quotation marks and citation omitted).

Defendants nonetheless urge the court to rely on *Adelson v. Harris*, 774 F.3d 803 (2d Cir. 2014), wherein the Second Circuit concluded that the immunity and fee-shifting provisions of Nevada's anti-SLAPP law did not "squarely conflict with a valid federal rule." 774 F.3d at 809. *Adelson* is inapposite because the competing rules were not in conflict.

In the alternative, Defendants ask the court to reject Second Circuit precedent and follow the First Circuit's decision in *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010), which applied Maine's anti-SLAPP statute in federal court. In *La Liberte*, the Second

---

[4] Rule 8 requires "[a] pleading that states a claim for relief [to] contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). "Each allegation [in a pleading] must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

[5] Under Rule 12(b)(6), dismissal is only appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000). In reviewing a complaint, a court must "accept as true the material facts alleged in the complaint and draw all reasonable inferences in plaintiff['s] favor." *Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015) (alterations adopted) (internal quotation marks and citations omitted). A court cannot "weigh the evidence." *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017), or assess credibility. *See Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017).

Circuit rejected an invitation to follow *Godin*: "The idea that the more stringent requirement of the anti-SLAPP standard is a beneficial 'supplement' to the Federal Rules is a policy argument—and fatal, because the more permissive standards of the Federal Rules likewise reflect policy judgments as to what is sufficient." *La Liberte*, 966 F.3d at 88. The Second Circuit thus squarely rejected the approach Defendants urge the court to take.

Because *La Liberte* is controlling, Vermont's anti-SLAPP statute does not apply in federal court as it abrogates Fed. R. Civ. P. 12(b)(6) and 56. For this reason, the court DENIES Defendants' special motions to strike. (Docs. 13, 33.)

### B.   Defendants' Motions to Dismiss.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (internal quotation marks and citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff will prevail. *Christiansen v. Omnicom Grp.,*

*Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

"[M]otions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road" because the court must still "accept as true the material facts alleged in the complaint and draw all reasonable inferences in [the] plaintiff['s] favor." *Garcia v. Does,* 779 F.3d 84, 97 (2d Cir. 2015) (alterations adopted) (internal quotation marks and citations omitted).

## 1. Whether VHRC Defendants Are Entitled to Sovereign Immunity for Plaintiff's Official Capacity Claims.

VHRC Defendants seek dismissal of Plaintiff's claims against VHRC and Mr. Christie and Ms. Yang in their official capacities on sovereign immunity grounds. "While Eleventh Amendment immunity is jurisdictional, it is not coextensive with the limitations on judicial power in Article III, and therefore whether it is properly raised under Fed. R. Civ. P. 12(b)(1) or 12(b)(6) is an unsettled question of law." *Allco Fin. Ltd. v. Roisman*, 2022 WL 2528328, at \*5 (D. Vt. July 7, 2022) (alterations adopted) (internal quotation marks and citations omitted). "In accordance with the approach taken by other district courts within [the Second] Circuit, the court [applies] the stricter standard under Rule 12(b)(6) in assessing Defendants' Eleventh Amendment immunity arguments." *Id.* (alterations adopted) (internal quotation marks and citations omitted).

Under the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State," the Supreme Court has consistently "extended the Amendment's applicability to suits by citizens against their own States." *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (collecting cases). "Stated as simply as possible, the Eleventh Amendment means that, as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity when acting pursuant to its authority under

17

Section 5 of the Fourteenth Amendment." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (alterations adopted) (internal quotation marks and citations omitted).

"The immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The party "invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity." *Woods*, 466 F.3d at 237.

As VHRC Defendants note, this court has previously held that VHRC is an arm of the state entitled to sovereign immunity. *See Jamil v. Vt. Att'y Gen.'s Off.*, 2015 WL 475452, at *7 (D. Vt. Feb. 4, 2015) (dismissing claims against VHRC because it was "entitled to immunity from suit in federal court"). A Vermont Superior Court has reached this same conclusion. *See Besser v. Vt. Hum. Rts. Comm'n*, No. 90-2-03 (Vt. Sup. Ct. Aug. 8, 2003) (unpublished) (holding that sovereign immunity bars claims against VHRC). Plaintiff nonetheless argues that VHRC is *sui generis* and answers neither to the State of Vermont nor to its constituents. In this respect, he contends VHRC is "an independent governmental entity that was created by the Legislature but not as a state agency when that option was readily available, and not with a leadership that serves at the pleasure of the Governor." (Doc. 46 at 10.)

An entity "is entitled to immunity if it can demonstrate that it is more like 'an arm of the State,' such as a state agency, than like 'a municipal corporation or other political subdivision.'" *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). "The jurisprudence over how to apply the arm-of-the-state doctrine is, at best, confused." *Id.* at 293; *see also Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 136 (2d Cir. 2015) (noting "a lack of clarity").

In the Second Circuit, "two different tests have been applied to determine whether government entities are 'arms of the state' entitled to sovereign immunity under the Eleventh Amendment." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134–35 (2d Cir. 2015). In *Mancuso*, 86 F.3d at 293, the Second Circuit applied the following six-factor test:

> (1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.

*Id.* "If these factors all point in one direction, then a court's inquiry is complete." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 240 (2d Cir. 2006). If, however, the *Mancuso* factors provide mixed results, the court must focus "on the twin reasons for the Eleventh Amendment: (1) protecting the dignity of the state, and (2) preserving the state treasury." *Id.* (citing *Mancuso*, 86 F.3d at 293). "If the outcome still remains in doubt, then whether a judgment against the governmental entity would be paid out of the state treasury generally determines the application of Eleventh Amendment immunity." *Id.* at 241.

In *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79 (2d Cir. 2004), the Second Circuit applied a similar test to "guide the determination of whether an institution is an arm of the state: (1) 'the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity,' and (2) 'the degree of supervision exercised by the state over the defendant entity.'" *Id.* at 82 (quoting *Pikulin v. CUNY*, 176 F.3d 598, 600 (2d Cir. 1999)).

In terms of which test the court should apply, the Second Circuit has clarified:

> As we have seen in our review of the cases, the tests have much in common, and the choice of test is rarely outcome-determinative. The *Clissuras* test incorporates four of the six *Mancuso* factors. To the extent that the *Clissuras* factors point in different directions, the additional factors from the *Mancuso* test can be instructive.

*Alice Peck Day Mem'l Hosp. v. Smith*, 2022 WL 850745, at \*8 (D. Vt. Mar. 22, 2022) (alterations adopted) (quoting *Leitner*, 779 F.3d at 137). When applying either test, state law guides the analysis of the *Clissuras* and *Mancuso* factors. *See Walker v. City of Waterbury*, 253 F. App'x 58, 61 (2d Cir. 2007) ("[W]e routinely look to state decisional

law when we evaluate whether a governmental entity is entitled to sovereign immunity[.]'") (collecting cases). [6]

"The first *Clissuras* factor, and the most important factor in determining whether a state entity is entitled to sovereign immunity, is 'whether a judgment against the entity must be satisfied out of a State's treasury.'" *Leitner*, 779 F.3d at 137 (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 31 (1994)). "This condition is also reflected in the third and sixth *Mancuso* factors, which address how the entity is funded and whether the entity's obligations are binding upon the state, respectively." *Id.*

Plaintiff argues there is no evidence that a judgment against VHRC would be an obligation of the State of Vermont. However, Vermont law provides that VHRC's members "shall receive" certain "compensation" from the state and "shall be entitled to expenses actually and necessarily incurred in the performance of [their] duties." 9 V.S.A. § 4551(d). VHRC is empowered to "[e]stablish and maintain a principal office and such other offices within the State as it deems necessary" and "[a]ppoint employees as necessary to carry out the purposes of this chapter." *Id.* § 4553(a)(1), (3). At least in terms of compensation, Vermont treats VHRC staff as state employees,[7] which it defends and indemnifies in civil actions relating to the performance of their duties. *See* 3 V.S.A.

---

[6] Applying state law, the Second Circuit has held that state human rights agencies in New York and Connecticut are arms of the state entitled to sovereign immunity. *See, e.g.*, *Baba v. Japan Travel Bureau Int'l, Inc.*, 111 F.3d 2, 5 (2d Cir. 1997) (dismissing claims against New York State Department of Human Rights because "it is beyond cavil that the Eleventh Amendment bars this type of suit") (alteration adopted) (internal quotation marks and citations omitted); *White v. Comm'n of Hum. Rts. & Opportunities*, 198 F.3d 235, 235 (2d Cir. 1999) (holding "sovereign immunity shielded the [Connecticut Commission on Human Rights and Opportunities ("CHRO")] defendants from the claims against them in their official capacities"); *Nadimi v. Brown*, 8 F. App'x. 122, 125 (2d Cir. 2001) ("[T]o the extent that [CHRO's officers] were being sued in their official capacities, the claims for damages and retroactive injunctive relief were barred under the sovereign immunity doctrine of the Eleventh Amendment.").

[7] *See State of Vermont Employee Salaries*, https://data.vermont.gov/Government/State-of-Vermont-Employee-Salaries/jgqy-2smf (last accessed Aug. 18, 2022); *Alice Peck Day Mem'l Hosp. v. Smith*, 2022 WL 850745, at *8 n.3 (D. Vt. Mar. 22, 2022) ("The court may take judicial notice of documents retrieved from official government websites, or other relevant matters of public record.") (alterations adopted) (internal quotation marks omitted) (citing *Jones v. Cuomo*, 542 F. Supp. 3d 207, 211 n.1 (S.D.N.Y. 2021)).

§ 1101 (obligation to defend state employees); 12 V.S.A. § 5606 (indemnification of state employees). In addition, "all State agencies, Legislature, departments, State colleges, Judiciary, quasi-State agencies, boards, commissions, and employees" must contribute to a "*State Liability* Self-Insurance Fund" in order, among other things, "*to pay judgments*[.]" 29 V.S.A. § 1406(c) (emphasis supplied).

VHRC's budget "consists almost entirely of salaries and benefits and fixed operating costs" and approximately ninety percent of VHRC's funding is appropriated by the Vermont Legislature from Vermont's General Fund, while the remainder is derived from a grant from the United States Department of Housing and Urban Development.[8] A state entity's funding source is often critical to a sovereign immunity determination. *See Hess*, 513 U.S. at 48-49 (holding integrity of a state's fisc is entitled to "dispositive weight"). *Compare O'Neill v. Rutland Cnty. State's Att'ys Off.,* 2016 WL 7494857, at *5 (D. Vt. Dec. 29, 2016) (finding sovereign immunity where entity's "budgets are derived directly and exclusively from funds authorized and dis[bur]sed by the Vermont Legislature as part of the state budget"), *with Alice Peck*, 2022 WL 850745, at *8 (noting that sovereign immunity is not as certain where a state entity receives "funds from other sources including hospitals, medical service corporations, health insurance companies, health maintenance organizations, and accountable care organizations").

On balance, the first and most important *Clissuras* factor strongly supports a conclusion that the State of Vermont will be obligated to pay a judgment against the VHRC Defendants.

The second *Clissuras* factor is "the degree of supervision exercised by the state over the defendant entity." *Clissuras*, 359 F.3d at 82 (quoting *Pikulin*, 176 F.3d at 600). This incorporates "the second and fifth *Mancuso* factors, which consider how the governing members of the entity are appointed and whether the state has veto power over

---

[8] *See* VHRC, *Fiscal Year 2022 Budget Request*, https://hrc.vermont.gov/sites/hrc/files/documents/FY22%20Budget%20Request_HRC_1.pdf (last accessed Aug. 18, 2022) (providing numbers from 2021 budget as passed by Vermont Legislature). This report is required by statute, 32 V.S.A. § 301(a), and is subject to judicial notice. *See Alice Peck*, 2022 WL 850745, at *8 n.3.

the entity's actions, respectively." *Leitner*, 779 F.3d at 138.

Members of VHRC are "appointed by the Governor, with the advice and consent of the Senate[.]" 9 V.S.A. § 4551(a); *see Mancuso*, 86 F.3d at 295 (holding it "favors a finding of immunity" that "all three board members are appointed by the Governor of New York with the advice and consent of the state Senate"). VHRC members then serve at the Governor's pleasure. *See* 3 V.S.A. § 2004 ("Notwithstanding any other provision of law, all commissioners of State departments and all members of State boards and commissions appointed by the Governor, with the advice and consent of the Senate when this provision so applies, shall serve at the pleasure of the Governor until the end of the term, if any, for which they were appointed and until a successor has been appointed and qualified."); *see also State v. Lynch*, 409 A.2d 1001, 1004-05 (Vt. 1979) (construing Governor's authority under 3 V.S.A. § 2004 and ruling that § 2004 empowers the Governor to "remove all State commissioners appointed by the Governor with the confirmation of the Senate"). Because VHRC's members "are accountable to the statewide electorate . . . through the elected official[] who appoint[s] them[,] [this] strongly indicates that [VHRC] is a state agency[.]" *Walker*, 253 F. App'x at 61.

VHRC is required to send an annual report to both chambers of the Vermont Legislature "on the status of Commission program operations, the number and type of calls received, complaints filed and investigated, closure of litigated and nonlitigated complaints, public educational activities undertaken, and recommendations for improved human rights advocacy and activities." 9 V.S.A. § 4553(b). Like all state commissions, VHRC was subject to biennial review by the Sunset Advisory Commission, an executive commission which included members of the legislature and considered "(i) the purpose of the board or commission and whether that purpose is still needed; (ii) how well the board or commission performs in executing that purpose; and (iii) if the purpose is still needed, whether State government would be more effective and efficient if the purpose were executed in a different manner." 3 V.S.A. § 268(c)(2)(B) (repealed 2023). The Sunset Advisory Board recommended whether VHRC "should continue to operate or be eliminated" and whether "the powers and duties" of VHRC "should be revised." *Id.*

§ 268(c)(2)(A). Collectively, Vermont's executive and legislative branches exercise a substantial degree of oversight over VHRC and its members. Most importantly, the Governor can remove those members at any time and for any lawful reason.

Vermont's lack of veto power over VHRC's "day-to-day operations" is not "dispositive." *Leitner*, 779 F.3d at 139; *see also Woods*, 466 F.3d at 248-49 (concluding that Commissioner of Education's broad power to remove school officers, withhold funds, and review actions by school board "does not unequivocally equate to veto authority" but was sufficient to render the fifth *Mancuso* factor "neutral"). Although the "degree of supervision" is more akin to general oversight than actual management, *Clissuras*, 359 F.3d at 82 (quoting *Pikulin*, 176 F.3d at 600), the second *Clissuras* factor still favors a finding that VHRC is more like a state agency than an independent body that operates as it sees fit.

Although the majority of the *Clissuras* factors support sovereign immunity, Plaintiff contends two additional *Mancuso* factors do not. *See Leitner*, 779 F.3d at 137 (noting that "the additional factors from the *Mancuso* test can be instructive"). "The first [additional] *Mancuso* factor [is] how the entity is referred to in the documents that created it[.]" *Id.* at 139. Plaintiff notes that VHRC is not called an "agency" and is not listed as part of the Agency of Administration under 3 V.S.A. § 2202. The question, however, is not only what the entity is called but whether it is "more like" a "state agency" than "a municipal corporation or other political subdivision." *Mancuso*, 86 F.3d at 292 (internal quotation mark and citation omitted).[9] The authorizing statute refers to

_____

[9] The Vermont Agency of Administration does not encompass all arms of the state. It consists of six executive departments, *see* 3 V.S.A. § 2202, and there are at least thirteen other executive departments, *see id.* § 212. As VHRC Defendants point out, courts have repeatedly held entities outside the Vermont Agency of Administration are arms of the state entitled to Eleventh Amendment immunity. *See, e.g., O'Neill v. Rutland Cnty. State's Att'ys Off.*, 2016 WL 7494857, at *4-7 (D. Vt. Dec. 29, 2016) (finding that the Rutland County State's Attorney's Office and Department of State's Attorneys and Sheriffs were entitled to Eleventh Amendment immunity); *Richards v. State's Att'y Office*, 40 F. Supp. 2d 534, 537 (D. Vt. 1999) (holding that "it is clear that the State's Attorney's Office is an arm of the state" entitled to Eleventh Amendment immunity); *cf. Couture v. Blair*, 2015 WL 1931548, at *3 (D. Vt. Apr. 28, 2015) (treating the Vermont State Board of Parole as an "arm[] of the state").

23

VHRC as a "[c]ommission." 9 V.S.A. § 4551(a). Vermont law defines "[s]tate boards and commissions" as follows:

> a professional or occupational licensing board or commission, advisory board or commission, appeals board, promotional board, interstate board, supervisory board or council, or any other similar entity that:
>
>> (1) is created by State law, by federal law and contains State appointees, or by executive order;
>>
>> (2) is established as or is attached to an Executive Branch entity;
>>
>> (3) has statewide jurisdiction or carries out a State function; and
>>
>> (4) is not composed of members appointed exclusively by regional, county, or municipal entities.

3 V.S.A. § 116a(c)(1)-(4). Although VHRC is not specifically referred to as a "state agency," it is also not a "municipal corporation," a "political subdivision" of the state, or "unit[] of local government, such as cities and counties," *Woods*, 466 F.3d at 243 (internal quotation marks and citations omitted), but is rather "an ordinary State board, department or commission[.]" *Mancuso*, 86 F.3d at 294 (internal quotation marks and citation omitted).

The second additional *Mancuso* factor is "whether the entity's function is state or local[.]" *Leitner*, 779 F.3d at 139. VHRC's jurisdiction is statewide and includes the authority to "investigate and enforce complaints of unlawful discrimination" and, through public education, "increase awareness of the importance of full civil and human rights" throughout the state. 9 V.S.A. § 4552(a), (b)(1). "To carry out its duties," it may "[m]eet and hold hearings at any place within the State." 9 V.S.A. § 4553(a)(2). This, too, favors sovereign immunity.

Because the *Clissuras* and *Mancuso* factors compel a conclusion that VHRC is an arm of the state, VHRC is entitled to sovereign immunity under the Eleventh Amendment. VHRC Defendants' motion to dismiss all claims against VHRC and all claims against Mr. Christie and Ms. Yang in their official capacities is therefore GRANTED.

24

### 2.   Whether VHRC Defendants Are Entitled to Sovereign Immunity for Plaintiff's Individual Capacity Claims.

VHRC Defendants move to dismiss claims against Mr. Christie and Ms. Yang in their individual capacities based on absolute and qualified immunity. "The Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage of the litigation, and it is well established that an affirmative defense of official immunity may be resolved by Rule 12(b)(6) if clearly established by the allegations within the complaint[.]" *Liber. Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (alterations adopted) (internal quotation marks and citations omitted).

"The issue of immunity . . . differs as between the state and federal law claims." *Cornejo v. Bell*, 592 F.3d 121, 130 (2d Cir. 2010). Mr. Christie's and Ms. Yang's official immunity as to Plaintiff's § 1983 claims is "a question of federal law" while their official immunity as to Plaintiff's state law claims is "a question of state law[.]" *Gross v. Rell*, 585 F.3d 72, 86 (2d Cir. 2009). The absolute immunity doctrines under federal law and Vermont law may therefore yield divergent outcomes. *See O'Connor v. Donovan*, 2012 VT 27, ¶ 16, 191 Vt. 412, 422, 48 A.3d 584, 590.

### a.   Whether Mr. Christie and Ms. Yang Are Entitled to Absolute or Qualified Immunity from Plaintiff's § 1983 Claims.

Under federal law, officials performing "certain functions analogous" to those of a judge or prosecutor are entitled to absolute immunity with respect to those functions. *See Butz v. Economou*, 438 U.S. 478, 515 (1978); *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992) (explaining Supreme Court's decision in *Butz* and holding that "[t]he reasoning of *Butz* applies not only to federal agency officials, but also to local executive officers"). Because "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties[,]" *Burns v. Reed*, 500 U.S. 478, 486-87 (1991), "[s]tate actors who seek absolute immunity 'bear the burden of showing that public policy requires an exemption of that scope.'" *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994) (quoting *Butz*, 438 U.S. at 506).

"In determining whether an official is entitled to absolute immunity, [courts] must

take a functional approach and look to the particular acts or responsibilities that the official performed." *King v. Simpson*, 189 F.3d 284, 287-88 (2d Cir. 1999). The court must then "determine if the duties of the defendants were judicial or prosecutorial, which entitles them to absolute immunity, or administrative, which may entitle them to qualified immunity." *Id.* at 288 (citing *Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir. 1987)).

> The Supreme Court has identified a non-exhaustive set of factors characteristic of the judicial process which may be considered when determining whether absolute immunity applies:
>
>> (a) the need to assure that the individual can perform [their] functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Peoples v. Leon, et al.*, No. 21-956, slip op. at 10-11 (2d Cir. Mar. 20, 2023) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985)).

### i.    VHRC Defendants' Investigation and Final Determination.

In this case, VHRC Defendants' decision-making process and Final Determination were adjudicative in nature and entitled to absolute immunity. *See White v. Comm'n of Hum. Rts. & Opportunities*, 198 F.3d 235, 235 (2d Cir. 1999) ("We agree with the district court that what plaintiff is challenging is the CHRO's decision-making process and the decisions themselves, and that the CHRO defendants are protected from such challenges by the doctrine of absolute immunity.") (internal quotation marks omitted). Absolute immunity is also appropriate for "investigating charges of discrimination and in making determinations of whether probable cause exists." *Colletta v. Northwell Health,* 2019 WL 7598666, at *9 (E.D.N.Y. Aug. 19, 2019), *report and recommendation adopted*, 2019 WL 5287961 (E.D.N.Y. Oct. 18, 2019).

To the extent Plaintiff is challenging VHRC Defendants' "decision-making process and the decisions themselves," Mr. Christie and Ms. Yang are also "protected from such challenges by the doctrine of absolute immunity." *White*, 198 F.3d at 235

(citation omitted); *see also Stanley v. Ind. C.R. Comm'n*, 557 F. Supp. 330, 334 (N.D. Ind. 1983), *aff'd*, 740 F.2d 972 (7th Cir. 1984) (holding director and commissioner of Indiana Civil Rights Commission were entitled to absolute immunity); *Crenshaw v. Baynerd*, 180 F.3d 866, 868 (7th Cir. 1999) (holding commissioner of Indiana Civil Rights Commission was entitled to absolute immunity). Plaintiff's claims against Mr. Christie and Ms. Yang in their individual capacities based on the VHRC's investigation and the Final Determination are therefore DISMISSED on absolute immunity grounds.

### ii. VHRC Defendants' Decision to Release the Investigative Report.

The VHRC Defendants' decision to release the Investigative Report to Seven Days, however, presents a more complicated question. Under Vermont law, "[i]f [VHRC] determines that there are reasonable grounds to believe that discrimination has occurred, that determination and the names of the parties may be made public[.]" 9 V.S.A. § 4555(c). VHRC's "complaint files and investigative files shall be confidential." *Id.* § 4555(a)(1). 9 V.S.A. § 4555 does not define what constitutes an "investigative file." The term "investigative report" is also not contained in the statute. Presumably, in crafting § 4555, the Vermont Legislature sought to encourage the provision of relevant information to VHRC free from concern that an individual's identity and the information he or she provided would be released to the public.

It is undisputed that Vermont law does not affirmatively authorize VHRC to release an investigative report. Seizing upon that lack of authority, Plaintiff argues that the Investigative Report is not part of VHRC's "determination[,]" *id.* § 4555(c), and was

required to be kept confidential. VHRC Defendants urge the court to find otherwise.[10] The record before the court is bereft of evidence of where and how the Investigative Report was maintained, whether it was designated "confidential," whether it was subject to limited distribution, whether interviewees were promised confidentiality, and how frequently VHRC has previously released copies of investigative reports. The court is thus not in a position to determine, as a matter of law, whether the release of the Investigative Report in this case violates 9 V.S.A. § 4555(a)(1).

For the same reason, the court cannot find that the release of the Investigative Report did not violate clearly established law, entitling Mr. Christie and Ms. Yang to qualified immunity. The Second Circuit has acknowledged that those asserting "a qualified immunity defense at a motion to dismiss stage face a formidable hurdle." *Neary v. Wu*, 753 F. App'x 82, 84 (2d Cir. 2019). When a defendant asserts a qualified immunity defense in a Rule 12(b)(6) motion, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

Mr. Christie and Ms. Yang are only entitled to qualified immunity if they were acting within the scope of their official duties when the wrongful act occurred, meaning

---

[10] Defendants argue it has "been the [V]HRC's routine practice for nearly two decades to publish . . . investigative reports[.]" (Doc. 34 at 18-19.) These facts are not contained within the SFAC and Defendants do not ask the court to take judicial notice of this practice. As Plaintiff points out, Seven Days quoted Ms. Yang as stating that VHRC had chosen not to publish the Investigative Report on its website and there is "no obligation on the [V]HRC's part to post anything on our website or to otherwise announce the decision[.]" (Doc. 58-4 at 49, ¶ 121) (internal quotation marks omitted). *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ("When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' [] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."); *see also Khaytin v. Stern & Stern, Esqs.*, 2013 WL 5520000, at *5 (E.D.N.Y. Sept. 30, 2013) ("Although Defendant's arguments are substantiated with evidence, most of this evidence cannot be considered upon a motion to dismiss. . . . While this [c]ourt could consider this evidence by converting Defendant's proposed motion into a motion for summary judgment, . . . it would be inappropriate to do so at this juncture since it is unclear whether Plaintiff has yet had a sufficient opportunity to conduct the discovery necessary to controvert Defendant's evidence.").

that the "specific act[] at issue [was] performed within the scope of their official duties[,]" *Schecter v. Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir. 1996), and that their "alleged conduct did not violate one of the plaintiff's clearly established statutory or constitutional rights." *Id.* at 269. Conduct violates "clearly established law" only when it is clear that "every reasonable official would have understood that what he is doing violates that right." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012) (internal quotation marks omitted). This does not mean "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but . . . in [] light of pre-existing law[,] the unlawfulness must be apparent." *Anderson v. Creighton*, 438 U.S. 635, 640 (1987) (internal citations omitted); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("[T]his Court's caselaw does not require a case directly on point for a right to be clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate.").

"While 'a defense of qualified immunity should ordinarily be decided 'at the earliest possible stage in litigation,' it is appropriate to delay a decision where further discovery is necessary." *Rodriguez v. Warden, Metro. Corr. Facility*, 2015 WL 857817, at *16 (S.D.N.Y. Feb. 27, 2015) (quoting *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)) (internal citation omitted). Whether the Investigative Report was part of VHRC's "investigative file" and whether "every reasonable official would understand that" releasing the Investigative Report was "unlawful[,]" *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted), are not apparent from "the face of the complaint[.]" *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000). If the Investigative Report was part of VHRC's "investigative file," every reasonable official would understand it could not be released to Seven Days. If it is not part of VHRC's investigative file, Mr. Christie and Ms. Yang still lacked affirmative authority to release it, however, there may be no clearly established right to its nondisclosure. Accordingly, the court cannot decide as a matter of law whether Mr. Christie and Ms. Yang are entitled to qualified immunity on Plaintiff's § 1983 claims insofar as those claims pertain to the release of the Investigative Report.

For the foregoing reasons, VHRC Defendants' motion to dismiss Plaintiff's § 1983 claims against them in their individual capacities is GRANTED IN PART and DENIED IN PART. It is GRANTED with regard to VHRC's investigation, decision-making process, and Final Determination and DENIED WITHOUT PREJUDICE with regard to Mr. Christie's and Ms. Yang's release of the Investigative Report to Seven Days.

### b. Whether Mr. Christie and Ms. Yang Are Entitled to Absolute or Qualified Immunity from Plaintiff's State Law Claims.

The Vermont Supreme Court has gone "to considerable lengths . . . to distinguish Vermont common-law immunity applicable to state law claims from the federal immunity doctrine applicable to § 1983 claims." *O'Connor*, 2012 VT 27, ¶ 16, 191 Vt. at 422, 48 A.3d at 590 (observing that federal immunity law requires a "different analysis altogether"). Vermont law "provides absolute immunity for 'high executive' officials such as the Attorney General and agency heads for acts committed within the scope of their authority and only qualified immunity for lower level officials[.]" *Id.*

As VHRC Defendants point out, at least two Vermont Superior Court decisions have held that VHRC members and employees are protected under Vermont law by absolute immunity in the performance of their duties. These decisions, however, contain no independent analysis but merely adopt the analysis of one of the litigants. *See* Docs. 49-2, 49-3. As a result, they provide scant guidance in determining on what grounds absolute immunity is available. The Vermont Supreme Court has used the term "high executive official" to refer to executive department heads.[11] Neither Mr. Christie nor Ms. Yang is an agency head and thus neither is entitled to absolute immunity as a "high

---

[11] *See, e.g., LaShay v. Dep't of Soc. & Rehab. Servs.*, 625 A.2d 224, 227 (Vt. 1993) ("Because defendant [Commissioner] is the highest executive officer at [the Department of Social and Rehabilitation Services], he is entitled to absolute immunity, if he was acting within the scope of his authority."); *Levinsky v. Diamond*, 559 A.2d 1073, 1079 (Vt. 1989) (holding the Attorney General and Commissioner of Department of Social Welfare were entitled to absolute immunity "as the 'highest executive officers' in their respective governmental units"); *Curran v. Marcille*, 565 A.2d 1362, 1363 (Vt. 1989) (holding Commissioner of Department of Motor Vehicles and Commissioner of Department of Corrections entitled to absolute immunity).

executive official."

Absolute immunity may, however, remain available to prosecutors to protect them "from civil suits for certain actions closely associated with their . . . prosecutorial activities, including—among other things—the decision whether to prosecute and the prosecution of the action." *Czechorowski v. State*, 2005 VT 40, ¶ 10, 178 Vt. 524, 527, 872 A.2d 883, 889 (internal quotation marks omitted). In *Czechorowski v. State*, the Vermont Supreme Court found that Dena Monahan, an attorney for the Department of Aging and Disabilities, was entitled to absolute immunity "in her role as public advocate defending appeals before the [Human Services] Board" because her "functions were closely analogous to those of a government prosecutor[.]" *Id.* ¶ 14, 178 Vt. at 528, 872 A.2d at 890. "'[T]he decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution,' and is equally likely to be 'distorted if their immunity from damages arising from that decision was less than complete.'" *Id.* (quoting *Butz*, 438 U.S. at 515). At least one Vermont Superior Court has concluded that a VHRC Investigator was entitled to absolute immunity. *See Miller v. Horwitz*, No. 21-CV-02935 (Vt. Sup. Ct. Nov. 15, 2021) (unpublished) (adopting the reasoning stated in Motion to Dismiss at 6, Miller v. Horwitz, No. 21-CV-02935 (Vt. Sup. Ct. Nov. 15, 2021) that "[s]tate officers such as Ms. Horwitz have absolute immunity for prosecutorial and quasi-judicial functions"). To the extent Mr. Christie and Ms. Yang were engaged in these functions, the court agrees they are entitled to absolute immunity.

"Supervising the investigative activities" of subordinates and making statements to the press may also fall within the scope of prosecutorial functions entitled to absolute immunity. *O'Connor*, 2012 VT 27, ¶ 25, 191 Vt. at 426, 48 A.3d at 593; *see also Grega v. Pettengill*, 123 F. Supp. 3d 517, 549 (D. Vt. 2015) ("The court concludes that . . . conduct . . . which falls within the investigative or prosecutorial processes[] is within the general authority of his office and is therefore entitled to absolute immunity under Vermont law.") (internal quotation marks omitted) (citing *O'Connor*, 2012 VT 27, ¶ 9, 191 Vt. at 418, 48 A.3d at 588). Mr. Christie's and Ms. Yang's supervision of

Investigator Campbell may therefore fall within the scope of their duties.

In contrast, where a state employee's role is not judicial or prosecutorial in nature, absolute immunity generally does not apply. *See Czechorowski*, 2005 VT 40, ¶ 13, 178 Vt. at 528, 872 A.2d at 890 (observing that "Monahan's activities as general counsel to the Department—consulting with the Commissioner, rendering advice, and drafting the decision—were not strictly prosecutorial in function, and therefore were not entitled to absolute immunity"). Release of the Investigative Report appears to fall within this category.

VHRC is "accorded" "considerable statutory . . . powers[,]" *O'Connor*, 2012 VT 27, ¶ 21, 191 Vt. at 424, 48 A.3d at 592, to accept complaints, conduct investigations, and determine whether there are reasonable grounds for a case and, if so, decide whether to bring a civil action.[12] These "functions" are "closely analogous to those of a government prosecutor[.]" *Czechorowski*, 2005 VT 40, ¶ 14, 178 Vt. at 528, 872 A.2d at 890. In addition, Vermont's interest in "the vigorous and uninhibited enforcement" of anti-discrimination and public accommodation law is "obviously strong[.]" *Id.*, 2005 VT 40, ¶ 16, 178 Vt. at 529, 872 A.2d at 891; *see also Dep't of Corr. v. Hum. Rts. Comm'n*, 2006 VT 134, ¶ 20, 181 Vt. 225, 233, 917 A.2d 451, 457 (detailing history of Vermont's public accommodation laws). VHRC members and employees must exercise "judgment over a range of sensitive decisions that are bound to provoke anger, second-guessing, and retaliatory citizen suits, as this case amply attests." *Czechorowski*, 2005 VT 40, ¶ 16, 178 Vt. at 529, 872 A.2d at 891. However, officials claiming absolute immunity must have

---

[12] *See* 9 V.S.A. § 4553(a)(5) (providing VHRC may "issue subpoenas"); *id.* § 4553(a)(6) (providing VHRC may "[e]nforce conciliation agreements and prohibitions against discrimination by bringing an action in the name of the Commission"); *id.* § 4554(c) ("The Commission or its designated representative shall conduct such preliminary investigation *as it deems necessary* to determine whether there are reasonable grounds to believe that unlawful discrimination has occurred.") (emphasis supplied); *id.* § 4554(d) (providing the Commission may "bring an action in Superior Court . . . or dismiss the proceedings" if it "finds reasonable grounds to believe that unlawful discrimination has occurred" and cannot resolve them informally); *id.* § 4506(c) ("The Human Rights Commission may bring an action in the name of the Commission to enforce the provisions of this chapter in accordance with its powers established in chapter 141 of this title.").

also acted "within the scope of their authority[.]" *O'Connor*, 2012 VT 27, ¶ 16, 191 Vt. at 422, 48 A.3d at 590.

Neither Mr. Christie nor Ms. Yang acted "within the scope of their authority" if the release of the Investigative Report violated Vermont law. *Id.*; *see also Abdel-Fakhara v. Vermont*, 2022 WL 4079491, at *22 (D. Vt. Sept. 6, 2022) (considering whether defendant "exceed[ed] his statutory authority" to determine whether he acted within the scope of his authority for immunity analysis); *Dumont v. Corr. Corp. of Am.*, 2016 WL 8193639, at *13 (D. Vt. Nov. 21, 2016), *report and recommendation adopted*, 2017 WL 456463 (D. Vt. Feb. 2, 2017) (looking to the text of the relevant law to determine whether the actions of a defendant asserting absolute immunity "fit[] squarely within his statutory authority"); *Bowles v. United States*, 685 F. App'x 21, 26 (2d Cir. 2017) (upholding district court's conclusion that employee's statements to press were not made within the scope of her employment where they contravened her employer's policy and instructions not to speak to the media). Because the court cannot determine, as a matter of law, whether VHRC was required by statute to keep the Investigative Report confidential, in turn, the question of absolute immunity must remain undecided until a factual record is established. If absolute immunity is not available, the court must decide whether qualified immunity exists.

To be protected by qualified immunity under Vermont law, an official must therefore be "1) acting during the course of their employment and within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial[,] acts." *O'Connor*, 2012 VT 27 ¶ 6, 191 Vt. at 416-17, 48 A.3d at 586-87 (alteration adopted) (internal quotation marks omitted). "Good faith" exists "[i]f the official's conduct does not violate clearly-established rights of which a reasonable person would have known[.]" *Amy's Enters. v. Sorrell*, 817 A.2d 612, 617 (Vt. 2002). "To make this determination, [Vermont courts] have adopted the objective good-faith test from § 1983 qualified-immunity case law. The outcome of the inquiry depends on the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Sabia v. Neville*, 687 A.2d 469, 521 (Vt. 1996) (internal citations

omitted).

In applying the good faith standard, a court "look[s] first at the theory of liability[,]" finding that the existence of good faith may turn on whether the defendant has complied with a statutory duty. *Id.* at 521-23 (citing to *Murray v. White*, 587 A.2d 975, 981 (Vt. 1991) ("The fact that defendant's investigation was in compliance with statutory requirements, combined with an inability to find any clearly established law that imposed on defendant an obligation to investigate further, compels the conclusion that the extent of defendant's investigation was in good faith.")); *LaShay v. Dep't of Soc. & Rehab. Servs.*, 625 A.2d 224, 228 (Vt. 1993) (concluding the defendant "violated his statutory duty, and, therefore, did not act in good faith").

In this case, it is not clear whether Mr. Christie or Ms. Yang violated a statutory duty. Correspondingly, there is no evidence that their decision to release the Investigative Report was in accordance with a statutory duty. The Vermont Supreme Court has held that "decisions made in the course of investigations" including "publicity decisions" are discretionary. *Amy's Enters.*, 817 A.2d at 617 (citing *Levinsky v. Diamond*, 559 A.2d 1073, 1082 (Vt. 1989)). However, the release of the Investigative Report was also arguably ministerial in nature as it was an administrative act that could have been performed by any VHRC employee without the exercise of discretion. The parties do not adequately brief whether it more closely resembles a discretionary or a ministerial duty. The question of good faith must also await a factual record.

For the foregoing reasons, VHRC Defendants' motion to dismiss Plaintiff's state law claims against them in their individual capacities is GRANTED on absolute immunity grounds with regard to Mr. Christie's and Ms. Yang's investigation, decision-making, and Final Determination and DENIED WITHOUT PREJUDICE with regard to their release of the Investigative Report on absolute and qualified immunity grounds.

### 3. Whether Plaintiff Plausibly Alleges a Claim for Defamation Against VHRC Defendants.

VHRC Defendants argue that Plaintiff's defamation claim must be dismissed because VHRC Defendants were absolutely privileged in releasing the Investigative

Report to the public and because Plaintiff fails to plausibly allege a false and defamatory statement, actual malice, and resulting harm. Under Vermont law, in order to state a claim for defamation,

> a plaintiff must establish the following elements: (1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

*Soojung Jang v. Trustees of St. Johnsbury Acad.*, 331 F. Supp. 3d 312, 344 (D. Vt. 2018) (citation omitted).

In Vermont, "[a]bsolute privilege provides a complete shield against defamation actions" based on statements made within a judicial proceeding or the preliminary stages of a judicial or quasi-judicial proceeding. *Couture v. Trainer*, 2017 VT 73 ¶ 10, 205 Vt. 319, 325, 174 A.3d 1245, 1249. Because Vermont law requires VHRC to publish its final determination, the release of that decision is privileged. The release of the Investigative Report, however, warrants closer scrutiny.

While VHRC has the power to investigate discrimination complaints by holding hearings and issuing subpoenas to compel testimony or documents, *see* 9 V.S.A. § 4553 (providing VHRC's powers), it is not required to hear evidence and make factual determinations "in the manner of a court[.]" *Rueger v. Nat. Res. Bd.*, 2012 VT 33, ¶ 8, 191 Vt. 429, 434, 49 A.3d 112, 116 ("[District] commissions hear evidence and issue rulings in the manner of a court, and their decisions are subject to review by the Environmental Division. Their work satisfies an ordinary understanding of the term 'quasi-judicial.'") (internal citations omitted).[13] Instead, although VHRC can hold hearings and issue subpoenas, it does not make findings of fact but merely determines reasonable grounds which, in turn, enables it to bring an action in Vermont Superior

---

[13] *See also* 1 V.S.A. § 310 (defining "[q]uasi-judicial proceeding" under the Vermont Open Meetings Law as, in part, "a case . . . which is conducted in such a way that all parties have opportunity to present evidence and to cross-examine witnesses presented by other parties").

Court, which conducts a trial *de novo*.[14] The VHRC's determinations are not appealable. *See* 1 V.S.A. § 310 (defining a "[q]uasi-judicial proceeding" under the Vermont Open Meetings Act as requiring "a case in which the legal rights of one or more persons who are granted party status are adjudicated, . . . , which results in a written decision, and the result of which is appealable by a party to a higher authority"). The allegedly defamatory statements in the Investigative Report were thus not made in a quasi-judicial proceeding and the judicial proceedings privilege does not apply.

To the extent that the allegedly defamatory statements in the Investigative Report are opinion, "[c]ourts have . . . routinely rejected defamation claims based upon a 'pure' opinion that is not susceptible of being proven true or false." *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 720 (D. Vt. 2012), *aff'd*, 570 F. App'x 66 (2d Cir. 2014). Whether a statement is an opinion or a statement of fact is a question of law for the court. *See Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985) ("It is also clear that the determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court."). In making this determination, a court undertakes:

> (1) An assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which "might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Knelman*, 898 F. Supp. 2d at 721 (citing *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 403 (2d. Cir. 2006), and, noting that *Kirch* applied New York law, observing that "[a]lthough

---

[14] *See* 9 V.S.A. § 4553(a)(6)(A) (empowering VHRC to "[e]nforce conciliation agreements and prohibitions against discrimination by bringing an action in the name of the Commission"); *id.* § 4554 ("If the Commission finds reasonable grounds to believe that unlawful discrimination has occurred, . . . [and] [i]f the case is not disposed of by informal means in a manner satisfactory to a majority of the Commission within six months, it shall either bring an action in Superior Court as provided in section 4553 of this title or dismiss the proceedings[.]").

Vermont has not adopted a similar test, it is likely to find these same or similar factors relevant to its analysis"); *see also Grega*, 123 F. Supp. 3d at 552 (applying the *Kirch* factors).

Although the Investigative Report does not describe Plaintiff or his conduct as "racist," it contains several statements with this connotation. *See, e.g.*, Doc. 34-2 at 92 (stating that Plaintiff's treatment of Dr. Clemmons and her brother, in contrast to his treatment of Mr. Barreda, "is a significant example of disparate treatment based on race, color, and sex"); *id.* at 94 (concluding Plaintiff's treatment of Dr. Clemmons, her brother, and Mr. Barreda "is evidence of pretext and it is proof of discrimination against Dr. Clemmons on the basis of race, color, and sex"); *id.* at 92 (quoting a linguistic analysis stating that Plaintiff's conduct "reflect[ed] the systemic racism and implicit racial bias that characterize institutions in the United States. Empirical studies of interactions between police officers and citizens show systematic differential treatment of African Americans and Whites, and this pattern is replicated here as well[]") (internal quotation marks omitted). These statements are not characterized as Investigator Campbell's personal opinions; however, they are also not readily susceptible to being deemed true or false. At this juncture, the court cannot determine, as a matter of law, that the statements are merely non-actionable opinions.

Whether Plaintiff is a public official or a private person and whether he must further plausibly allege actual malice is also a question of law. *See Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966) ("[I]t is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'"). The Vermont Supreme Court has held that police officers are "public officials" regardless of their rank, because the duties of even "the lowest in rank of police officials" are "peculiarly governmental in character and highly charged with the public interest." *Colombo v. Times-Argus Ass'n*, 380 A.2d 80, 83 (Vt. 1977) (internal quotation marks omitted) ("[P]ublic discussion and public criticism directed towards the performance of [a patrolman's] office cannot constitutionally be inhibited by threat of prosecution under State libel laws.").

Because he is a "public official," Plaintiff must also plausibly allege VHRC

Defendants acted with actual malice because the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334, 94 S. Ct. 2997, 3004, 41 L. Ed. 2d 789 (1974) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)); *see also Ryan v. Herald Ass'n*, 566 A.2d 1316, 1319 (Vt. 1989) (citing *Gertz*, 418 U.S. at 342-43 and *New York Times Co.*, 376 U.S. at 279-80). To establish reckless disregard, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262 (1968).

The proof necessary to establish actual malice must generally be robust. At the pleading stage, however, "a public-figure plaintiff must [only] plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" actual malice." *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (second alteration in original) (quoting *Twombly*, 550 U.S. at 556). Courts "have inferred actual malice at the pleading stage from allegations that referred to the nature and circumstances of the alleged defamation[.]" *Id.*

Plaintiff alleges that "Defendants had knowledge of the falsity of the statements and/or acted in reckless disregard of their truth or falsity." (Doc. 58-4 at 70, ¶ 159.) He contends that between the draft Investigative Report and its finalization in November 2020, VHRC Defendants changed its conclusion from finding no evidence of discrimination to finding abundant evidence of discrimination. According to Plaintiff, Ms. Yang allegedly participated in falsifying the Investigative Report's findings and conclusion and Mr. Christie allegedly approved those changes.

"[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). Nor can "an extreme departure from professional standards" generally "provide a sufficient basis for finding actual malice."

38

*Id.* at 665. However, when "combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement," evidence of ill will "may . . . support a finding of actual malice." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000).

Plaintiff contends that the Investigative Report was changed for the purpose of making an example of him and for making the VSP appear discriminatory even though many years of investigation allegedly yielded no evidence of discrimination. He further contends VHRC departed from its normal practices and statutory duties in releasing the Investigative Report to Seven Days. He contends these facts plausibly give rise to a clear and convincing inference that certain VHRC officials sought to punish VSP and Plaintiff and expose them to public condemnation. Accepting Plaintiff's allegations as true, and viewing them in the light most favorable to Plaintiff, although a close question, the SFAC plausibly alleges that Ms. Yang and Mr. Christie acted with actual malice in releasing the Investigative Report to Seven Days.

VHRC Defendants argue that even if Plaintiff alleged malice, he fails to allege that he suffered harm warranting compensatory damages. However, "[e]vidence of embarrassment or temporary damage to reputation is sufficient to show actual harm." *Kneebinding, Inc. v. Howell*, 2018 VT 101, ¶ 83, 208 Vt. 578, 616, 201 A.3d 326, 355 (2018). The statements regarding Plaintiff in the Investigative Report are sufficient to subjectively cause Plaintiff reputational damage and would objectively cause this same damage to a reasonable person as well. In addition, Plaintiff has offered evidence of at least one allegedly thwarted employment opportunity at least partially attributable to the release of the Investigative Report.

Because at the pleading stage the court must accept Plaintiff's factual allegations as true, VHRC Defendants' motion to dismiss Plaintiff's state law defamation claim (Count V) as to Ms. Yang and Mr. Christie in their individual capacities must be DENIED WITHOUT PREJUDICE.

### 4.     Whether Plaintiff Plausibly Alleges a False Light Invasion of Privacy Claim Against VHRC Defendants.

VHRC Defendants argue that Plaintiff's claim for false light invasion of privacy must be dismissed because both the Final Determination and Investigative Report were public documents and Plaintiff fails to plausibly allege VHRC Defendants acted with reckless disregard in their release.

> To state a claim [for false light invasion of privacy] under [Restatement (Second) of Torts] § 652E, the plaintiff must allege that the defendant gave publicity to a matter concerning the plaintiff that placed the plaintiff in a false light, "the false light in which the [plaintiff] was placed would be highly offensive to a reasonable person," and the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed."

*Hoyt v. Klar*, 2021 WL 841059, at *2 (Vt. Mar. 5, 2021) (quoting Restatement (Second) of Torts § 652E (Am. L. Inst. 1977) (second and third alterations in original)). In addition, "it is essential . . . that the matter published concerning the plaintiff is not true." Restatement (Second) of Torts § 652E cmt. a.

Citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), VHRC Defendants argue that Plaintiff cannot maintain an invasion of privacy claim when the information publicized was available in a public document, because "even the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record." *Id.* at 494-95. "There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public." Restatement (Second) of Torts § 652D cmt. b. The Final Determination, which is a public document, thus cannot provide a basis for a false light claim.

With regard to the Investigative Report, Plaintiff contends it was not supposed to be a public document and claims it "attributes to him characteristics . . . or beliefs that are false, and so [he] is placed before the public in a false position." Restatement (Second) of Torts § 652E cmt. b.; *see also Machleder v. Diaz*, 801 F.2d 46, 57 (2d Cir. 1986) ("A broadcast cannot cast the plaintiff in a false light unless it is substantially false."). The

false light in which Plaintiff was allegedly placed, being a "racist" and engaging in discriminatory policing, would be highly offensive to a reasonable person. An accusation of this nature, if it is proved false, is a "major misrepresentation of [a plaintiff's] character, history, activities[,] or beliefs [such] that serious offense may reasonably be expected to be taken by a reasonable man in his position[.]" Restatement (Second) of Torts § 652E cmt. c; *see also Fairstein v. Netflix*, 553 F. Supp. 3d 48, 79 (S.D.N.Y. 2021) (holding that dialogue that could lead viewers to conclude that the plaintiff "directed discriminatory policing practices" could support a defamation action); *Jorjani v. N.J. Inst. of Tech.*, 2019 WL 1125594, at *4 (D.N.J. Mar. 12, 2019) ("[A]n allegation of racism alone is not actionable, but if the statement falsely implies someone engaged in specific acts (e.g., made racist statements or refused to employ a certain race), it may be defamatory.").

Accepting Plaintiff's factual allegations as true, Plaintiff plausibly states a claim for false light invasion of privacy against Ms. Yang and Mr. Christie in their individual capacities solely with regard to the release of the Investigative Report. VHRC Defendants' motion to dismiss Count IV is therefore GRANTED IN PART and DENIED IN PART.

## 5.     Whether Plaintiff's § 1983 Claims Against Seven Days Must Be Dismissed for Failure to Plausibly Allege State Action or Civil Conspiracy.

Seven Days seeks dismissal of Plaintiff's 42 U.S.C. § 1983 claims because it was not acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia[.]" 42 U.S.C. § 1983. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (citation omitted). "It is well-established that 'actions by journalists in publishing a newspaper article do not constitute the requisite 'state action' to support state action claims.'" *Thomas v. City of New York*, 2018 WL 5791965, at *14 (E.D.N.Y. Nov. 5,

2018) (alteration adopted) (quoting *Idema v. Wager*, 120 F. Supp. 2d 361, 371 (S.D.N.Y. 2000)); *see also Skinner v. Dwyer*, 1992 WL 265995, at \*2 (N.D.N.Y. Sept. 9, 1992) ("A newspaper does not act under color of law when it publishes news received from police or other state officials."). Any direct § 1983 claim against Seven Days must therefore be DISMISSED.

Seeking to bootstrap Seven Days to VHRC and other state actors, Plaintiff alleges that Seven Days "acted in concert with [V]HRC, a state actor, to the extent necessary for liability under section 1983" because it was "a willful participant in [V]HRC's scheme to publicly indict DPS/VSP and the troopers including [P]laintiff with false accusations, to damage their reputations, and to deprive them of their constitutional rights to due process." (Doc. 58-4 at 47, ¶ 114.) Thereafter, Seven Days allegedly "spun the story in [V]HRC's favor" in "return for access to" VHRC's Investigative Report. *Id.* The SFAC alleges Seven Days's "request to [V]HRC for the Investigative Report was an overt act indicative of the agreement to act in concert" and Seven Days "acknowledged in its article its early access to the Investigative Report by noting it was 'unpublished' by [V]HRC [in the June 23 Article]." *Id.* at 47-48, ¶¶ 115, 117.

"To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (internal quotation marks and citation omitted). "Put differently, a private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." *Id.* (internal quotation marks and citation omitted).

"A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Id.*; *see also Dwares v. City of New York*, 985 F.2d 94, 99–100 (2d Cir. 1993) (collecting cases). Although § 1983 conspiracies "may have to be proven by circumstantial, rather than direct, evidence[,]" *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999), a plaintiff "should make an effort to provide some details of time and place and the alleged effect of

42

the conspiracy." *Dwares*, 985 F.2d at 100 (internal quotation marks omitted).

Plaintiff has failed to allege any details of an agreement between VHRC and Seven Days to violate his constitutional rights. His contention that they acted as part of a conspiracy is both speculative and far-fetched. *See JBCHOLDINGS NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 533 (S.D.N.Y. 2013) (rejecting fraud claim on plausibility grounds because "plaintiffs have failed to allege a plausible motive for such an audacious and frankly unrealistic plan").

"[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed[.]" *Id*. Because Plaintiff fails to plausibly allege Seven Days acted under color of state law, and fails to state a plausible claim of civil conspiracy, Seven Days's motion to dismiss Plaintiff's § 1983 claims (Counts I, II, and III) is GRANTED.

## 6. Whether Plaintiff Plausibly Alleges a Claim for Defamation Against Seven Days.

Seven Days argues that Plaintiff's defamation claim must be dismissed because Plaintiff fails to plausibly allege a false statement or the requisite level of fault. In addition, Seven Days contends its June 23 Article was a neutral report that is privileged under the Vermont Constitution and Vermont common law.

In the SFAC, Plaintiff identifies misrepresentations and omissions which he contends render the June 23 Article wholly or partially false. He asserts the "sting" of the article is to accuse him of being a racist, which he is not. This is sufficient to allege a false and defamatory statement. *See Lent v. Huntoon*, 470 A.2d 1162, 1167 (Vt. 1983) (upholding libel conviction where the plaintiff "asserted that the letter, *taken in its totality*, was defamatory since it *implied* that he was fired because of some dishonesty or incompetence") (emphasis supplied); *Burgess v. Reformer Publ'g Corp.*, 508 A.2d 1359, 1364 (Vt. 1986) (holding statement "could be read to *convey the impression* that Burgess was the subject of a grand jury investigation for embezzlement") (emphasis supplied); *Weisburgh v. Mahady*, 511 A.2d 304, 306 (Vt. 1986) (observing that courts focus on "the

43

'gist,' the 'sting,' or the 'substantial truth' of the defamation") (internal quotation marks omitted).

The First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. at 279-80; *accord Ryan*, 566 A.2d at 1319 (Vt. 1989). "As used in this context, 'reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013) (quoting *St. Amant*, 390 U.S. at 731), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015).

A court must be mindful that, as a public official, Plaintiff's conduct is expected to be subject to public debate. "The abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws." *Colombo*, 380 A.2d at 83.

Plaintiff's evidence of actual malice by Seven Days is minimal to non-existent. The June 23 Article contains statements that are both favorable and unfavorable to Plaintiff. "Not only is proving actual malice a heavy burden, but, in the era of *Iqbal* and *Twombly*, pleading actual malice is a more onerous task as well." *Biro*, 963 F. Supp. 2d at 278 (alterations adopted) (internal quotation marks and citations omitted). "[G]iven the difficulty of proving actual malice, as well as the fact that actual malice must be proven by clear and convincing evidence in order for a plaintiff to succeed, it stands to reason that Rule 12(b)(6) should play a particularly important role in testing the plausibility of a plaintiff's defamation claim." *Id.* at 279 (citations omitted).

Plaintiff alleges that Seven Days had knowledge of the falsity of the statements in its June 23 Article or acted in reckless disregard of their truth or falsity and that it was

"motivated by profit and self-promotion as a news organization[,]" prompting it to "focus on [P]laintiff . . . to personalize the face of [VSP] for the 'bogeyman' effect with its readers which in turn would stimulate interest in the story." *Id.* at 57, 65 ¶¶ 128, 143. "It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice." *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (citing *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 281-82 (1974)).

Moreover, "the mere presence of some ulterior motive—whether a profit motive, a motive to produce the most interesting stories, or a personal desire to harm the subject of a story—is not enough to support a finding of actual malice." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 596 (D.C. Cir. 2016). "Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 667 (1989). "This is so even though such motives may naturally provide publishers with an incentive to achieve an end without regard to the truth of what they publish." *Jankovic*, 822 F.3d at 596.

Plaintiff's allegation that Seven Days's request for the Investigative Report was "illegal" under 9 V.S.A. § 4555 is also insufficient to plausibly plead actual malice. Seven Days had no statutory duty to maintain the Investigative Report's confidentiality, nor was it required to refrain from requesting it. It was free to request its release, and if the Investigative Report was part of VHRC's investigative file, the VHRC Defendants were free to deny that request. *See* 9 V.S.A. § 4555(a) ("Except as provided in this subsection, the [VHRC]'s complaint files and investigative files shall be confidential.").

Because Plaintiff has failed to plausibly allege an "'intent to inflict harm through falsehood,' a 'willingness to publish unsupported allegations,' or a desire to publish 'with little or no regard for the report's accuracy[,]'" he has not plausibly pled actual malice. *Jankovic*, 822 F.3d at 596 (alteration adopted) (emphasis omitted) (quoting *Tavoulareas*, 817 F.2d at 795-97).[15] Seven Days's motion to dismiss Count V is therefore GRANTED.

---

[15] The cases Plaintiff cites in support, *Jacques v. Bank of Am.*, 2013 WL 129328 (E.D. Cal. Jan. 9, 2013) and *Calanno v. Terra Vac Corp.*, 2008 WL 11337850 (S.D. Cal. May 22, 2008),

### 7.    Whether Plaintiff Plausibly Alleges a Claim for False Light Invasion of Privacy Against Seven Days.

Seven Days argues that Plaintiff's claim for false light invasion of privacy is duplicative of his defamation claim. The Vermont Supreme Court has addressed those claims separately, noting that they are "different but closely related tort[s.]" *Hoyt*, 2021 WL 841059, at *2. This approach is consistent with § 652E, which explains:

> In many cases to which the rule stated here applies, the publicity given to the plaintiff is defamatory, so that he would have an action for libel or slander under the rules stated in Chapter 24. In such a case the action for invasion of privacy will afford an alternative or additional remedy, and the plaintiff can proceed upon either theory, or both, although he can have but one recovery for a single instance of publicity.

> It is not, however, necessary to the action for invasion of privacy that the plaintiff be defamed. It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position.

Restatement (Second) of Torts § 652E cmt. b.

In this case, Plaintiff's false light claim against Seven Days fails for the same reason as his defamation claim. "In order for a plaintiff to succeed on a false light claim without unduly impinging on the First Amendment guarantees of freedom of the press, falsity and the requisite level of fault must be demonstrated." *Machleder*, 801 F.2d at 53-54 (2d Cir. 1986). Accordingly, "[a] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim. The First Amendment considerations that apply to defamation therefore apply also to [the plaintiff's] counts for false light and tortious interference." *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) (internal quotation marks and citations omitted).

Here, Plaintiff fails to plausibly allege actual malice, which is the requisite degree of fault. Seven Days's motion to dismiss Plaintiff's false light invasion of privacy claim (Count IV) must therefore be GRANTED.

---

involve a different standard of malice required "to avoid the privilege of California Civil Code section 47(c)[]." *Jacques*, 2013 WL 129328, at *2.

**8.     Whether Plaintiff Plausibly Alleges a Claim for Tortious Interference with Contract.**

Plaintiff alleges that Defendants tortiously interfered with his current and prospective employment contracts as a law enforcement officer. The first claim requires Plaintiff to plausibly plead that "the defendant[s] . . . intentionally and improperly induced or caused the [third party] not to perform under its contract with the plaintiff." *Kneebinding, Inc.*, 2018 VT 101, ¶ 93, 208 Vt. at 619-20, 201 A.3d at 357 (internal quotation marks omitted).

Although Plaintiff alleges that "he has been prevented from working as a trooper" (Doc. 58-4 at 70, ¶ 162), he "has been unable to wear his service uniform and resume his work as a trooper[,]" *id.* at 64, ¶ 141, his "work conditions became intolerable as he can no longer function effectively and safely as a law enforcement officer[,]" *id.* at 66, ¶ 148, "[his] career in law enforcement has ended," *id.*, and "[his] job as a trooper was effectively taken from him[,]" *id.* at 67, ¶ 149, he does not allege that VSP terminated his employment. Plaintiff therefore fails to allege that VSP has failed "to perform under its contract with [him]." *Kneebinding, Inc.*, 2018 VT 101, ¶ 93, 208 Vt. at 619-20, 201 A.3d at 357 (internal quotation marks omitted).

To the extent Plaintiff claims Defendants interfered with his potential employment at UVMMC, that claim must also fail.

> Although a defendant may be liable for tortiously interfering with business relations not yet formalized by contract, general allegations of reduced employment opportunities, or speculation about potential future business partners, will not suffice. Instead, "there must exist a reasonable probability that a business or contractual relationship would have arisen but for the conduct of the defendant[.]"

*Prince v. Entergy Nuclear Operations, Inc.*, 2011 WL 3363207, at *6 (D. Vt. Aug. 3, 2011) (quoting *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 22, 188 Vt. 245, 255, 6 A.3d 701, 709) (alteration in original). "Unlike in a defamation claim, tortious interference with contractual relationships requires that the defendant have actual knowledge of the plaintiff's business relationship and the specific intent to interfere with it." *Bowles v. O'Connell*, 2018 WL 3827141, at *8 (D. Vt. Aug. 10, 2018). "To recover,

47

the plaintiff must have suffered harm from the interference, which includes such loss as the plaintiff can prove to have resulted directly and proximately from the defendant's wrongful acts." *Kneebinding, Inc.*, 2018 VT 101, ¶ 93, 208 Vt. at 619-20, 201 A.3d at 357-58. The plaintiff may recoup for pecuniary loss, consequential losses, emotional distress, or harm to reputation. *Id.*, 2005 VT 101, ¶ 93, 208 Vt. at 620, 201 A.3d at 358 (citing the Restatement (Second) of Torts § 766 cmt. t (1979)).

Plaintiff alleges that "one of the State's largest employers declined to employ [him] as a security guard, citing as its reason the [V]HRC findings." (Doc. 58-4 at 42, ¶ 106.) Although this allegation is sufficient to show "the existence of a valid business relationship or expectancy[,]" Plaintiff fails to allege that VHRC Defendants or Seven Days had any "knowledge . . . of the relationship or expectancy[.]" *J.A. Morrissey, Inc.*, 2010 VT 66, ¶ 21, 188 Vt. at 255, 6 A.3d at 708; *see also Bowles*, 2018 WL 3827141, at *8 (requiring defendant's actual knowledge of plaintiff's business relationship). Without such knowledge, he has failed to plausibly allege tortious interference with a prospective business relationship claim. Count VI is therefore DISMISSED.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for leave to file a SFAC (Doc. 58) is GRANTED; VHRC Defendants' and Seven Days's respective special motions to strike pursuant to Vermont's anti-SLAPP statute (Docs. 13, 33) are DENIED; VHRC Defendants' motion to dismiss under Fed. R. Civ. P. 12(b) (Doc. 34) is GRANTED IN PART and DENIED IN PART; and Seven Days's motion to dismiss under Fed. R. Civ. P. 12(b) (Doc. 12) is GRANTED.

All claims in the SFAC have been DISMISSED except:

1. The 42 U.S.C. § 1983 claims (Counts I, II, and III) against Mr. Christie and Ms. Yang in their individual capacities, to the extent those claims relate to the release of the Investigative Report to Seven Days;

2. The invasion of privacy claim (Count IV) against Mr. Christie and Ms. Yang in their individual capacities, to the extent that claim relates to the release of the Investigative Report to Seven Days; and

3. The defamation claim (Count V) against Mr. Christie and Ms. Yang in their individual capacities, to the extent that claim relates to the release of the

Investigative Report to Seven Days.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _21st_ day of March, 2023.

Christina Reiss, District Judge
United States District Court