UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 JUN 10  PM 3:42

CLERK

BY_____
DEPUTY CLERK

ANDREW LEISE,                           )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        Case No. 2:22-cv-00009
                                        )
VERMONT HUMAN RIGHTS                    )
COMMISSION, KEVIN CHRISTIE, BOR         )
YANG, DA CAPO PUBLISHING, INC., and     )
JOHN AND JANE DOE I-X,                  )
                                        )
        Defendants.                     )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
LEAVE TO AMEND FOR PLAINTIFF'S PROPOSED AMENDMENTS TO THE
SUPPLEMENTAL FIRST AMENDED COMPLAINT, GRANTING VHRC
DEFENDANTS' PARTIAL MOTION TO DISMISS, AND DENYING VHRC
DEFENDANTS' REQUEST FOR PARTIAL RULE 54(B) JUDGMENT**
(Doc. 109)

Plaintiff Andrew Leise, a Vermont State Police ("VSP") trooper, brings this action

against Defendants Bor Yang, former Executive Director of Vermont Human Rights

Commission ("VHRC"), and Kevin Christie, Chairman of VHRC, in their personal

capacities (collectively, "VHRC Defendants"), as well as John and Jane Doe I-X, the

"individual actor(s) [who] carried out the actions of [V]HRC and Seven Days[.]"[1] (Doc.

106 at 8, ¶ 18.)

Plaintiff's claims arise from VHRC's November 2020 determination that there

were reasonable grounds to find that VSP discriminated against Lydia Clemmons, Ph.D.,

based on her race and gender. Plaintiff claims VHRC's determination (the "Final

Determination"), its wrongful release of a confidential investigative report (the

"Investigative Report"), and Seven Days' subsequent reporting about the same falsely

portrayed him as racist and sexist. In his proposed Second Amended Complaint (the

---

[1] Seven Days is a newspaper published by Da Capo Publishing, Inc.

"PSAC"), he asserts six causes of action: (1) a procedural due process claim (liberty interest/stigma plus) under 42 U.S.C. § 1983 (Count I); (2) a procedural due process claim (property interest/constructive termination) under § 1983 (Count II); (3) a substantive due process claim for arbitrary and oppressive government action under § 1983 (Count III); (4) an invasion of privacy claim under Vermont law (Count IV); (5) a defamation claim under Vermont law (Count V); and (6) a tortious interference with contract claim under Vermont law (Count VI).

Plaintiff is represented by Kaveh S. Shahi, Esq. VHRC Defendants are represented by Lisa B. Shelkrot, Esq.

## I.    Procedural Background.

On March 24, 2023, the court issued an Opinion and Order granting in part and denying in part VHRC Defendants' April 1, 2022 motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. 66.) The Opinion and Order dismissed all Plaintiff's claims against VHRC Defendants except for his 42 U.S.C. § 1983 claims (Counts I, II, and III) and invasion of privacy and defamation claims (Counts IV and V) asserted against VHRC Defendants in their individual capacities, to the extent these claims relate to the allegedly wrongful release of the Investigative Report to Seven Days. The court also dismissed Seven Days and VHRC as defendants, and all claims against VHRC Defendants in their official capacities. The court deferred ruling on whether VHRC Defendants were entitled to qualified immunity on the § 1983 claims until the development of a factual record, a decision from which VHRC Defendants filed an interlocutory appeal.

Thereafter, on June 29, 2023, the court granted in part and denied in part VHRC Defendants' motion for reconsideration. (Doc. 90.) It dismissed without prejudice Plaintiff's 42 U.S.C. § 1983 procedural due process liberty and property claims (Counts I and II) as to VHRC Defendants in their individual capacities but did not dismiss Plaintiff's § 1983 substantive due process claim (Count III). Pursuant to this ruling, VHRC Defendants' appeal was narrowed to the question of qualified immunity regarding Count III. On August 10, 2023, the court denied without prejudice partial final judgment

for Seven Days and granted partial final judgment in favor of VHRC under Rule 54. (Doc. 95.)

Plaintiff moved for leave to file a second amended complaint on July 13, 2023, (Doc. 92), which the court denied without prejudice on August 28, 2023 because of VHRC Defendants' pending interlocutory appeal. (Doc. 99.) In a hearing on September 19, 2023, the court indicated that it would consider the pending motions to dismiss in the context of an amended complaint. (Doc. 102.) The Second Circuit issued a limited remand on Plaintiff's motion for leave to amend on September 27, 2023. On October 17, 2023, the court conditionally granted the motion and stated that it would "consider Defendants' arguments that any amendments are futile in the context of their anticipated motions to dismiss." (Doc. 105.)

On October 18, 2023, Plaintiff filed the PSAC. (Doc. 106.) Thereafter, on November 9, 2023, VHRC Defendants moved to dismiss Counts I and II for failure to state a claim under Fed. R. Civ. P. 12(b)(6), (Doc. 109), and Plaintiff responded in opposition on November 27, 2023. (Doc. 110.) After VHRC Defendants filed a reply on December 11, 2023, and requested final judgment in their favor pursuant to Fed. R. Civ. P. 54, the court took the pending motion under advisement. (Doc. 114.)

The court considers the conditionally granted motion for leave to amend and motion to dismiss in tandem. *See Nolan v. County of Erie*, 2021 WL 51004, at *4 (W.D.N.Y. Jan. 6, 2021) ("There is nothing that bars [d]efendants from moving to dismiss while a court decides a pending motion for leave to amend."); *Phillips v. Orleans County*, 2019 WL 3088051, at *4 (W.D.N.Y. July 15, 2019) (explaining that consideration of both motions simultaneously will allow the court to "determine whether the amendments would be futile and at the same time consider whether a claim should be dismissed").

## II.     The PSAC's Factual Allegations.

Many of the PSAC's factual allegations remain virtually unchanged, and thus the court adopts its prior summary of those allegations as set forth herein. New allegations set forth in paragraphs 139 through 146 of the PSAC are addressed separately.

## A.      The Disputes at Clemmons Family Farm.

Plaintiff is a VSP corporal based at the VSP's Williston Barracks. In the fall of 2017, he was one of the VSP troopers who responded to incidents at Clemmons Family Farm in Charlotte, Vermont.

Dr. Clemmons, an African-American woman, is the owner and operator of Clemmons Family Farm, a 148-acre farm that hosts classes and events. In September 2017, Dr. Clemmons reported to VSP that her tenant Greg Barreda, a Hispanic male, had paid a security deposit in silver coins, which Dr. Clemmons suspected were stolen. Mr. Barreda was arrested and charged in Vermont Superior Court with the theft of the coins. On September 22, 2017, Mr. Barreda was released on conditions which initially did not prohibit him from returning to the Clemmons Family Farm but were subsequently amended to require him to stay three hundred feet from Dr. Clemmons.

Between October 2017 and December 2017, VSP responded to Clemmons Family Farm more than ten times to address conflicts between Dr. Clemmons and Mr. Barreda regarding the latter's truck, dogs, possessions, firearms, alleged violations of his conditions of release, and alleged trespasses. As a result, Mr. Barreda was charged with four violations of his conditions of release and one count of unlawful trespass. Plaintiff responded to complaints by both Dr. Clemmons and Mr. Barreda and "attempted to address the parties in a fair and reasonable manner while controlling the risk of aggravation and escalation between the parties and maintaining his own safety." (Doc. 106 at 14, ¶ 38.)

On November 15, 2017, Mr. Barreda was granted "a temporary stalking order" against Dr. Clemmons in Vermont Superior Court. *Id.* at 22, ¶ 59. On that same day, Plaintiff and a VSP sergeant served Dr. Clemmons with the stalking order at Clemmons Family Farm. On November 27, 2017, the stalking order was vacated. Dr. Clemmons was granted a temporary restraining order against Mr. Barreda on December 14, 2017, which Plaintiff served on Mr. Barreda five days later. On December 28, 2017, Mr. Barreda was evicted from Clemmons Family Farm pursuant to a Vermont Superior Court order.

Dr. Clemmons filed a written complaint with VSP Internal Affairs on December

21, 2017 to request the removal of Plaintiff and another officer from her case because of their alleged racial bias. She thereafter filed a complaint in early 2018 with VHRC against VSP and the Vermont Department of Public Safety for denial of "services, facilities, goods, privileges, advantages, benefits, or accommodations" on the basis of her race, color, and sex in violation of 9 V.S.A. § 4502(c).

## B.    VHRC's Investigation.

VHRC Investigator Nelson M. Campbell, Esq. spent approximately three years investigating Dr. Clemmons' discrimination complaint. In the course of her investigation, Investigator Campbell reviewed "documents, court filings, bodycam recordings of troopers' words and actions in interactions with Dr. Clemmons, internal emails, and other witness testimony[.]" (Doc. 12-2 at 20.)

Plaintiff alleges that on July 16, 2020, Investigator Campbell provided a draft report to the parties which concluded there was insufficient evidence to show VSP discriminated against Dr. Clemmons on the basis of sex or race because VSP's treatment was not "markedly hostile" and because there was a lack of a racial "comparator" of "a white individual or family in similar circumstances, who was delivered services by the VSP in a more favorable way than [Dr. Clemmons'] family." (Doc. 106 at 35-36, ¶¶ 93-95) (internal quotation marks omitted). Investigator Campbell allegedly stated that Mr. Barreda was a comparator for purposes of the sex discrimination claims and was treated less favorably than Dr. Clemmons.

## C.    The Investigative Report.

On November 10, 2020, Ms. Yang approved the final version of the Investigative Report, which Plaintiff contends VHRC "manipulated and falsified" to "reverse the conclusions and generate an investigative report that recommended a finding of discrimination." *Id.* at 2, ¶ 3. VHRC allegedly sought "to politically promote itself as aligned with national movements such as Black Lives Matter[,]" *id.* ¶ 2, and "exploit[ed] Dr. Clemmons' race [to] score politically against VSP as a representative of the 'white' law enforcement." *Id.* at 5, ¶ 9. VHRC members were allegedly "induced" by the Investigative Report to find reasonable grounds to conclude VSP discriminated against

Dr. Clemmons. *Id.* at 2, ¶ 3.

The 105-page Investigative Report details interactions between VSP, Dr. Clemmons, and Mr. Barreda between September and December 2017. It includes two exhibits: a photograph of the Clemmons Family Farm property and a color-coded table of the calls that Dr. Clemmons and Mr. Barreda made to VSP. Applying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Investigative Report concludes that Dr. Clemmons established a prima facie case of discrimination. Although it finds VSP's asserted legitimate, non-discriminatory reasons for its actions "persuasive on their face," which "initially swayed the investigation towards making a no reasonable grounds recommendation[,]" after analyzing evidence of pretext, the Investigative Report ultimately concludes that "VSP's reasons were illegitimate." (Doc. 12-2 at 85.)

The Investigative Report's pretext analysis includes numerous references to Plaintiff and states that Plaintiff "denigrated Dr. Clemmons to Barreda and disparaged her, telling him he would cover for him and that she was unreasonable. He then characterized her as dishonest on perhaps the most ridiculous basis imaginable—her guests were late on a Sunday morning to their location—rural Charlotte." *Id.* at 88. A subsection entitled "Continuous preferential treatment of Barreda by [Plaintiff]" states:

> [Plaintiff's] treatment of Dr. Clemmons and Josh Clemmons on October 22 and beyond, in contrast to his treatment of Barreda, is a significant example of disparate treatment based on race, color, and sex. [Plaintiff's] rudeness, accusatory attitude[,] and his dismissiveness of the Clemmons[es]' concerns, even though he had never met them before, strongly suggest that [Plaintiff] either already had an unfavorable opinion about Dr. Clemmons prior to his arrival, or that he formed one upon seeing her and her brother.

*Id.* at 93 (emphasis in original).

Citing an undated "linguistical analysis of [Plaintiff's] interaction with the Clemmons[es] on October 22, 2017[]" by Maeve Eberhardt, an associate professor at the University of Vermont, which was "requested" by Dr. Clemmons, the Investigative Report quotes Dr. Eberhardt as follows: "Empirical studies of interactions between police officers and citizens show systematic differential treatment of African Americans and

Whites, and this pattern is replicated here as well." *Id.* The analysis notes Mr. Barreda "presents as White" and Dr. Clemmons "presents as African American[.]" *Id.*

Finding that "[Plaintiff] frequently expressed concern for Barreda's welfare, but never the welfare of the Clemmons[es]" and had a "dismissive attitude toward complaints from women," *id.* at 94-95, the Investigative Report concludes that "[Plaintiff's] treatment of Barreda and his treatment of both Clemmons[es], particularly Dr. Clemmons, is <u>not</u> evidence of professional conduct—it is evidence of pretext and it is proof of discrimination against Dr. Clemmons on the basis of race, color, and sex." (Doc. 12-2 at 95) (emphasis in original).

Acknowledging that her "own perspective shifted over almost three years as the evidence kept coming in[,]" *id.* at 102, Investigator Campbell cites Plaintiff's "disparaging, sexually discriminatory[,] and highly inappropriate conversation with Barreda about Dr. Clemmons[]" as "result[ing] in a reassessment of the issue of whether the VSP *intended* to provide quality police services for the Clemmons[es] and raised the very credible possibility of discrimination by [Plaintiff] based on sex, race[,] and color." *Id.* at 100 (emphasis in original). Investigator Campbell concluded that Plaintiff had "internalized" VSP's "highly negative" views of Dr. Clemmons "before he arrived[]" at Clemmons Family Farm for the first time. *Id.*

### D.   The Final Determination.

VHRC's four-page Final Determination records two March 25, 2021 votes of VHRC's members. The members, chaired by Mr. Christie, voted unanimously, with one abstention, in favor of finding reasonable grounds to believe that VSP and the Vermont Department of Public Safety illegally discriminated against Dr. Clemmons on the basis of (1) race and color and (2) sex, in violation of Vermont law.

Plaintiff alleges that he is not racist or sexist and that his conduct reflected "exemplary law enforcement." (Doc. 106 at 16, ¶ 42.) In every encounter with Dr. Clemmons, he contends he "acted professionally and fairly in the best tradition of law enforcement." *Id.* at 41, ¶ 104. Plaintiff's PSAC includes a chart identifying thirteen allegedly false statements in the Investigative Report. *Id.* at 16-18, ¶ 43.

### E.    Release of Documents to Seven Days.

Plaintiff alleges that while the Final Determination is a public document, the Investigative Report is not and was "unlawfully released" in violation of 9 V.S.A. § 4555 to Seven Days on June 10, 2021 "in exchange for favorable media coverage." *Id.* at 2, ¶ 4. He avers "[V]HRC in an executive session discussed and approved the release of the Investigative Report upon request." *Id.* at 47, ¶ 115. Thereafter, VHRC Defendants allegedly had an "arrangement" whereby Seven Days would "promote [V]HRC's leadership, shape public opinion against VSP and its troopers, and eliminate scrutiny of the Investigative Report which would have been part of the due process right of the troopers to defend their good names." *Id.* at 3, ¶ 5. "Consistent with this scheme, on June 23, 2021, Seven Days published an article . . . entitled, 'Vermont State Police Discriminated Against Black Woman Who Runs Clemmons Family Farm, Commission Says'" (the "June 23 Article"). (Doc. 106 at 3, ¶ 5.)

The June 23 Article acknowledges that the Final Determination and Investigative Report were "unpublished" and were not available on VHRC's website. (Doc. 12-1 at 2.) Seven Days requested the Investigative Report on June 10, 2021, and VHRC "staff emailed it that day." *Id.* at 3. The June 23 Article notes:

> Bor Yang, executive director of the commission, acknowledged in an email that reports become public documents when the commission determines reasonable grounds exist to believe discrimination occurred.

> "That report is made available to the public upon request but there is no obligation on the [V]HRC's part to post anything on our website or to otherwise announce the decision," she wrote. "A decision was made to not post this report on our website but to make it available upon request. The basis for that decision was discussed in executive session."

> From the time the determination was made in March, Yang wrote, the commission has six months to attempt to negotiate a legal settlement with the state police. If one is not reached, the commission has the option to sue on Clemmons[es]' and the public's behalf.

> "We are still in the negotiations phase and so I will not be providing further comment on the case," she wrote.

*Id.*

The following paragraphs of the June 23 Article identify Plaintiff by name:

State police Cpl. Andrew Leise arrived. In under a minute, according to the report, he accused Clemmons of nullifying the court-ordered conditions of release by "coming to her place of business and being within 300 feet of Barreda, despite the fact that she was under no legal restraint that prohibited her from coming to her place of business."

Investigator Campbell reviewed dashcam and bodycam footage. She wrote that Leise's initial tone toward Clemmons and her brother was "alternately impatient, brusque, accusatory and confrontational peppered with occasional perfunctory politeness."

Leise stayed for an hour and helped Barreda move his belongings. He also "coached Barreda about what to put in his statement" to police, the report says, and thanked him for being a "gentleman." Leise later informed the Williston barracks in an email that, because Clemmons' guests began arriving a half hour later than she said they were due, he doubted her honesty.

*Id.* at 5. Seven Days provided a link to the Final Determination and Investigative Report beneath a heading that stated: "Read the full report below[.]" *Id.* at 7.

The June 23 Article notes Vermont Public Safety Commissioner Michael Schirling characterized Plaintiff's conduct as a "de-escalat[ion]" technique and criticized the Investigative Report for taking "significant liberties with the facts to interpret them in the light least favorable to the responding troopers in an unfair way[.]" *Id.* at 3, 5 (internal quotation marks omitted). The June 23 Article quotes Ms. Yang as saying that it is "not unusual for a staff attorney to sway back and forth as they consider new and evolving evidence in a case." (Doc. 12-1 at 3) (internal quotation marks omitted).

Plaintiff alleges that Seven Days "focused only on [him]" despite the dozens of VSP troopers involved and "falsely highlighted [his] conduct as racist." (Doc. 106 at 57, ¶ 129.) The PSAC identifies twenty-two alleged misrepresentations or omissions in the June 23 Article that "presented [P]laintiff's involvement in a false and misleading light[,]" *id.* at 57-60, ¶ 130, and lists seventeen "omissions and representations" and eighteen ways Seven Days attempted to "spin the story[.]" *Id.* at 51-56, ¶¶ 124-25.

He claims that on July 28, 2021, VHRC through Mr. Christie "declined to meet with [him] to discuss with him the restoration of his reputation[,] . . . thereby

reaffirm[ing] [VHRC's] malice and ill-will toward [P]laintiff, and depriv[ing] [him] of the opportunity for a post-deprivation name-clearing." *Id.* at 67, ¶ 147.

### F.   Plaintiff's Alleged Damages.

Plaintiff alleges that his "personal and professional reputation has been seriously damaged[] and his career in law enforcement has practically ended as a result of [D]efendants' conduct[.]" *Id.* at 42, ¶ 106. He asserts that he "has been unable to return to work as a VSP trooper[,]" *id.* at 61, ¶ 134, but concedes he is still employed by VSP. He alleges that this is "tantamount to [his] constructive discharge as any reasonable law enforcement officer in his position would find it intolerable to continue to work as a trooper." (Doc. 106 at 61-62, ¶ 134.) He alleges he has "suffered a loss of income" and "has been seeking employment in positions that do not involve his engagement with the public while wearing a VSP uniform[,]" which offer "lower pay and benefits, and are less prestigious." *Id.* at 62, ¶ 134. He claims University of Vermont Medical Center ("UVMMC") refused to hire him as a security guard because of Defendants' false characterization of him as a "racist." *Id.* at 6, ¶ 11.

Plaintiff seeks compensatory damages "for loss of income for the balance of the career he would have enjoyed with VSP until retirement[]"; "garden variety" emotional damages for "upset, humiliation, embarrassment[,] and damage to his good name[]"; nominal damages "for the violation of his constitutional rights[]"; attorney's fees, interest, and costs; and punitive damages. *Id.* at 68, ¶ 150 (internal quotation marks omitted).

### G.   The PSAC's Additional Facts and Law.

Plaintiff alleges VHRC Defendants had the power to provide process to him prior to allegedly falsely characterizing him as a racist because they oversaw VHRC's investigation. He further contends VHRC Defendants were required to provide him a hearing or meeting before the public release of the Investigative Report. *See* 9 V.S.A. § 4552(b)(1).

Ms. Yang, as VHRC's Executive Director, was responsible for "oversee[ing] the day-to-day operations of the agency and its staff[.]" Vt. Admin Code § 11-1-1, ¶ 1(e).

She was allegedly "intimately involved" with the drafting of the Investigative Report. (Doc. 106 at 64, ¶ 140.) Mr. Christie, as VHRC's Chair, was allegedly responsible for overseeing the investigation. Plaintiff cites the following statutory duty:

> If the Commission finds reasonable grounds to believe that unlawful discrimination has occurred, but does not find an emergency, *it shall make every reasonable effort to eliminate the discrimination by informal means such as conference, conciliation, and persuasion*. If the case is disposed of by informal means in a manner satisfactory to a majority of the Commission, it shall dismiss the proceeding. If the case is not disposed of by informal means in a manner satisfactory to a majority of the Commission within six months, it shall either bring an action in Superior Court as provided in section 4553 of this title or dismiss the proceedings, unless an extension is necessary to complete ongoing good faith negotiations and all parties consent to the extension.

9 V.S.A. § 4554(e) (emphasis supplied). Plaintiff claims this duty "is mandatory, broadly stated, and not limited to engagement with only the respondent party[,]" and "[s]uch a review is contemplated by the statute to take place before the matter goes to court and litigation." (Doc. 106 at 65, ¶¶ 142-43.)

Because VHRC found reasonable grounds for discrimination and the Investigative Report found Plaintiff had discriminated, Plaintiff asserts VHRC Defendants were required to meet with Plaintiff about their findings and engage in a "conference, conciliation, and persuasion" process that would have provided a name-clearing opportunity. At that name-clearing hearing, Plaintiff could have used the affidavits of Joshua and Laura Clemmons to persuade VHRC Defendants that the racism allegations made by Dr. Clemmons were not credible.

VHRC Defendants were allegedly "directed involved" in the release of the Investigative Report to Seven Days and later defended their actions in the June 23 Article. (Doc. 106 at 66, ¶ 143.) Plaintiff asserts that the release was part of a "political ploy and self-promotion scheme" to gain favorable publicity and influence public opinion "to undermine the due process rights of law enforcement personnel implicated as racists." *Id.*

Plaintiff claims VHRC Rules "anticipate" a meeting or hearing "for witnesses to

show good cause to the Executive Director to protect their identities." *Id.* ¶ 144. He
contends that, "[a]t a minimum," this would have protected Plaintiff's and other VSP
troopers' identities. *Id.*

VHRC Rule 33 provides in part: "The identities of non-party witnesses may be
revealed as part of the investigative file upon request unless the executive director has
determined that there is good cause to protect the witnesses' identities." Vt. Admin Code
§ 11-1-1, ¶ 33 ("VHRC Rule 33"). This good cause determination allegedly "would entail
a properly noticed hearing[,] as VHRC is required under 9 V.S.A. §[ ]4553(c) to comply
with 3 V.S.A. chapter 25[,]" which has procedural requirements delineated in 3 V.S.A.
§ 809. (Doc. 106 at 66, ¶ 145.) Plaintiff asserts that "[t]he tremendous reputational and
career damage to law enforcement officers from the release of their identities" in the
Investigative Report without due process and its racist behavior accusation was good
cause for identity protection. *Id.*

Although Plaintiff alleges that due process required a pre-deprivation hearing, he
concedes that "a post[-]deprivation hearing or meeting could have mitigated [the] harm"
with "a public retraction and apology to help restore [his] reputation and the ability to
remain employed as a trooper." *Id.* at 67, ¶ 146.

## III.   VHRC Defendants' Partial Motion to Dismiss the PSAC.

### A.   Standard of Review.

A plaintiff may amend a complaint only "with the opposing party's written
consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give
leave [to amend] when justice so requires[,]" *id.*, but "[l]eave may be denied 'for good
reason, including futility, bad faith, undue delay, or undue prejudice to the opposing
party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting
*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "A proposed
amendment to a complaint is futile when it 'could not withstand a motion to dismiss.'"
*Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164-65 (2d Cir. 2015) (quoting *Lucente v.
IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The sufficiency of a complaint is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

Although VHRC Defendants' motion does not indicate it is a partial motion to dismiss, it is directed only to Counts I and II of the PSAC. Accordingly, the court addresses only those counts.

### B.    Whether the PSAC States a Procedural Due Process Liberty Interest Claim.

To state a claim for a "constitutionally cognizable deprivation of liberty without sufficient process[,]" a plaintiff must assert "(1) that [he or] she possessed a cognizable liberty interest, and (2) that the defendants deprived [him or] her of that same liberty without providing process adequate to justify their actions." *Velez v. Levy*, 401 F.3d 75,

87 (2d Cir. 2005) (footnote omitted). Generally, "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica*, 370 F.3d 322, 329-30 (2d Cir. 2004).

The "stigma plus" doctrine "provides a remedy for government defamation under federal constitutional law[]" when it occurs concurrently with the loss of a tangible interest. *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004).

> To prevail on a "stigma plus" claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.

*Id.* (citation and internal quotation marks omitted).

"While there is 'no rigid requirement that both the 'stigma' and the 'plus' must issue from the same government actor or at the same time,' they must be 'sufficiently proximate.'" *Mudge v. Zugalla*, 939 F.3d 72, 80 (2d Cir. 2019) (alteration adopted) (quoting *Velez*, 401 F.3d at 89). "This requirement will be satisfied where (1) the stigma and plus would, to a reasonable observer, appear connected—for example, due to their order of occurrence or their origin—and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." *Velez*, 401 F.3d at 89 (internal citations omitted).

"[D]eleterious effects which flow directly from a sullied reputation [are] normally . . . insufficient" to "satisf[y] the 'plus' prong" of a stigma-plus claim, including "the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation." *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994). Instead, "the damage [to one's reputation] must be accompanied by some significant deprivation[.]" *O'Neill v. City of Auburn*, 23 F.3d 685, 691 n.2 (2d Cir. 1994). Courts have found the "'deprivation of a plaintiff's property' or the 'termination of a plaintiff's government employment'" to

be burdens sufficient to satisfy the stigma-plus standard. *Mudge*, 939 F.3d at 80 (quoting *Sadallah*, 383 F.3d at 38).

With regard to adequate process, "[a] hearing must be held for the limited purpose of giving a discharged employee an opportunity to clear her name. A name-clearing hearing significantly reduces the risk that an employee will be dismissed with false stigmatizing charges placed in her personnel file." *Velez*, 401 F.3d at 91 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 633 (2d Cir. 1996)) (internal quotation marks omitted); *see also Stone v. Town of Irasburg*, 2014 VT 43, ¶ 35, 196 Vt. 356, 371, 98 A.3d 769, 779 ("To remedy a stigma-plus violation through a post-deprivation name-clearing hearing, due process requires . . . an opportunity to clear one's name before a body which is sufficiently neutral that a person has some realistic chance of success."). The Supreme Court "has squarely rejected the notion that the decision maker at a name-clearing hearing cannot be both an investigator and adjudicator." *Donato*, 985 F. Supp. at 318 (citing *Withrow v. Larkin*, 421 U.S. 35, 58 (1975) ("[T]he combination of investigative and adjudicative functions does not, without more, constitute a due process violation[.]")).

### 1.    Whether Plaintiff Was Entitled to Process Under VHRC Rule 33.

Citing VHRC Rule 33, Plaintiff asserts that VHRC Defendants oversaw the investigation and were required to hold a name-clearing meeting pursuant to 9 V.S.A. § 4553(c)[2] and 3 V.S.A. § 809(a).[3] VHRC Defendants counter that VHRC Rule 33 describes the executive director's *discretionary* decision-making, rather than establishing a mandatory good cause witness-identity protection process, and provisions under 3 V.S.A. § 800 do not apply because the decision "is not a 'contested case' as defined by 3

---

[2] "To carry out its duties under this chapter, the Commission shall adopt procedural and substantive rules in accordance with the provisions of 3 V.S.A. chapter 25." 9 V.S.A. § 4553(c).

[3] "In a contested case, all parties shall be given an opportunity for hearing after reasonable notice." 3 V.S.A. § 809(a).

V.S.A. § 801(b)(2)."[4] (Doc. 114 at 8 n.6.)

VHRC Rule 33 states that the identities of non-party witnesses in an investigative file "may be revealed . . . upon request" unless the VHRC Executive Director "has determined that there is good cause" not to do so. Vt. Admin Code § 11-1-1, ¶ 33. The plain terms of VHRC Rule 33 authorize VHRC's Executive Director to redact witness names based on his or her good cause determination. It does not entitle a party or a witness to that result, nor does it require a hearing prior to the Executive Director's decision. A stigma-plus claim is thus not available based on an alleged violation of VHRC Rule 33.

### 2. Whether Plaintiff was Entitled to Process Under 9 V.S.A. § 4554(e).

Plaintiff claims he was entitled to procedural due process under 9 V.S.A. § 4554(e), which provides that VHRC "shall make every reasonable effort to eliminate the discrimination by informal means such as conference, conciliation, and persuasion." VHRC Defendants contend that a § 4554(e) hearing is only required before VHRC files its *own* action and "implicitly dictates that [V]HRC must try to resolve the case with the entity that was found to have discriminated, not individual witnesses[,]" and that any other interpretation would produce "a clearly unworkable result." (Doc. 114 at 8.)

Contrary to VHRC Defendants' contention, § 4554(e) does not condition the requirement to "make every reasonable effort to eliminate the discrimination by informal means such as conference, conciliation, and persuasion[]" upon the filing of an action. Instead, if the "informal means" fails to prove satisfactory to a majority of the VHRC members within six months, VHRC must either file an action or dismiss, unless there is consent to extend "ongoing good faith negotiations[.]" 9 V.S.A. § 4554(e) ("If the case is not disposed of by informal means in a manner satisfactory to a majority of the Commission within six months, it shall either bring an action in Superior Court . . . or

---

[4] "'Contested case' means a proceeding, including but not restricted to rate-making and licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing." 3 V.S.A. § 801(b)(2).

dismiss the proceedings, unless an extension is necessary to complete ongoing good faith negotiations and all parties consent to the extension."). The "informal means" is thus contemplated to take place *before* an action is filed, not *if* an action is filed, and is triggered only by a finding of unlawful discrimination.

Investigator Campbell interviewed Plaintiff before the Investigative Report's release, but Plaintiff claims he was not provided the mandatory "conference, conciliation, and persuasion" process after unlawful discrimination was found.[5] *Id.* Plaintiff has therefore plausibly alleged that he was deprived of a statutory process to which he was entitled.

### 3. Whether Plaintiff's Stigma-Plus Claim is Sufficient Under *Velez*.

In the court's dismissal of Count I on reconsideration, it found that Plaintiff had plausibly alleged a "stigma" in light of the characterization of his actions in the Investigative Report as well as a "government-imposed alteration of status" in the form of "a de facto demotion at [the VSP] in light of his diminished duties and reduced income, and he has further lost a position at [UVMMC]." (Doc. 90 at 6) (citation and internal quotation marks omitted). Nevertheless, the court found Plaintiff had not satisfied the final *Velez* requirement:

> [Plaintiff] fail[ed] to plausibly allege that the VHRC Defendants had the legal authority to bring about a change in his employment or offer due process to him. Stated differently, because [VHRC Defendants] "had no legal authority to bring about [Plaintiff's] ouster" or demotion, they could not "be held legally accountable for the alleged process failure." *Velez*, 401

---

[5] To the extent VHRC Defendants argue that Plaintiff was not a party to the discrimination but merely a witness, the Investigative Report nonetheless affirmatively accused him of unprofessional conduct and unlawful discrimination. *See, e.g.*, Doc. 12-2 at 88 ("[Plaintiff] denigrated Dr. Clemmons to Barreda and disparaged her, telling him he would cover for him and that she was unreasonable."); *id.* at 93 ("[Plaintiff's] rudeness, accusatory attitude[,] and his dismissiveness of the Clemmons[es]' concerns, even though he had never met them before, strongly suggest that [Plaintiff] either already had an unfavorable opinion about Dr. Clemmons prior to his arrival, <u>or</u> that he formed one upon seeing her and her brother.") (emphasis in original); *id.* at 95 ("[Plaintiff's] treatment of Barreda and his treatment of both Clemmons[es], particularly Dr. Clemmons, is <u>not</u> evidence of professional conduct—it is evidence of pretext and it is proof of discrimination against Dr. Clemmons on the basis of race, color, and sex.") (emphasis in original).

> F.3d at 93. To the extent that Plaintiff alleges Mr. Christie "refused to
> provide [him] an opportunity to meet with [the V]HRC to discuss clearing
> his name" after the alleged deprivation, he does not allege how a name
> clearing would have altered his VSP employment status or duties. (Doc. 58-
> 4 at 46, ¶ 113.)

(Doc. 90 at 7) (fifth and sixth alterations in original). The court advised, "[i]n an amended

complaint, Plaintiff may seek to explain this causal relationship and the alleged remedies

[VHRC Defendants] could have provided him. At this juncture, he has not done so." *Id.*

Plaintiff's new allegations in the PSAC shift his theory of liability to one that

tacitly recognizes VHRC Defendants could not have impacted the terms and conditions

of his VSP employment.[6] He argues this is not dispositive because the focus of *Velez* is

on the ability to provide process. VHRC Defendants disagree and assert that "Plaintiff

lacks a nexus between the process he seeks (a name-clearing meeting with [VHRC

Defendants]) and the alleged separate state-imposed alteration of status[,]" because he

"fail[s] to explain how the [V]HRC could have provided him with process *with respect to

his employment*." (Doc. 109 at 5) (emphasis in original).

The *Velez* court focused on both the ability to provide process and the ability to

impose adverse consequences:

> None of the [members of a first group of defendants] **had the power to
> provide process to the plaintiff**. They did not undertake or oversee the
> investigation, **and they could order neither pre-removal review nor
> post-removal remedies.** As a consequence they cannot be held legally
> accountable for the alleged process failure. **The same is true as to [a
> second group of defendants] . . . [that] had no legal authority to bring
> about [the plaintiff's] ouster, for only [a certain defendant] was
> empowered to impose that "plus."** Accordingly, [the] complaint does not
> state a theory under which the [second group of defendants] can be taken to
> have deprived [plaintiff] of her "stigma-plus" liberty interest.

401 F.3d at 93 (emphasis supplied).

The Second Circuit recently recognized *Velez* does not permit a stigma-plus claim

based on a right to process alone, albeit in an unpublished decision.

---

[6] Plaintiff retains this claim for his procedural due process claim based on a property interest,
which the court addresses separately.

> [Plaintiff's] claim for damages based on her alleged loss of a protected liberty interest without due process of law cannot lie against defendants who had neither the **power to provide process** to her **nor the power to inflict the deprivation.** Only [the judicial defendants] had the power to provide process such as an investigation and a pre- or post-deprivation hearing <u>**and** to decide in what manner [plaintiff] could work as an interpreter.</u> Accordingly, we affirm the judgment of the district court dismissing [plaintiff's] stigma-plus claims against the DA Defendants.

*Walker v. Fitzpatrick*, 814 F. App'x 620, 625 (2d Cir. 2020) (emphasis supplied).

"[A] statute that merely establishes procedural requirements does not thereby create a liberty interest, because an 'expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause.'" *Rodriguez v. McLoughlin*, 214 F.3d 328, 339 (2d Cir. 2000) (quoting *BAM Hist. Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983)) (citation and internal quotation marks omitted).

> Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement. . . . The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right.

*Id.* (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)) (alteration in original). "It is the 'substantive limits on the authority of state officials,' not the 'procedural requirements,' that 'ground[]' a liberty interest." *Bangs v. Smith*, 84 F.4th 87, 100-01 (2d Cir. 2023) (quoting *BAM Hist. Dist. Ass'n*, 723 F.2d at 236) (alteration in original). To the extent Plaintiff asserts that the right to statutory process alone creates a liberty interest, that claim is in conflict with well-established law.

Since *Velez*, courts have uniformly held that the process-provider must have some control or influence over the "plus" to be liable for a stigma-plus liberty interest claim.[7]

---

[7] *See, e.g.*, *Dolcine v. Hanson*, 2021 WL 949748, at *8 (S.D.N.Y. Mar. 12, 2021) (granting summary judgment to defendants who, "[a]s individual officers with no authority over or supervision of Plaintiff, . . . 'could order neither [the] pre-removal review nor post-removal remedies' that due process required, and they 'had no legal authority to bring about [Plaintiff's suspension]'") (second and third alterations in original) (citing *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005)); *Cirulli v. Astorino*, 2015 WL 4635707, at *11 (S.D.N.Y. Aug. 3, 2015) (holding that certain defendants "cannot be held accountable for the alleged process failure[]" because "[t]here

This is consistent with the purpose of procedural due process which is to furnish a "meaningful opportunity to invoke the discretion of the decisionmaker . . . before the [adverse action] takes effect." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985).

Although Plaintiff plausibly alleges that VHRC Defendants had the power to provide him process, he does not further plausibly allege that VHRC Defendants were "empowered to impose that 'plus'" by effectuating changes in his VSP employment. *Velez*, 401 F.3d at 93; *cf. Chiaravallo v. Middletown Transit Dist.*, 561 F. Supp. 3d 257, 282 (D. Conn. 2021) (finding the plaintiff had "set[] forth evidence that [a defendant] leveraged control over [the transit district's] funding and contract in order to orchestrate [plaintiff's] immediate removal[,]" which was "authority over the termination process [that] distinguishe[d] the case at bar from *Velez*"). Reputational harm, alone, will not suffice. *See Sadallah*, 383 F.3d at 38 ("[D]eleterious effects [flowing] directly from a sullied reputation, standing alone, do not constitute a plus under the stigma plus doctrine.") (citation and internal quotation marks omitted). Plaintiff's stigma-plus claim as to VHRC Defendants is therefore insufficient as a matter of law and must be dismissed.

Based on the foregoing, the court GRANTS VHRC Defendants' motion to dismiss Plaintiff's procedural due process liberty interest claim asserted against them in their

---

is no basis to infer that [they] had the power to order pre-deprivation process or post-deprivation remedies"); *Orr v. Wisner*, 2010 WL 2667918, at *7-8 (D. Conn. June 29, 2010) (finding certain defendants' actions which "consist largely of making recommendations . . . that [Plaintiff] be suspended or fired" insufficient for a stigma-plus claim when it was undisputed that other defendants "had the 'ultimate authority' to discipline [plaintiff] and to provide him with process"); *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 270 (S.D.N.Y. 2006) (dismissing a due process liberty interest claim against an individual who made stigmatizing statements but was subject to a state law that "limit[ed] [him] to investigating abuse and recommending remedial action and does not contemplate any role for him in adjudicating an employee's employment status"); *see also Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1235-36 (11th Cir. 2022) ("[W]e agree with the district court that even if [plaintiff] had properly demonstrated stigma plus another concrete harm, it cannot show that the OIG caused that harm. . . . [T]he OIG's role is to conduct investigations and issue reports . . . [but] does not have the authority to refuse any group permission to use school board property–that power lies with MDCPS.") (footnote omitted).

individual capacities.

### C.   Whether the PSAC States a Procedural Due Process Property Interest Claim.

In Count II, Plaintiff renews his dismissed procedural due process claim against VHRC Defendants in their individual capacities based on a protected property interest. As previously asserted, he alleges that his "job as a VSP trooper was protected under state law," (Doc. 106 at 69, ¶ 154), and the Investigative Report "placed a false 'badge of infamy' on [him] as a racist" without procedural due process. *Id.* ¶ 155. He claims that his "work conditions became intolerable as he can no longer function effectively and safely as a law enforcement officer[,]" his "career in law enforcement has ended[,]" and thus his "job as a trooper was effectively taken from him" by VHRC Defendants. *Id.* at 70, ¶¶ 156-57.

Plaintiff's allegations that VHRC Defendants caused a change in his VSP employment status remain implausible. The PSAC is bereft of factual allegations that VHRC Defendants had the authority to alter the terms and conditions of his employment. The court previously dismissed Count II for this reason and that is the law of the case. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) ("[T]he doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (alteration adopted) (citation and internal quotation marks omitted); *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'") (citation omitted); *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009), *aff'd*, 374 F. App'x 71 (2d Cir. 2010) (observing that a trial court decision "remains the law of the case[]" unless reversed on appeal).

Under the law of the case, amendments to pleadings must propose a new ground for liability rather than merely reassert claims that have been dismissed. *See Perkins v.*

*Perez*, 2020 WL 248686, at *4 (S.D.N.Y. Jan. 16, 2020) (alterations adopted) ("Where an amended complaint 'is in large part identical to a plaintiff's first complaint, the law of the case doctrine counsels against reconsideration of' a court's earlier dismissal.") (quoting *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015), *aff'd*, 626 F. App'x 20 (2d Cir. 2015)); *Barkai v. Neuendorf*, 2024 WL 710315, at *6 (S.D.N.Y. Feb. 21, 2024) ("The mere filing of an amended complaint, repleading these claims, does not entitle [p]laintiff to relitigate them absent 'extraordinary circumstances'.") (citing *Weslowski*, 96 F. Supp. 3d at 315-16).

Because of the law of the case, the court GRANTS VHRC Defendants' motion to dismiss Plaintiff's Count II procedural due process property interest claim asserted against them in their individual capacities. For the same reason, any claim that is similarly a reiteration of a dismissed claim is DISMISSED *sua sponte*.

## IV.   VHRC Defendants' Request for Partial Final Judgment.

VHRC Defendants request final judgment in their favor pursuant to Fed. R. Civ. P. 54 on Counts I, II, and VI in their individual capacities and all counts in their official capacities. Because the court has not dismissed Plaintiff's substantive due process claim (Count III), invasion of privacy claim (Count IV), or defamation claim (Count V) to the extent the claims arise out of the release of the Investigative Report to Seven Days, it considers this a request for partial final judgment under Rule 54(b).

> Rule 54(b) authorizes a district court to enter partial final judgment when three requirements have been satisfied: (1) there are multiple claims or parties, (2) at least one claim or the rights and liabilities of at least one party has been finally determined, and (3) the court makes an express determination that there is no just reason for delay of entry of final judgment as to fewer than all of the claims or parties involved in the action.

*Linde v. Arab Bank, PLC*, 882 F.3d 314, 322-23 (2d Cir. 2018) (alterations adopted) (citation and internal quotation marks omitted).

"[I]n deciding whether there are no just reasons to delay the appeal of individual final judgments in [a] setting such as this, a district court must take into account judicial administrative interests as well as the equities involved." *Curtiss-Wright Corp. v. Gen.*

*Elec. Co.*, 446 U.S. 1, 8 (1980). A court should also "consider such factors as whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Id.* (footnote omitted).

Even where the adjudicated and remaining claims may be decided separately, an entry of partial final judgment "should be used only in the infrequent harsh case," and only if there exists "some danger of hardship or injustice through delay which would be alleviated by immediate appeal[.]" *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 41 (2d Cir. 2003) (internal quotation marks omitted) (quoting *Cullen v. Margiotta*, 618 F.2d 226, 228 (2d Cir. 1980) (per curiam)). A danger of hardship exists "where a plaintiff might be prejudiced by a delay in recovering a monetary award, or where an expensive and duplicative trial could be avoided if, without delaying prosecution of the surviving claims, a dismissed claim were reversed in time to be tried with the other claims[.]" *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 16 (2d Cir. 1997) (internal quotation marks and citations omitted).

"The matter of whether to direct the entry of a partial final judgment in advance of the final adjudication of all of the claims in the suit must [also] be considered in light of the goal of judicial economy as served by the 'historic federal policy against piecemeal appeals.'" *O'Bert*, 331 F.3d at 40-41 (quoting *Curtiss-Wright Corp.*, 446 U.S. at 8). "Respect for that policy requires that the court's power . . . be exercised sparingly[,]" bearing in mind "that '[n]ot all' dismissals of 'individual claims should be immediately appealable, even if they are in some sense separable from the remaining unresolved claims.'" *Id.* at 41 (quoting *Curtiss-Wright Corp.*, 446 U.S. at 8). "Within this framework, the determination of whether to grant Rule 54(b) certification is committed to the discretion of the district court and will be set aside only for an abuse of discretion." *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991).

Plaintiff asserted three 42 U.S.C. § 1983 claims and three state law tort claims against VHRC Defendants in their official and individual capacities, and the court

dismissed Counts I, II, and VI against them in their individual capacities and all claims asserted against them in their official capacities. Each of Plaintiff's claims arise from the allegedly wrongful release of the Investigative Report to Seven Days. The substantial factual overlap between the dismissed claims and the remaining claims weighs against the entry of partial final judgment in VHRC Defendants' favor. *See Hogan v. Consol. Rail Corp.*, 961 F.2d 1021, 1026 (2d Cir. 1992) ("[T]he interrelationship of the dismissed and surviving claims is generally a reason for *not* granting a Rule 54(b) certification, not a reason for granting it[.]") (emphasis in original).

Although the court previously granted partial final judgment in favor of VHRC, which has been dismissed from this action on sovereign immunity grounds, *see* Doc. 66 at 24, claims against VHRC Defendants remain. An entry of partial final judgment thus would fail to "limit piecemeal litigation" and "maximize judicial efficiency." *Cuoco v. Moritsugu*, 222 F.3d 99, 110 (2d Cir. 2000); *see also Advanced Magnetics, Inc.*, 106 F.3d at 17 (observing that judicial efficiency is better served when "only one jury, rather than two, will be required to become familiar with . . . the events surrounding the [case]"). There are no "countervailing equities that would justify partial judgment[.]" *Horn v. Med. Marijuana, Inc.*, 2019 WL 4871499, at *2 (W.D.N.Y. Oct. 3, 2019).

VHRC Defendants also do not clearly "articulate[] any unusual hardship or injustice that [they], or any other party, would endure if required to await, in accordance with normal federal practice, the disposition of the entire case before obtaining a final judgment" on the dismissed claims. *Timperio v. Bronx-Lebanon Hosp. Ctr.*, 2020 WL 9211177, at *3 (S.D.N.Y. Mar. 9, 2020) (alterations adopted) (citation and internal quotation marks omitted).

Pursuant to Fed. R. Civ. P. 54(b), VHRC Defendants' request for partial final judgment in their favor is DENIED WITHOUT PREJUDICE.

24

## CONCLUSION

Based on the foregoing, the court GRANTS IN PART and DENIES IN PART Plaintiff's motion to amend, GRANTS VHRC Defendants' motion to dismiss Counts I and II, DISMISSES reiterated claims against VHRC Defendants *sua sponte*, and DENIES WITHOUT PREJUDICE VHRC Defendants' motion for partial final judgment. (Doc. 109.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _10th_ day of June, 2024.

Christina Reiss, District Judge
United States District Court

25